## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **Vyrian Inc.,** | |
| *Plaintiff*, | |
| **v.** | **CASE NO.** |
| **Abdul Tayyeb Datarwala, Husain Datarwala, and Amatullah Alibhai,** | **Jury Trial Demanded** |
| *Defendants*. | |

## <u>ORIGINAL COMPLAINT</u>

Plaintiff Vyrian Inc. ("Plaintiff" or "Vyrian") files this Complaint against Defendants Abdul Tayyeb Datarwala, Husain Datarwala, and Amatullah Alibhai (collectively "Defendants") and in support states as follows:

## <u>NATURE AND SUMMARY OF THE COMPLAINT</u>

1.     This civil action arises from a multi-year scheme through which former Vyrian employees— Abdul Tayyeb Datarwala ("Abdul"), his brother Husain Datarwala ("Husain"), and Abdul's wife, Amatullah Alibhai ("Amatullah")—orchestrated and executed the diversion of company funds under the guise of operating Vyrian's India Business Unit. The scheme relied on systematically inflated invoices, falsified payroll and statutory charges, coded and opaque record-keeping, and unauthorized intrusions and deletions into Vyrian's email systems to surveil executives, obstruct oversight, and destroy evidence. Vyrian's losses exceed $6.2 million.

2.     Vyrian asserts claims for conspiracy to violate the Computer Fraud and Abuse Act (18 U.S.C. § 1030(b)) against all Defendants, direct CFAA violations (18 U.S.C. § 1030(a)) against Abdul,

and Texas-law claims for fraud, breach of fiduciary duty, breach of contract, and civil conspiracy, together with equitable claims constructive trust/equitable relief. Vyrian seeks compensatory and exemplary damages, statutory remedies (including attorneys' fees under 18 U.S.C. § 1030(g)), injunctive relief to preserve and trace assets, and imposition of a constructive trust over all traceable proceeds.

## **PARTIES**

3.     Plaintiff Vyrian Inc. is a Nevada corporation with its headquarters and principal place of business at 3931 Ann Arbor Dr., Houston, TX 77036. Vyrian distributes technology and electronic components globally.

4.     Defendant Abdul Datarwala was Vyrian's Vice President of Global Trading and oversaw the India Business Unit.  Abdul Datarwala enjoyed a close personal relationship with Vyrian CEO, Sath Sivasothy, grounded in Abdul Datarwala's ties to the Dawoodi Bohra community, which had helped Sivasothy and his family when they first came to the United States. Abdul Datarwala may be served at his last known address, 3434 Harper Meadow Lane, Missouri City, TX 77459.

5.     Defendant Husain Datarwala is Abdul Datarwala's brother and was employed by Vyrian as "Key Manager" of Vyrian's India Business Unit, OT Solutions Tech Pvt. Ltd. Husain Datarwala is believed to reside in India. Service upon Husain Datarwala may be effected under Federal Rule of Civil Procedure 4(f)(1) via the Hague Convention, or by alternative means upon motion and court approval.

6.     Amatullah Alibhai is Abdul Datarwala wife and was employed as Vyrian's project manager. During her employment she interfaced with India-based teams and benefitted from the scheme described below. Amatullah Alibhai may be served at her last known address, 3434 Harper Meadow Lane, Missouri City, Texas 77459.

## JURISDICTION AND VENUE

7.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

8.    The Court has supplemental jurisdiction over the related state-law claims under 28 U.S.C. § 1367(a) because they arise from the same nucleus of operative facts.

9.    The Court has personal jurisdiction over Abdul Tayyeb Datarwala and Amatullah Alibhai because they resided in Fort Bend County, Texas during the relevant period and purposefully directed tortious conduct at a Texas company headquartered in this District.

10.    The Court has specific personal jurisdiction over Husain Datarwala because he purposefully directed the acts at issue toward Texas, including coordinating and transmitting fraudulent invoices and payment instructions to Houston, Texas, administering funds for a Texas company, and traveling to Texas in February 2025 to further the scheme.

11.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Houston, Texas, including receipt and processing of the challenged invoices, the transmission of funds, operation and monitoring of Plaintiff's computer systems, and the resulting injury to Plaintiff.

## FACTUAL ALLEGATIONS

### A.    The India Business Unit

12.    Vyrian formed its India Business Unit in 2020 to reduce costs and streamline operations.

13.    To formalize and document the structure and oversight of its India Business Unit in response to aerospace quality compliance requirements, Vyrian executed a Memorandum of Understanding ("MOU") dated October 3, 2022, which documented then existing policies and procedures. Exhibit A ("MOU").

14.    The MOU was executed by Sath Sivasothy, CEO of Vyrian, and Husain Datarwala, in his

capacity as Key Manager of The India Business Unit. The document was specifically designed to address and close a quality compliance nonconformance finding during Vyrian's AS9120B and AS6081 audit, and was intended to serve as objective evidence of Vyrian's exclusive control and ownership over its Indian operations.

15.    The MOU is clear and unambiguous in establishing that OT Solutions was a fully captive, non-commercial business unit, created and wholly funded by Vyrian for the limited purpose of providing ministerial employer-of-record and administrative support services in India. Key provisions include:

- **Vyrian's Exclusive Ownership and Control**. The MOU states that "the entirety of the India Business Unit, Administrative Employer of Record, and all related operations are wholly owned and controlled by Principal [Vyrian] and continue to be solely financed by Principal to ensure exclusivity and compliance with international law" (Recital 6, MOU at 2).

- **No Independent Commercial Authority or Profit Motive.** Section 2.1.2 expressly prohibits Husain or OT Solutions from "leveraging the India Business Unit or any Principal resources for independent commercial interests, activities, or personal gain."

- **Express Fiduciary Obligations.** Section 3.3 states that "all management and supervisory personnel shall operate in good faith and with due diligence" and must "at all times act in the best interest of the Principal."

- **Abdul Datarwala's role as Vice President of Operations.** Abdul Datarwala was formally designated as Vice President of Operations/Global Trade with full authority to "establish, supervise, and audit all India Business Unit and

Administrative Employer of Record operations, finances, systems, and personnel" (§ 3.1.1.1(b), MOU at 4).

- **Husain Datarwala's role as Key Manager.** Husain Datarwala was appointed Key Manager "responsible for the Administrative Employer of Record's day-to-day office administration," payroll execution, lease management, and tax obligations—but only "in accordance with directives from the Principal's Vice President" (§ 3.1.2.1(b), MOU at 5–6).

- **Pass-Through Billing and Expense Controls.** Section 7 of the MOU imposes detailed accounting protocols. Invoices were required to reflect "only direct pass-through costs" and were prohibited from including "markups, margins, modification, or additional charges" (§ 7.6.2, MOU at 15).

- **Ownership of Work Product and Equipment.** All work product, systems, and records created by OT Solutions or its personnel remained the "sole and exclusive property of Vyrian" (§ 5.6, MOU at 10). All company equipment, tools, and devices were likewise to be returned immediately upon termination (§§ 6.2–6.8, MOU at 14). In 2022, in response to a negative audit finding by one of Vyrian's third party auditors, Vyrian documented its existing practices and relationship to the India Business Unit in a Memorandum of Understanding. See Memorandum Of Understanding, Exhibit A.

**B.    The Conspiracy and its Objects.**

16.    From 2020 through early 2025, Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai executed a multiyear conspiracy to defraud Vyrian. The scheme involved submitting inflated monthly spreadsheets and invoices for Vyrian's India Business Unit, OT Solutions Tech Pvt. Ltd..

These monthly spreadsheets and invoices overstated salaries, commissions, lease costs, and statutory tax/Provident Fund charges, all for the personal enrichment of Abdul, Husain, and Amatullah. Attached as exhibits to this Complaint, and incorporated by reference, are monthly payment emails (Exhibit B), fraudulent spreadsheets from 2020 – 2025 (Exhibit C), and a sample of employee paystubs and offer letters for what the employees were actually paid (Exhibit D).

17.    Additionally, in furtherance of the conspiracy, the co-conspirators covertly reconfigured Vyrian's Microsoft Exchange "outgoing spam filtering" to copy all outbound corporate emails—including those of the CEO, CFO, and HR Director—into a mailbox they controlled, then directly infiltrated executive mailboxes and, in the weeks before termination, deleted the entirety of Amatullah's mailbox as well as approximately 445 emails and related documents tied to the scheme. These acts were executed without authorization and with the purpose of anticipating oversight, concealing the fraud, and destroying proof.

18.    While the conspiracy lasted, Vyrian remitted over $9.5 million to OT Solutions Tech Pvt. Ltd. and related alter egos; approximately $6.2 million of that amount is estimated to be fraudulent.

### B. The Manner and Means of the Conspiracy

19.    Each month, Abdul and Husain prepared itemized expense spreadsheets for the India Business Unit, which included line items for salaries, taxes, office leases, bonuses, commissions, and miscellaneous costs. These spreadsheets were submitted directly to Vyrian's CFO for approval and payment. Exhibit B (Emails from 2020-25 from Abdul and Husain requesting payment). Abdul and Husain met with Vyrian's CEO over Zoom during the first week of each month to review the month's submitted invoices. Exhibit C (Excel files from 2020-25 showing employee wages and expenses). Abdul leveraged and exploited his status as a trusted senior officer to ensure that the fraudulent invoices were processed without question.

20.    The fraud involved multiple layers of misrepresentation causing Vyrian to regularly make

improper payments, for example:

- **Overstatement of employee compensation**. India Business Unit employees were often paid just 25% to 35% of the amounts billed to Vyrian. For example, during a November 2023 video call, Abdul Datarwala claimed he had directly spoken to a new hire ("DM-03") and negotiated the employee's part-time salary to $2,200 and full-time salary to just over $4,000. The following month, the new employee appeared on invoices at $4,850 monthly, a rate that continued through 2025. The employee's bank statements later revealed that the employee had never received more than $1,700 per month regardless of part-time or full-time status, despite what Abdul approved for Vyrian to be charged monthly. In another example, a sales employee ("SE-09") was reported as receiving $1,900 per month, but his paystub revealed actual monthly payments of less than $660. The Datarwalas knowingly misrepresented compensation rates to Vyrian while systematically pocketing the substantial difference. The same pattern held across dozens of employees for years. See Exhibit D (Sample of 11 employee paystubs and offer letters for what they were actually paid).

**Wage Theft Based on 11 Representative Business Unit Employees**

| | Employee ID | Invoiced Salary (USD) | Datarwala Brothers Paid | Wage Theft USD | Delta |
|---|---|---|---|---|---|
| Ujjwal Mourya | SE-12 | 2,650.00 | 1,148.24 | 1,501.76 | 43% |
| Dhananjay Godse | SE-09 | 1,900.00 | 654.50 | 1,245.50 | 34% |
| Shubham Prajapathi | SE-64 | 1,850.00 | 516.71 | 1,333.29 | 28% |
| Shashank Tripathi | SE-08 | 2,050.00 | 688.94 | 1,361.06 | 34% |
| Vikas Mani | CS-02 | 2,400.00 | 1,090.83 | 1,309.17 | 45% |
| Aditya Vardhan | CS-07 | 1,900.00 | 631.53 | 1,268.47 | 33% |
| Abhijeet Singh | PE-01 | 2,350.00 | 723.39 | 1,626.61 | 31% |
| Akshay Majalikar | PE-03 | 2,250.00 | 930.07 | 1,319.93 | 41% |
| Heena Rani | AF-02 | 2,750.00 | 735.35 | 2,014.65 | 27% |
| Rohan Goyal | AF-03 | 2,700.00 | 1,010.45 | 1,689.55 | 37% |
| Naveen Sharma | DM-03 | 4,850.00 | 1,664.94 | 3,185.06 | 34% |

- **Ghost Payroll**: Employee end-of-employment notice periods were also manipulated to extract additional funds from Vyrian. For example, in a meeting with Vyrian's CEO on February 19, 2025, the Datarwalas insisted that Vyrian pay a three-month notice payment of $12,000 for employee (SE-113) based on the $4,000 per month salary Vyrian paid him. However, the employee's paystubs only showed a monthly payable salary of $2,350 per month and he was subject to only a two-month notice period. This manipulation was a scheme to induce Vyrian to disburse additional fraudulent payments.

- **Fake or Inflated Tax Charges**: The invoices included line items for statutory taxes and Provident Fund payments (India's mandatory employee retirement savings contributions) that were never remitted to Indian authorities.

- **Commissions That Were Never Paid**: Between 2024 and 2025, over $176,000 in commissions were billed to Vyrian by the Datarwala brothers for payment to India Business Unit employees. Employees' bank statements confirm that they never received any such bonuses.

- **Lease Inflation**: Office leases were priced at above-market rates. The Datarwalas'

pocketed the difference.

21.    The chart below provides examples for when, who and how the fraudulent invoices were sent and broken up between the various shell entities. See January and February 2025 remittances below. This scheme was implemented since at least October 2020.

**JAN and FEB 2025 Remittances to OT Solutions (Vyrian India Business Unit) in USD**

| Invoice Month | Year | Requester | Date | OT Company codes | Amount | Wired On | Receiving Bank |
|---|---|---|---|---|---|---|---|
| January | 2025 | Abdul | 1/2/25 | OT Solutions | $52,908.00 | 1/2/25 | IDFC First Bank (India) |
| January | 2025 | Abdul | 1/6/25 | Webwise | $15,600.00 | 1/6/25 | IDFC First Bank |
| January | 2025 | Abdul | 1/8/25 | Nextech | $13,420.00 | 1/8/25 | AU Small Finance Bank LTD |
| January | 2025 | Abdul | 1/8/25 | Infotech | $17,070.00 | 1/8/25 | CITBANK NA |
| January | 2025 | Abdul | 1/6/25 | Modern | $20,610.00 | 1/6/25 | IDFC First Bank |
|  |  |  |  | Jan Wire Total | $119,608.00 |  |  |

| Invoice Month | Year | Requester | Date | OT Company codes | Amount | Wired On | Receiving Bank |
|---|---|---|---|---|---|---|---|
| February | 2025 | Husain | 2/3/25 | OT Solutions | $48,960.00 | 2/3/25 | IDFC First Bank (India) |
| February | 2025 | Husain | 2/4/25 | Webwise | $16,321.00 | 2/4/25 | IDFC First Bank |
| February | 2025 | Husain | 2/6/25 | Nextech | $20,455.00 | 2/6/25 | CITBANK NA |
| February | 2025 | Husain | 2/6/25 | Infotech | $14,688.00 | 2/6/25 | CITBANK NA |
| February | 2025 | Husain | 2/4/25 | Modern | $21,115.00 | 2/4/25 | IDFC First Bank |
|  |  |  |  | Feb Wire Total | $121,539.00 |  |  |

22.    On February 19, 2025, the scheme unraveled only after Kawaljeet Singh, an employee came forward during a Zoom call and disclosed his paystub that was grossly inconsistent with his invoiced salary on file. This employee disclosure triggered an internal audit of the India Business Unit's finances and discovery of additional employees that had significant differences between their actual pay and their invoiced salary submitted by Abdul and Husain.

**C.  Involvement of Husain and Amatullah Datarwala**

22.    Husain Datarwala was not merely a passive administrator in the multi-year scheme. He was an active co-conspirator who oversaw daily payroll operations, bank transfers, and all Business Unit administrative tasks that required a physical presence on the ground in India. Husain appeared on monthly Zoom video calls between 2022-2025 where he supported Abdul Datarwala's

fraudulent statements regarding invoice charges and lobbied for additional funding for the India Business Unit. Husain Datarwala sent or was copied on the email submission of every fraudulent invoice to Vyrian between 2020 and 2025.

23.    Amatullah Alibhai was not simply an unwitting employee caught in her family's scheme. She was a knowing beneficiary and deliberate accomplice who profited from and helped perpetuate the fraud. As a project manager from February 2022 to September 2023, Amatullah worked in close proximity to the fraudulent scheme. She liaised with the India team and was copied on communications related to web development projects performed by the Business Unit. She lived with Abdul during the entire period of the family scheme and hosted multiple lavish weddings— one in India and one in Dubai—clearly receiving benefits from the misappropriated funds. Furthermore, Defendants knowingly and purposefully deleted her entire email inbox in an attempt to cover their tracks.

24.    On learning of the impending litigation, Amatullah actively participated in Abdul's efforts to dispose of assets acquired through fraud by jointly listing their residential properties for sale in June and July 2025. The properties included 3434 Harper Meadow Missouri City, TX, (MLS #5054722) and a neighboring property at 3534 Lake Landing, Missouri City TX (MLS # 92213365), both listed through the Houston Association of Realtors. The synchronized listing of multiple homestead properties when litigation is imminent appears to be a coordinated effort by Amatullah and Abdul to liquidate and place fraudulently obtained assets beyond the reach of potential recovery.

### E.    Computer Fraud and Abuse.

25.    In January 2025, just prior to his termination, Microsoft data logs revealed that Abdul engaged in a large-scale deletion of emails and records, including messages implicating him, Husain and Amatullah in fraudulent activity.

26.      Company data logs also reveal that, potentially for years, Abdul unlawfully intercepted and rerouted all outbound emails—including private executive correspondence—into his own email folders. While Abdul held limited administrator privileges for the India Business Unit's OT Solutions' email systems, these privileges did not apply to Vyrian's separate email infrastructure. Abdul knowingly reconfigured Vyrian's Microsoft Exchange spam monitoring settings to intercept Vyrian's email traffic and effectively cause copies of all outgoing Vyrian emails to be routed to his personal email folders. This unauthorized configuration allowed him to systematically monitor all Vyrian correspondence, including executive communications, without directly logging into inboxes and triggering detection.

27.      Data logs reveal that on several other occasions, Abdul directly infiltrated the mailboxes of Vyrian's CEO, CFO, and HR managers without permission, activity that was well outside the scope of his employment and exceeded his legitimate authority as Vice President of Global Trading.

28.      Abdul's unauthorized access to Plaintiff's computer systems, including his surreptitious monitoring of executive email accounts, rerouting of outbound communications to himself, and deletion of digital records, was undertaken in furtherance of and to conceal the broader fraudulent scheme carried out by all three Defendants. Abdul's CFAA violations were an integral mechanism for controlling access to information, impeding oversight, and preventing detection of the scheme in which Husain and Amatullah were active participants.

## CAUSE OF ACTION NO. 1: CONSPIRACY TO VIOLATE THE COMPUTER FRAUD AND ABUSE ACT

## (18 U.S.C. § 1030(b) et seq.)

## (Against Defendants Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai)

29.      Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth

herein.

30.    **Statutory basis & private right of action.** This is a civil claim under 18 U.S.C. § 1030(b) and 18 U.S.C. § 1030(g) for conspiracy to violate the Computer Fraud and Abuse Act ("CFAA"). Plaintiff alleges that the conduct involved at least one factor in § 1030(c)(4)(A)(i)(I)—including an aggregate "loss" exceeding $5,000 in a one-year period—as further described below.

31.    **Protected computers.** At all relevant times, Plaintiff owned and operated Microsoft 365/Exchange email tenants hosted in the United States and used in interstate and foreign commerce for executive communications, finance, HR, and cross-border operations. These systems are "protected computers" within the meaning of § 1030(e)(2)(B).

32.    **The conspirators and agreement.** Beginning no later than 2024 and continuing into 2025, Abdul, Husain, and Amatullah knowingly combined, confederated and agreed to commit a CFAA offense by facilitating and concealing a multimillion-dollar fraud scheme through unauthorized and/or exceeding-authorization access to Plaintiff's protected computers and data. Their common objective was to obtain and retain things of value—including confidential business information and money routed through inflated invoices and shell entities—and to obstruct oversight and detection.

33.    **Predicate CFAA offense.** The conspiracy's object included a violation of § 1030(a)(4) (accessing a protected computer knowingly and with intent to defraud, without authorization or by exceeding authorized access, and by means of such conduct furthering the intended fraud and obtaining anything of value), and, in the alternative or in addition, § 1030(a)(2)(C) (obtaining information from a protected computer without authorization or exceeding authorized access).

34.    **Overt acts in furtherance of the conspiracy.** In furtherance of the agreement, and to facilitate and conceal the fraud Abdul:

a. Covertly reconfigured Microsoft Exchange spam filter rules to automatically forward all outgoing emails company-wide — including those from the CEO, CFO, and HR Director — into folders controlled by him. This gave him continuous and surreptitious access to confidential executive communications, including audit and business planning, fraud concerns, and financial oversight.

b. In September 2024, directly infiltrated the email account of Vyrian's CEO on six different occasions: 9/4, 9/23, 9/25, 9/26, 9/27, and 9/29.

c. On November 16, 2024 between the hours of 1:08 AM and 1:23 AM, infiltrated the email accounts of Vyrian's CEO, CFO, and HR Director and monitored their email communications without authorization.

d. In December 2024 and January 2025 — just weeks before his termination — deleted hundreds of emails and corporate documents, including invoice spreadsheets, approval trails, and correspondence that implicated him and his co-conspirators in the India Business Unit fraud.

e. Deleted the entirety of Amatullah's email account.

35.    **Unauthorized / exceeds-authorized-access.** Abdul's interception rule and mailbox intrusions were undertaken without authorization or exceeded authorized access because his role on the Vyrian Tenant was limited to basic account provisioning and password resets at the CEO's direction—not monitoring or accessing executive mailboxes or re-routing company-wide mail. He manipulated Threat Management and EAC settings to place himself in the mail-flow path and repeatedly toggled mailbox permissions to mask access.

36.    **Furthering the intended fraud; "anything of value."** By means of the unauthorized access, the conspirators furthered the intended fraud by surveilling executive oversight efforts,

preempting audit scrutiny, timing and defending inflated invoices, and destroying evidence; they thereby obtained "things of value," including confidential business information and the ability to extract and retain money through continued fraudulent billing.

37.    **Loss and § 1030(g) factor.** Plaintiff suffered "loss" as defined in § 1030(e)(11) exceeding $5,000 in a one-year period, including third-party forensic review, Exchange log analysis, incident response, system reconfiguration, permission remediation, and related investigative labor reasonably necessary to assess, contain, and remediate the intrusion. These losses occurred within a continuous 1-year window.

38.    **Causation.** The losses alleged were proximately caused by the conspiracy and its overt acts because such expenditures were reasonably necessary to investigate and remediate the unauthorized access, restore systems, and respond to the concealment and evidence-destruction efforts that enabled continued fraudulent extractions.

39.    **Joint and several liability.** Each Defendant is jointly and severally liable for all civil damages recoverable under § 1030(g) resulting from the conspiracy and from any predicate CFAA violation committed in furtherance of the conspiracy, irrespective of which conspirator performed the direct access.

## CAUSE OF ACTION NO. 2: VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT

## (18 U.S.C. §§ 1030(a)(2)(C) and (a)(4))

## (Against Defendant Abdul Datarwala)

40.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

41.    This cause of action is brought under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, which prohibits intentional, unauthorized access to protected computers, and the

knowing destruction, transmission, or misuse of data causing damage or loss. Plaintiff seeks civil relief pursuant to 18 U.S.C. § 1030(g) for violations of, inter alia, 18 U.S.C. § 1030(a)(2)(C) and § 1030(a)(4).

42.    At all relevant times, Vyrian Inc. maintained a secure, cloud-based Microsoft Exchange email platform and administrative system, hosted in the United States and used in interstate and foreign commerce. This included: 1) Internal and executive email communications (CEO, CFO, HR Director); 2) Financial audit files and accounting records; 3) Invoicing, remittance, and operations correspondence across U.S.–India channels; 4) Personnel data, vendor records, and bank instruction spreadsheets. These systems qualify as "protected computers" as defined in 18 U.S.C. § 1030(e)(2)(B).

43.    Defendant Abdul Datarwala, while serving as Vyrian's Vice President of Global Trading, was granted limited administrative access to coordinate India-based operations. However, he was not authorized to access, intercept, monitor or delete the internal email accounts of Vyrian's U.S. executives, nor to modify the company's mail routing settings for corporate-wide surveillance or deletion purposes, and nor to access or alter corporate records for any purpose other than legitimate business needs.

44.    In at least June 2024 through early 2025, Abdul exceeded his authorized access and intentionally manipulated the company's Microsoft Exchange system, by:

   a. **Rerouting Outbound Emails**: Abdul covertly reconfigured Microsoft Exchange spam filter rules to automatically forward all outgoing emails company-wide — including those from the CEO, CFO, and HR Director — into folders controlled by him. This gave him continuous and surreptitious access to confidential executive communications, including audit and business planning, fraud concerns, and financial

oversight for the purpose of obtaining information from a protected computer without authorization in furtherance of a scheme to defraud and to obtain things of value, including advance knowledge of oversight actions.

b. **Mailbox Infiltration**: Using unauthorized administrator tools or access credentials, Abdul directly accessed the mailboxes of Vyrian's CEO, CFO, and HR Director. These actions violated Vyrian's internal access controls and bypassed ordinary safeguards. The unauthorized access included monitoring flagged terms, attachments, and sender-recipient patterns tied to audit discussions. Specifically, in September 2024, Abdul Datarwala directly infiltrated the email account of Vyrian's CEO on six different occasions: 9/4, 9/23, 9/25, 9/26, 9/27, and 9/29, and conducted his unauthorized surveillance outside of normal business hours. Again, on November 16, 2024 between the hours of 1:08 AM and 1:23 AM, Abdul Datarwala infiltrated the email accounts of Vyrian's CEO, CFO, and HR Director and monitored their email communications without authorization.

c. **Mass Deletion of Records**: In December 2024 and January 2025 — just weeks before his termination — Abdul deleted hundreds of emails and corporate documents, including invoice spreadsheets, approval trails, and correspondence that implicated him in the India Business Unit fraud. Internal audit logs show unusual spikes in deletion activity tied to Abdul's credentials. Datarwala deleted approximately 445 email communications between December 30, 2024 and January 21, 2025 as well as the entirety of Amatullah's inbox.

45.    These actions were committed knowingly and without authorization, and were not within the scope of Abdul's job responsibilities.

46.     Abdul's intent in accessing and manipulating the protected systems was to: conceal the ongoing fraudulent scheme being conducted through OT Solutions and affiliated vendor shell entities; obstruct internal investigations into payroll fraud, inflated commissions, and missing tax payments; anticipate and neutralize oversight actions by monitoring executive planning emails and HR correspondence; destroy evidence before discovery or termination; and prevent Vyrian from uncovering over $6.2 million in embezzlement and false invoicing. Such conduct was undertaken with intent to defraud and in furtherance of obtaining things of value not otherwise available to him.

47.     These acts were committed with fraudulent and malicious intent and were instrumental to the success and concealment of Defendant's fraudulent conduct.

48.     As a direct result of Abdul's unauthorized access, Vyrian suffered losses well in excess of $5,000 during a one-year period, including: 1) forensic investigation costs, including Microsoft audit log recovery, spam filter rule tracking, and email server diagnostics; and 2) HR and IT response expenses associated with investigating mailbox infiltration and deletion.

## CAUSE OF ACTION NO. 3: FRAUD CONSPIRACY

### (Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai)

49.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

50.     Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai combined, confederated and agreed to defraud Plaintiff Vyrian Inc., through the coordinated submission and processing of fraudulent invoices, misappropriation of payroll and operating funds, and concealment of their misconduct.

51.     Defendants Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai knowingly agreed and conspired to commit the fraudulent acts alleged in Count 4, including but not limited to the

submission to Plaintiff's management team in Houston of the fraudulent Excel spreadsheets described in ¶¶ 20-22 and Exhibits B and C.

52.     Defendants committed numerous overt and unlawful acts in furtherance of their joint scheme to defraud Vyrian through submission and approval of fraudulent invoices by overstating payroll, bonuses, taxes, and leases (Exhibit B); and electronic surveillance and deletion of internal emails by Abdul to monitor Vyrian executives and preempt discovery.

53.     For example, in January 2025, Abdul Datarwala emailed Vyrian's CFO, Tony Sivasothy, and CEO, Sath Sivasothy, directing that five separate fraudulent invoices be paid to the following entities:

- **January 2, 2025** – OT Solutions: $52,908.00 (Receiving Bank: IDFC First Bank – India)

- **January 6, 2025** – Webwise: $15,600.00 (Receiving Bank: IDFC First Bank – India)

- **January 6, 2025** – Modern: $20,610.00 (Receiving Bank: IDFC First Bank – India)

- **January 8, 2025** – Infotech: $17,070.00 (Receiving Bank: Citibank N.A.)

- **January 8, 2025** – Nextech: $13,420.00 (Receiving Bank: AU Small Finance Bank Ltd.)

54.     On each of these payment requests, Abdul copied Husain Datarwala. The invoices—totaling $119,608.00—were approved and paid by Vyrian the same day they were requested.

55.     In February 2025, Husain Datarwala submitted similar fraudulent payment requests to Tony and Sath Sivasothy, for the following entities:

- **February 3, 2025** – OT Solutions: $48,960.00 (Receiving Bank: IDFC First Bank – India)

- **February 4, 2025** – Webwise: $16,321.00 (Receiving Bank: IDFC First Bank – India)

- **February 4, 2025** – Modern: $21,115.00 (Receiving Bank: IDFC First Bank – India)

- **February 6, 2025** – Nextech: $20,455.00 (Receiving Bank: Citibank N.A.)

- **February 6, 2025** – Infotech: $14,688.00 (Receiving Bank: Citibank N.A.)

56.    On each of these payment requests, Husain copied Abdul Datarwala. The invoices—totaling $121,539.00—were likewise approved and paid by Vyrian on the same day they were submitted.

57.    These invoices were fraudulent in that they sought payment for inflated or fictitious expenses, and the payment routing through multiple alter-ego entities concealed the true nature and destination of the funds.

58.    As an example, in January and February 2025, the Datarwala Brothers submitted invoices to Vyrian for the 11 employees listed below, representing gross monthly salaries far higher than the amounts those employees actually received. For example, Ujjwal Mourya was invoiced at $2,650.00 per month while his February 2025 paystub shows he received only $1,148.24—an undisclosed difference of $1,501.76 (43%). This same misrepresentation occurred for each employee in the sample:

**Wage Theft Based on 11 Representative Business Unit Employees**

| | Employee ID | Invoiced Salary (USD) | Datarwala Brothers Paid | Wage Theft USD | Delta |
|---|---|---|---|---|---|
| Ujjwal Mourya | SE-12 | 2,650.00 | 1,148.24 | 1,501.76 | 43% |
| Dhananjay Godse | SE-09 | 1,900.00 | 654.50 | 1,245.50 | 34% |
| Shubham Prajapathi | SE-64 | 1,850.00 | 516.71 | 1,333.29 | 28% |
| Shashank Tripathi | SE-08 | 2,050.00 | 688.94 | 1,361.06 | 34% |
| Vikas Mani | CS-02 | 2,400.00 | 1,090.83 | 1,309.17 | 45% |
| Aditya Vardhan | CS-07 | 1,900.00 | 631.53 | 1,268.47 | 33% |
| Abhijeet Singh | PE-01 | 2,350.00 | 723.39 | 1,626.61 | 31% |
| Akshay Majalikar | PE-03 | 2,250.00 | 930.07 | 1,319.93 | 41% |
| Heena Rani | AF-02 | 2,750.00 | 735.35 | 2,014.65 | 27% |
| Rohan Goyal | AF-03 | 2,700.00 | 1,010.45 | 1,689.55 | 37% |
| Naveen Sharma | DM-03 | 4,850.00 | 1,664.94 | 3,185.06 | 34% |

59.    The invoiced amounts for January and February 2025 reflect the same inflated rates the Datarwalas had been billing since the start of these employees' tenure, despite knowing the actual salaries paid were significantly lower. This scheme—knowingly misrepresenting compensation

rates to inflate invoices and pocket the difference—was applied not only to these 11 employees but across dozens of India Business Unit employees over multiple years. See Exhibit D (sample of 11 employee paystubs and offer letters reflecting actual pay).

60.    Amatullah Alibhai, while employed by Vyrian and maintaining privileged access to internal project management systems, knowingly retained and benefitted from fraud-derived assets. On December 2, 2022, during the height of the invoicing and payroll overbilling scheme, she acquired real property located at 3534 Lake Landing Lane, Missouri City, Texas 77459, using proceeds traceable to the conspiracy. She has since listed that property for sale on or about June 25, 2025, further evidencing her intent to convert and profit from the scheme's unlawful gains.

61.    These acts by Defendants are not isolated. They reflect a sustained, coordinated course of conduct undertaken by individuals who shared common knowledge, intent, and benefit.

62.    As a direct and proximate result of the conspiracy, Plaintiff has suffered:

    a. over $6.2 million in quantifiable losses arising from fraudulent invoices, ghost payroll, and fictitious commissions;

    b. operational harm from disrupted vendor relationships, failed compliance audits, and reputational injury;

    c. additional damages in the form of forensic audit costs, outside counsel fees, and remediation of Indian operations; and

    d. delay in discovery and restitution caused by the Defendants' unified efforts to conceal the truth.

63.    Each Defendant is jointly and severally liable for all damages resulting from the conspiracy and the torts committed in furtherance of it, including fraud, conversion, embezzlement, and breach of fiduciary duty.

64.    The conspiracy was executed with knowledge of its unlawfulness and intent to harm. Each Defendant acted willfully, maliciously, and in conscious disregard of Vyrian's rights and internal controls.

65.    Accordingly, Vyrian seeks exemplary damages to deter such coordinated corporate misconduct and punish the deliberate abuse of trust and position.

## CAUSE OF ACTION NO. 4: FRAUD

### (Abdul Datarwala and Husain Datarwala)

66.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

67.    From October 2020 through February 2025, Abdul Datarwala and Husain Datarwala repeatedly made and caused to be made material misrepresentations to Vyrian's management in Houston to induce Vyrian to remit monthly wire transfers described in detail in Count 3 ¶¶ 51-59.

68.    Specifically, Abdul submitted—via email to Vyrian's executives and in monthly Zoom invoice review calls—fraudulent Excel spreadsheets and PDF invoices reflecting inflated costs for Vyrian's Indian operations. *See* Exhibit B (Emails with dates from 2020-25 from Abdul and Husain requesting payment) and Exhibit C (Excel files from 2020-25 showing employee wages and expenses).

69.    These spreadsheets contained numerous false statements, including inflated salaries for at least the following eleven employees: Ujjawal Mourjja, Dhananjay Godse, Shubham Prajapathi, Shashank Tripathi, Vikas Mani, Aditya Vardhan, Abhijeet Singh, Akshay Majalikar, Rohan Goyal, Naveen Sharma, and Heena Rani, as well as fabricated commissions, inflated lease charges, and fictitious tax liabilities.

70.    By way of example, from December 2023 to January 2025, Abdul approved spreadsheets listing employee "DM-03" at a salary of $4,850 per month. Bank records show the employee

received no more than $1,700 per month despite Abdul claiming during a Zoom call with Vyrian's CEO to have personally negotiated with "DM-03" to set his initial part-time salary at $2,200 and full-time at "just over $4,000."

71.    Other specific misrepresentations by Abdul included:

     a.  Falsely representing that salary amounts on invoices reflected actual amounts paid to staff in India, when employees were receiving as little as 25–35% of the invoiced amount. Exhibit D (Sample of 11 employee paystubs and offer letters for what they were actually paid).

     b.  Misstating the duration and financial obligation of severance/notice periods—e.g., in February 2025 demanding $12,000 for "SE-113" based on a three-month notice period at $4,000/month, when the employee's contract called for only two months at $2,350/month. Including fabricated line items for commissions and bonuses—totaling over $176,000 between 2024–2025—that employees never received.

     c.  Adding "Provident Fund" and other statutory tax charges without ever remitting them to Indian authorities.

     d.  Representing that OT Solutions and affiliates (Webwise, Nextech, Infotech Innovations, Modern Technology) were necessary intermediaries to pay staff, when in reality they were alter ego shell entities used to route funds for personal gain.

72.    Each misrepresentation was material and false, made knowingly or with reckless disregard for the truth, and intended to induce Vyrian to approve and remit monthly payments totaling over $9.5 million.

73.    As a direct and proximate result, Vyrian was fraudulently induced to remit millions of dollars to shell entities under Abdul's control and suffered damages estimated at $6.2 million.

74.     Husain Datarwala directly participated in the preparation and execution of the fraud. He managed payroll and operational execution in India, co-prepared the monthly expense spreadsheets, and coordinated with Abdul in crafting and submitting false invoices. See Exhibit B (Emails with dates from 2020-25 from Abdul and Husain requesting payment) and Exhibit C (Excel files from 2020-25 showing employee wages and expenses).

75.     Vyrian reasonably relied on the Abdul's and Husain's express and implied representations in authorizing millions of dollars in wire transfers and maintaining the business structure of its India Business Unit. That reliance was induced by false assurances of accuracy, completeness, and compliance, and by the Datarwala brothers deliberate efforts to obscure the fraud through document manipulation, access restriction, and electronic email surveillance of executives.

76.     As a direct result of the Defendants' fraudulent conduct, Vyrian has suffered: over $6.2 million in documented financial losses; substantial investigative, forensic, and legal expenses; loss of operational stability due to layoffs and inability to support infrastructure expansion; and ongoing damages stemming from lost employee trust, internal disruption, and reputational harm.

77.     The conduct of Abdul and Husain, individually and together, was intentional, malicious, and undertaken with willful disregard for Plaintiff's rights. Plaintiff therefore seeks punitive and exemplary damages to punish and deter such egregious misconduct.

## CAUSE OF ACTION NO. 5: BREACH OF FIDUCIARY DUTY

### (Against Defendants Abdul Datarwala and Husain Datarwala)

78.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth herein. This is an action for breach of fiduciary duty under Texas common law.

79.     Abdul and Husain owed Plaintiff Vyrian Inc. fiduciary duties arising either by law, contract, or the nature of their employment and agency roles.

80.    **Abdul Datarwala** served as Vyrian's Vice President of Global Trading from 2021 through 2025. In this executive capacity, he had direct authority over Vyrian's India Business Unit and exclusive administrative rights over OT Solutions Tech Pvt. Ltd., the administrative Employer of Record ("EOR") established to support Vyrian's operations in India. His control included banking, payroll, vendor relationships, invoice submission, and financial reconciliation.

81.    Abdul's fiduciary status, which exists under law, is recognized pursuant to the October 3, 2022 MOU that he assisted to prepare and was executed between Vyrian and OT Solutions Tech. Abdul was named as the Vice President of Operations/Global Trade and charged with: establishing, supervising, and auditing all India Business Unit and Administrative Employer of Record operations, finances, systems, and personnel; assuming and maintaining exclusive global administrative rights and control over Vyrian's operational infrastructure; reviewing all invoices for accuracy and substantiating and conducting appropriate scrutiny prior to submitting them for final payment to Vyrian's finance team; and ensuring compliance with contract, regulatory, and quality assurance obligations.

82.    **Husain Datarwala** was appointed as the Key Manager of OT Solutions in the same MOU, and served as an on-the-ground proxy and administrative agent. His responsibilities included payroll, office management, lease coordination, vendor relations, and invoice generation, all "subject to the review and approval of the Principal's Vice President." The MOU further stated that all managers act in the best interest of the Principal and must avoid any personal gain or independent commercial use of Vyrian resources.

83.    As managerial representatives of Vyrian, Abdul and Husain owed ongoing fiduciary duties of loyalty, care, candor, and full disclosure. These duties included the following obligations 1) to disclose material facts regarding the true nature, purpose, and recipients of payments made from

24

Plaintiff's accounts, 2) to not engage in self-dealing by directing, authorizing, or benefiting from transactions in which they had a personal financial interest, without disclosing such interest to Plaintiff or obtaining Plaintiff's informed consent; 3) to refrain from misappropriating corporate resources, 4) disclose conflicts of interest, and 5) to act solely in the company's best interests.

## A.    Breach of Fiduciary Duties

84.    Each Defendant breached their fiduciary duties through knowing misconduct, concealment, and personal enrichment:

85.    **Abdul Datarwala:** Approved and submitted monthly invoices containing knowingly inflated salaries, fictitious commissions, and unsubstantiated tax charges; Utilized alter ego shell entities—including Webwise Solutions, Nextech, and Infotech Innovations—to divert funds while disguising vendor affiliations; illegally monitored internal executive communications by re-routing outgoing emails to his personal folders and unlawfully accessing the mailboxes of Vyrian's CEO, CFO, and HR manager; deleted hundreds of emails and records in January 2025, immediately before his termination, in an apparent effort to conceal fraud; refused to cooperate in internal audits, despite his express contractual obligation under the MOU to "review, substantiate, and retain copies of all invoices and documentation."

86.    **Husain Datarwala:** Co-prepared and submitted falsified invoices; participated in structuring severance schemes based on misrepresented employment terms; administered payroll with knowledge that employees were receiving far less than what was invoiced—often only 25% to 35% of billed amounts; engaged in improper use of Vyrian's corporate credit card for luxury personal expenditures while traveling in the United States; and accepted and routed company funds into accounts tied to shell entities he managed, in violation of his contractual limitations and fiduciary status as an administrative proxy.

### B.    Proximate Cause and Injury

87.    The Defendants' breaches of duty were a direct and proximate cause of substantial injury to Plaintiff, including: 1) over $6.2 million in diverted funds through fictitious payroll, commissions, lease overcharges, and inflated invoices; 2) loss of substantial business equipment utilized by the India Business Unit, including computers and associated computer data; 3) destruction of audit and compliance integrity under AS9120 and AS6081 standards; 4) loss of business continuity, trained human capital resources, and reputational harm in the aerospace and defense supply chain sector; and 5) substantial costs associated with forensic accounting, remediation, and litigation.

88.    **Exemplary Damages**: Defendants' breaches of fiduciary duty were willful, intentional, and involved self-dealing. Accordingly, Plaintiff seeks exemplary damages for this conduct.

89.    **Equitable Remedies**: In addition to compensatory damages, Plaintiff seeks disgorgement of all profits and benefits wrongfully obtained by Defendants through their breaches of fiduciary duty, as Defendants should not be permitted to retain any benefit from their wrongful conduct.

90.    Plaintiff also seeks forfeiture of all compensation, benefits, and profits that Vyrian paid to Defendants during the period of their breaches of fiduciary duty, as disloyal fiduciaries are not entitled to retain compensation earned while violating their obligations to their principal.

### <u>CAUSE OF ACTION NO. 6: BREACH OF CONTRACT</u>

### <u>(Against Defendant Husain Datarwala)</u>

91.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

92.    On October 3, 2022, Vyrian Inc., Husain Datarwala, and OT Solutions Tech Pvt. Ltd. executed a written Memorandum of Understanding ("MOU") signed by Sath Sivasothy as CEO of

Vyrian and by Husain Datarwala as Key Manager of OT Solutions. See Exhibit A.

93.    The MOU constitutes a valid and enforceable contract supported by Vyrian's continued funding of the India Business Unit, provision of equipment and resources, and ongoing business relationship with OT Solutions.

94.    Under the MOU, Husain accepted specific contractual obligations, including: (1) **Pass-Through Billing** (§ 7.6.2): billing only "direct pass-through costs" with "no markups, margins, modification, or additional charges"; (2) **Audit Cooperation** (§§ 5.10-5.15): providing "full access" to records and "cooperat[ing] fully" with audits; (3) **Good Faith Performance** (§ 3.3): operating "in good faith" and "in the best interest of the Principal"; (4) **Equipment Return** (§ 9.3.1): returning all company assets upon termination; and (5) **Exclusivity** (§ 9.3.2): refraining from using "OT Solutions" for other clients.

95.    The MOU contains express Texas choice of law and jurisdiction provisions (§§ 15.0, 16.0).

### A. Vyrian's Performance and Husain's Material Breaches

96.    Vyrian performed by providing over $9.5 million in funding, equipment, and infrastructure, and by maintaining the business relationship as specified in the MOU.

97.    Husain materially breached the MOU by: (1) submitting invoices with inflated salaries, fictitious commissions, and fabricated charges, violating the pass-through billing requirements; (2) refusing to provide payroll records, tax receipts, and other documentation during Vyrian's 2024-2025 audits; (3) using OT Solutions and shell entities for personal enrichment, violating good faith and exclusivity obligations; and (4) failing to return company equipment and assets after termination.

### B. Damages and Contractual Remedies

98.    As a direct result of Husain's breaches, Vyrian suffered over $6.2 million in fraudulent

overpayments, loss of equipment and records, investigation costs, and operational disruption.

99.    The MOU provides for liquidated damages for willful breach (§ 5.17.2), equipment recovery damages including attorneys' fees (§ 9.3.1), and other contractual remedies. Due to Husain's continued refusal to return property or cooperate with audits, Vyrian seeks specific performance and injunctive relief.

100.    To prosecute this breach of contract claim, Vyrian was required to retain counsel and, upon prevailing in this case, should be awarded its reasonable and necessary attorneys' fees as provided by Chapter 38 of the Texas Civil Practice and Remedies Code.

## CAUSE OF ACTION NO. 7: CONSTRUCTIVE TRUST AND EQUITABLE RELIEF

## (Against Defendants Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai)

101.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein. This is a claim for the imposition of a constructive trust and other equitable relief arising from Defendants' knowing retention of funds and assets rightfully belonging to Plaintiff.

102.    Defendants Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai, by virtue of their fiduciary positions and their knowing participation in the diversion of corporate funds, wrongfully obtained or benefitted from property belonging to Vyrian. Such property includes, without limitation, cash proceeds from inflated payroll billings, fictitious commissions, lease overcharges, and other misappropriated corporate funds, which were funneled to and through entities controlled by Abdul and Husain, including OT Solutions, the various shell entities, real estate purchase and their own bank accounts.

103.    Vyrian can identify specific funds and assets derived from the fraud, including: U.S. corporate card charges for luxury items during Husain's February 2025 visit; funds paid against falsified and overinflated invoices to OT Solutions and shell vendors (Webwise Solutions,

Nextech, Infotech Innovations, etc.); assets and expenditures associated with lavish wedding events and overseas travel; and bank accounts and disbursements still unreconciled due to Defendants' obstruction.

104.    Equity requires that Defendants be declared constructive trustees of all such funds, assets purchased with such funds, and any traceable proceeds thereof, and that Defendants be compelled to transfer possession and title to Vyrian. Plaintiff further seeks all other equitable relief necessary to prevent unjust enrichment, ensure full disgorgement of wrongfully obtained property, and protect Plaintiff's rights, including but not limited to the imposition of a constructive trust, accounting, and injunctive relief to preserve and recover the trust property.

105.    Due to the nature of the misconduct — including deletion of records, destruction of emails, refusal to produce financial documents, and transfer of funds across jurisdictions — monetary relief alone would be inadequate. A constructive trust will enable Plaintiff to trace and recover property rightfully belonging to it, including funds still held by the Defendants or downstream recipients. Without the imposition of a constructive trust, Defendants may further conceal, dissipate, or transfer assets outside the reach of the Court.

106.    Defendants have currently listed the subject properties for sale where one property is currently under contract further demonstrating risk of irreparable harm. These properties were purchased during the time Defendants embezzled and fraudulently misappropriate funds from Plaintiff and are subject to equitable claims of ownership. Plaintiff intends to file and to record a Notice of Lis Pendens under Tex. Prop. Code § 12.007 concerning the following real properties located in Fort Bend County, Texas:

**3434 Harper Meadow Ln**, Missouri City, TX 77459, and is legally described as: Lot 1 Block 2, of Parks Edge Section 11, and addition in Ft. Bend County, Texas, according to the Map or Plat thereof recorded in Plat No. 20210010, Plat Records of Ft. Bend County, Texas.

**3534 Lake Landing Ln**, Missouri City, TX 77459, and is legally described as: Lot 49 Block 2, of Parks Edge Section 11, an Addition in Ft. Bend County, Texas, according to the Map or Plat thereof recorded in Plat No. 20210010, Plat Records of Ft. Bend County, Texas

### JURY DEMAND

107.    Having paid the required fee, Plaintiff demands a trial by jury upon all issues raised in this complaint.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vyrian Inc. respectfully requests that the Court enter judgment in its favor and against Defendants Abdul Tayyeb Datarwala, Husain Datarwala, and Amatullah Alibhai, jointly and severally, and grant the following relief:

**Compensatory Damages:** An award of actual damages in an amount to be determined at trial.

**Restitution and Disgorgement**: Full restitution of all funds wrongfully retained by Defendants, and disgorgement of unjust enrichment obtained directly or indirectly as a result of the fraudulent scheme and fiduciary breaches.

**Exemplary and Punitive Damages:** An award of punitive damages in an amount sufficient to punish Defendants' willful, malicious, and fraudulent conduct, and to deter similar misconduct.

**Constructive Trust**: The imposition of a constructive trust over: 1) any funds or assets traceable to the misappropriated proceeds; 2) bank accounts or financial instruments held in Defendants' names or controlled by them; and 3) any real or personal property acquired or funded, directly or indirectly, with misappropriated funds, including but not limited to, 3434 Harper Meadow Ln and 3534 Lake Landing Ln in Fort Bend County, Texas, and any proceeds from their sale or refinancing.

**Attorneys' Fees and Costs**: An award of Plaintiff's reasonable attorneys' fees and the costs of prosecuting this action.

**Pre- and Post-Judgment Interest**: Pre-judgment and post-judgment interest at the maximum

rate allowed by law from the date of injury until the date of final judgment and satisfaction.

**Such Other and Further Relief**: Such other and further legal or equitable relief as the Court

deems just, proper, and appropriate under the circumstances.

Dated: August 15, 2025                              Respectfully submitted,

                                                   By: */s/ Federico Reynal*

                                                   Federico Reynal
                                                   State Bar No. 24060482
                                                   The Reynal Law Firm, P.C.
                                                   917 Franklin St. Fl. 6
                                                   Houston, TX 77002
                                                   Phone: 713-410-6217
                                                   areynal@frlaw.com

                                                   Manoj S. Gandhi
                                                   State Bar No. 24055518
                                                   Allison Beckham
                                                   State Bar No. 24050271
                                                   Josh Clayton
                                                   State Bar No. 24050426
                                                   CLAYTON, MCKAY & BAILEY, PC
                                                   1919 Decatur Street
                                                   Houston, TX 77007
                                                   Phone: (832) 782-4964
                                                   manoj@cmblaw.com
                                                   allison@cmblaw.com
                                                   josh@cmblaw.com

                                                   **ATTORNEYS FOR PLAINTIFF
                                                   VYRIAN INC.**