# Exhibit A

# MEMORANDUM
# OF UNDERSTANDING &
# BUSINESS UNIT OPERATIONS AGREEMENT

## BY AND BETWEEN

**Vyrian Incorporated**



**OT Solutions Tech**



## Executive Summary

—

Vyrian Incorporated ("Principal") and its India Business Operations Unit ("India Business Unit" or "Unit") desire to enter into this Memorandum of Understanding ("MOU") with Husain Datarwala (PP U8301986), of Indore, Madhya Pradesh India ("Employee") and OT Solutions Tech ("Administrative Employer of Record"), hereinafter referred to together as ("Parties"), in response to an audit finding issued in connection with Vyrian's compliance with the AS9120B and AS6081 Quality Management System (QMS) standards.[1]

The purpose of this MOU is to formally document Vyrian's exercise of effective and exclusive control over the activities, management, and operations of the India Business Unit and its Administrative Employer of Record, OT Solutions Tech, as required by AQMS AS9120B.

OT Solutions Tech is a proxy entity that has been strategically established through Vyrian's sole financial investment within its India Business Unit to function as an exclusive, operational extension of Vyrian's business in India. This MOU and other objective evidence demonstrating Vyrian's control of its India Business Unit operations shall be provided to National Quality Assurance (NQA)'s auditors for review and closure of the issued nonconformance. Objective evidence shall be posted, where applicable, in the Online Aerospace Supplier Information System (OASIS) database[2] for reference and maintained on site.

The Parties acknowledge that this MOU memorializes the successful working relationship between the Parties since 2020 and ensures that Vyrian is able to maintain appropriate oversight, management, and control of the services provided by the Unit on Vyrian's behalf. This MOU sets forth the current intent of the parties with respect to the general terms and conditions to be included in the engagement and ensures compliance with relevant Quality Management System standards for sub-contracted activities. By continuing to perform work under this MOU and submitting invoices for payment, Employee and Unit leadership acknowledge and agree to be bound by the terms and conditions set forth herein.

—

---

[1] (*Reference IAQG/NQA Audit 103043, September 2022. Enclosures attached.*)
[2] *https://oasis.iaqg.org/*

VYRIAN

## RECITALS

—

WHEREAS, Vyrian ("Principal") desires to expand and onboard additional staff in India and has established a dedicated Business Unit to administer such operations; and

WHEREAS, Husain Datarwala (PP U8301986), of Indore, Madhya Pradesh India ("Employee") has been retained full-time in his individual capacity in India since March 2020; and

WHEREAS, in or about 2021, Principal remitted payment to Employee for the sole and express purpose of serving as a local proxy and temporary agent, vested with the limited Power of Attorney, to incorporate and establish labor compliance activities for the India Business Unit in India, under the direction and continuing supervision of the Principal's Vice President of Operations/Global Trade; and

WHEREAS, pursuant to this arrangement, "One Theory Solutions" was incorporated in India on behalf of the Principal as "OT Solutions Tech" ("Administrative Employer of Record") to operate for the sole purpose of providing employer of record services and managing labor compliance for the Principal; and

WHEREAS, Employee acknowledges and agrees that his role with regard to the Administrative Employer of Record is ministerial and revocable, and confers no continuing rights, interests, or claims in the Administrative Employer of Record or its operations; and

WHEREAS, the entirety of the India Business Unit, Administrative Employer of Record, and all related operations are wholly owned and controlled by Principal, and continue to be solely financed by Principal to ensure exclusivity and compliance with international law and the terms and conditions of this Agreement;

WHEREAS, Parties acknowledge that at all times, Principal retains full control over all activities of the Employee, India Business Unit, Administrative Employer of Record, and any other contractors onboarded to provide services under this arrangement and neither the Employee, Business Unit, nor Administrative Employer of Record shall have authority to act or contract beyond the scope of this Agreement; and

WHEREAS, the purpose of this Memorandum of Understanding is to memorialize in good faith the current status of the working arrangement between the Employee, India Business Unit, Administrative Employer of Record, and Principal, to ensure mutual understanding and clarity of roles and responsibilities moving forward.

**NOW, THEREFORE** in consideration of the foregoing, the Parties have agreed upon the following terms and conditions of the engagement:

—

## 1.0. TERM

—

1.1.    **Prior Relationship.** The Parties acknowledge that they have maintained a continuous business relationship since March 2020 (Employee) and Administrative Employer of Record (2021) respectively, and this Agreement incorporates all prior understandings, negotiations, discussions, agreements, and arrangements between the parties relating to the subject matter.

1.2.    **Term.** The term of this consolidated Agreement shall commence on October 3, 2022, and shall continue until terminated in accordance with the provisions hereof ("Term").



## 2.0. OPERATIONAL RISK MITIGATION

**2.1.** **Risk Measures & Restrictions.** The restrictions set forth in this Agreement are an essential component of Principal's supply chain risk mitigation strategy. The following restrictions are deliberately designed to reduce the risk of Employee, Business Unit, or Administrative Employer of Record leadership engaging in activities that could compromise service or product quality, violate industry standards, or otherwise jeopardize Principal's business interests.

**2.1.1.** **Captive Services.** Employee acknowledges that both the India Business Unit and its Administrative Employer of Record are captive to Principal and exist and operate exclusively for Principal and at the Principal's sole discretion. Employee's agreement to provide support for Principal's employer of record and labor compliance activities, including limited proxy activities, in no way imply operational control of the India Business Unit or Administrative Employer of Record by Employee. This arrangement ensures, and Employee agrees, that Principal maintains exclusive control and ownership over the unified business operation.

**2.1.2.** **No Independent Commercial Interests.** Employee is prohibited from leveraging the India Business Unit or any Principal resources for independent commercial interests, activities, or personal gain. The Business Unit and Administrative Employer of Record are prohibited from pursuing any independent commercial interests, profit-generating activities, or contracts with third parties now or in the future without Principal's prior express written permission. By removing any independent profit motive and commercial incentives from Business Unit and Administrative Employer of Record operations, the Principal aims to eliminate conflicts of interest, prevent resource diversion, ensure complete alignment of Business Unit's activities with Principal's quality and compliance requirements, and maintain the integrity and security of Principal's supply chain.

**2.1.3.** **Consideration.** As consideration for exclusivity, confidentiality, consent to jurisdiction, and nondisclosure, Principal has paid Employee an increased salary to secure compliance with this Agreement during and after the Term. This salary is designed to eliminate potential conflicts of interest and reduce perverse incentives within the Business Unit that might otherwise compromise quality or compliance standards for the Principal. Payments for Employee's services rendered on behalf of India Business Unit and Administrative Employer of Record under this MOU shall be made on a monthly basis. Employee shall prepare and submit invoices in accordance with the terms set forth herein.

**2.1.4.** **Performance Review & Audit.** The Business Unit shall report all relevant Key Performance Indicator (KPI) metrics in accordance with *QMS-009-Quality Objectives*[3] to Principal on a quarterly basis, and Principal shall maintain final approver status on all Business Unit and Administrative Employer of Record activities. The Principal's QMS Audit Responses and corrective actions[4] associated with this operational risk measure are attached to this MOU for reference.

**2.1.5.** **Employee Acknowledgement.** Employee acknowledges that the Administrative Employer of Record's captive, non-commercial status is fundamental to the risk-controlled operating environment that Principal requires for its aerospace and defense supply chain compliance. Employee acknowledges and agrees that any proxy or ministerial agency held pursuant to this Agreement is: (1) conditionally authorized by Principal for the sole, limited, and temporary purpose of facilitating corporate formation and regulatory compliance, (2) exclusively revocable by Principal, and (3) does not confer upon Employee or any other party any actual,

[3] See attached representative Sales KPI report provided by Business Unit as part of Principal's QMS-065Q Audit Response.
[4] QMS-063S, QMS-064P, and QMS-065Q



beneficial, or equitable ownership interest in the Administrative Employer of Record or India Business Unit. Employee further acknowledges that its compliance with these terms is a material inducement for Principal to enter into this Agreement.

—

### 3.0.  INDIA BUSINESS UNIT MANAGEMENT STRUCTURE & SUPERVISON

—

**3.1.**    In accordance with the SAE AS9120 standard's requirements for organizations to establish, implement, and maintain a process for managing risks to the achievement of its applicable requirements, the Parties hereby establish the following management and reporting structure for the operation of the India Business Unit and OT Solutions Tech, its Administrative Employer of Record:

—

### VICE PRESIDENT OF OPERATIONS/GLOBAL TRADE

—

**3.1.1.**    **Vice President of Operations/Global Trade**

**3.1.1.1.**    Roles & Responsibilities

a.  The Vice President of Operations/Global Trade ("Vice President" or "VP"), shall be the Principal's primary representative and supervising authority over India Business Unit and Administrative Employer of Record's complete operation for risk mitigation and QMS compliance purposes.

b.  The Vice President shall establish, supervise, and audit all India Business Unit and Administrative Employer of Record operations, finances, systems, and personnel (including but not limited to Administration, Information Technology, Billing, Human Resources, Sales, and Sourcing functions) on behalf of Principal. The Vice President shall have ultimate responsibility for the India Business Unit, Administrative Employer of Record, and Key Manager's performance.

c.  The Vice President shall manage and direct all recruitment, training, and performance review initiatives for Administrative Employer of Record personnel.

d.  The Vice President shall at all times assume and maintain exclusive global administrative rights and control of all Administrative Employer of Record software tools, banking, billing, and payment portals, and all other administrative accounts for review, confirmation, auditing, and substantiation purposes. The Vice President shall ensure that multi-factor authentication is at all times maintained under the direct control of designated Principal users only. Employee, Administrative Employer of Record, and its related personnel may hold secondary or subordinate privileges as necessary for operational tools, but only as needed to maintain such tools and portals to accomplish Principal work objectives contemplated under this Agreement.

e.  The Vice President shall review Administrative Employer of Record expenses, determine areas for efficiency and cost reduction, and implement cost containment strategies.

f.  The Vice President shall review and retain copies of all India Business Unit and Administrative Employer of Record contracts executed in the fulfillment of Principal objectives for final approval, including lease agreements, service agreements, offer letters, payroll documents, tax documents and



any other such documentation or agreement purporting to contractually bind or obligate the Business Unit or Administrative Employer of Record, for Principal compliance verification and approval.

g.  The Vice President shall review all invoices submitted by Employee or Administrative Employer of Record for payment for accuracy and substantiate and conduct appropriate scrutiny of such invoices prior to submitting them for final payment to Vyrian's finance team.

h.  The Vice President shall work with the Key Manager as needed to document the *QMS-009* quarterly Key Performance Indicators (KPIs), key quality metrics, and shall provide documentation for review to the Business Compliance Director, QMS auditors, and others upon request.

i.  The Vice President shall monitor compliance with contractual, regulatory, and performance standards. Upon identifying any risk, impropriety, discrepancy, or operational concerns, the Vice President shall promptly document the issue, initiate further review, and escalate it through the appropriate internal Principal channels for resolution.

### 3.1.1.2.  Designee: Abdul Datarwala

The Vice President's unique qualifications substantially enhance Vyrian's ability to ensure effective oversight and control of the India Business Unit and Administrative Employer of Record.

a.  As Vice President, Mr. A. Datarwala is uniquely qualified to establish and supervise all Business Unit operations, systems, and personnel. Mr. Datarwala has served in various operational capacities at Vyrian since 2018 (e.g., lab, operations, sales) and possesses exceptional, non-replicable qualifications that make him suitable for assuming oversight responsibilities with respect to both Vyrian and captive Administrative Employer of Record operations.

b.  Datarwala is a native of the Administrative Employer of Record's local region and possesses a comprehensive understanding of local business customs, regulatory environment, labor practices, and cultural nuances that materially impact Vyrian's operational efficacy and compliance. Additionally, Mr. Datarwala can strategically leverage familial and pre-existing community relationships to expedite issue resolution and circumvent traditional barriers to operational transparency and efficiency in the locality.

c.  Datarwala also possesses native-level proficiency in the regional language which is critical for supporting direct communication with the Business Unit, Administrative Employer of Record, its workers, and local authorities. The Vice President is uniquely qualified to review local contractual arrangements, employment agreements, regulatory compliance, and operational directives in the local language without relying on translation services or intermediaries.

—

## KEY MANAGER
—

### 3.1.2.  Key Manager

### 3.1.2.1.  Roles & Responsibilities

a.  The Key Manager shall be responsible for the Administrative Employer of Record's day-to-day office administration in accordance with directives from the Principal's Vice President.



      b.   The Key Manager's responsibilities shall also include managing third-party leases, facilitating pass-through invoicing and payroll operations, and ensuring compliance with all tax obligations in the operating jurisdiction subject to the review and approval of the Principal's Vice President.

      c.   The Key Manager shall report to the Vice President.

**3.1.2.2.**   <u>Designee: Husain Datarwala</u>

      a.   As Key Manager, Mr. H. Datarwala is qualified to provide office management services including managing third-party leases and other administrative obligations. Mr. Datarwala has worked independently at Vyrian as a sourcing employee and has operated a business in the region.

      b.   Importantly, the Key Manager resides in the Administrative Employer of Record's local area, speaks the local language, and understands local business customs, regulations, labor practices, and cultural nuances that materially impact operational efficacy and compliance.

—

### PROCUREMENT DIRECTOR

—

**3.1.3.**     **Procurement Director**

**3.1.3.1.**   <u>Roles & Responsibilities</u>

      a.   The Procurement Director shall lead procurement training and provide daily, order-level direction to India Business Unit sourcing and purchasing staff.

      b.   The Procurement Director shall provide support to the Vice President, Compliance Director, and Key Manager as needed.

**3.1.3.2.**   <u>Designee: Janessa Templeton</u>

Ms. Templeton is qualified to provide procurement supervision and brings almost a decade of direct Vyrian procurement experience to the role.

—

### QUALITY/BUSINESS COMPLIANCE DIRECTOR

—

**3.1.4.**     **Quality/Business Compliance Director**

**3.1.4.1.**   <u>Roles & Responsibilities</u>

      a.   The Business Compliance Director shall coordinate the quality review and document submission process for Principal processes and Key Performance Indicators (KPIs) that are impacted by the India Business Unit.



    b.  The Vice President and Procurement Director shall submit reports quarterly to the Compliance Director to confirm the Unit's performance and adherence to *QMS-009*.

**3.1.4.2.**   <u>Designee: Audrey Sivasothy</u>

    Ms. Sivasothy is qualified to provide compliance services and brings a decade of direct Vyrian quality and compliance experience to the role.

**3.2.**      **Reporting Structure**

**3.2.1.**    The Vice President of Operations/Global Trade shall report to the Principal CEO.

**3.2.2.**    The Key Manager shall report to the Vice President of Operations/Global Trade.

**3.2.3.**    The Principal's Procurement and Business Compliance Directors shall report to the Principal CEO and provide functional support for the overall management framework established by the Vice President of Operations/Global Trade.

**3.3.**      **Fiduciary Obligations**

    All management and supervisory personnel shall operate in good faith and with due diligence in the performance of their respective duties in support of the Principal. They shall disclose any potential concerns or conflicts of interest that may arise during the course of their duties and shall at all times act in the best interest of the Principal.

**3.4.**      **Modifications to Structure**

    Any changes to this management structure must be agreed upon in writing by Principal's management team following a documented risk review per QMS-030. In the event any management personnel, including Key Manager, becomes unable to perform his/her duties, a replacement shall be designated by Vyrian within thirty (30) days.

—

## 4.0. SUPPORT SERVICES

—

**4.1.**    **Support Services.**  The Administrative Employer of Record (AEOR) will use commercially reasonable efforts to perform all support services (the "Support Services") and meet all service performance metrics outlined in any applicable KPI, statement of work, or other documents between the Parties.

**4.2.**    Support Services shall include employer of record and labor compliance services.

**4.3.**    **People.**

**4.3.1.**   **Employer of Record.**  For compliance with Indian law, the Administrative Employer of Record, shall be the employer of record and responsible for all regulatory matters associated with the support staff ("Staff") hired to perform services for Principal. The AEOR shall handle all administrative employment functions including processing new hire documentation, background checks, payroll administration, benefits enrollment, and ensuring compliance with applicable employment laws. The AEOR and shall not hire or onboard any Staff or engage with any other individual or entity for any purpose without Principal's prior written approval.

V Y R I A N

**4.3.2.** **Operational Control.** Principal shall have exclusive authority to select, interview, and approve all Staff prior to formal engagement. Principal shall maintain exclusive control over all Staff regarding: (a) work assignments and documents; (b) training on Principal's products, services, and procedures; (c) performance evaluation; (d) work schedules; (e) quality, sales and purchasing protocols; and (f) termination decisions. Administrative Employer of Record shall not interfere with Principal's operational control of Staff under any circumstances, nor shall AEOR attempt to contract with, influence, or bind Staff in a manner that undermines the interests of the Principal during or after the Term.

**4.3.4.** AEOR shall inform Staff, whether via offer letters, employment agreements, training sessions, or otherwise that while AEOR is the employer of record, Staff will work under the exclusive direction and control of the Principal, and shall be required to adhere to Principal's policies, procedures, and business practices.

**4.3.5.** Principal will train all Staff in accordance with its AS9120/AS6081 quality management system, to ensure a full understanding of counterfeit avoidance procedures required for aerospace parts distribution. Principal will be responsible for ensuring Staff adherence to these standards in hiring, training, and job performance. AEOR shall maintain comprehensive training records for auditing purposes and establish a database documenting each Staff member's skills and competency levels as required by these aerospace quality standards.

**4.3.6.** In the event of (a) termination of this Agreement for any reason or (b) material breach of this Agreement by Employee or AEOR, all Staff shall be immediately released from any non-competition, non-solicitation, or similar restrictive covenants that might otherwise limit their employment opportunities between the Parties or otherwise. AEOR shall not enforce any such restrictions, threaten enforcement, or otherwise discourage or impede Staff from seeking employment with Principal or any future employer. Breach does not relieve Employee or AEOR of their ongoing statutory duties and obligations to provide notice, wages, and other statutory remuneration under applicable Indian Labor Codes.

—

## 5.0. QUALITY MANAGEMENT REQUIREMENTS

—

**5.1.** **Service Requirements Overview.** Vyrian recognizes the very important role our service providers have in the value we offer our customers. As OT Solutions (Administrative Employer of Record) operates solely within the India Business Unit under Vyrian's direct control and management, the quality management and competency requirements are deemed satisfied by virtue of the existing working relationship.

**5.2.** **Code of Conduct and Policy Enforcement**
Employee shall ensure that the Administrative Employer of Record performs its compliance tasks in accordance with all required ethical, legal, environmental, and social responsibilities. This includes ensuring:

    **i.** **Compliance with Local Laws and Regulations**
    Administrative Employer of Record must adhere to the laws and regulations of the locality in which it operates. This includes all local, state, and federal laws/regulations in the country of origin.

    **ii.** **Compliance with Environmental, Health, and Safety Laws**
    Administrative Employer of Record must maintain and operate leased facilities and processes in accordance with local, state, and federal laws/regulations in the country of origin. For items with inherent hazards, safety notices must be clearly visible. As applicable, documented safety handling and protection information must be provided.



iii.    **Non-Discrimination**
Administrative Employer of Record shall not participate in or condone discrimination against any protected class of people as prohibited by local, state, and federal laws/regulations in the country of origin.

iv.    **Compliance with Labor Standards**
Employee shall ensure that:

a.    Administrative Employer of Record shall only employ workers of minimum legal age in accordance with local, state, and federal laws/regulations in the country of origin. Child labor laws must be followed.

b.    Administrative Employer of Record shall not to practice forced or indentured labor, or exceed the daily and weekly working hours as permitted by local, state, and federal laws/regulations in the country of origin.

c.    Administrative Employer of Record shall ensure the full payment of wages (1) in legal, traceable tender, (2) at regular intervals (no longer than one month), and (3) directly to the workers concerned.

d.    Administrative Employer of Record shall compensate workers in accordance with local, state, and federal laws/regulations in the country of origin and remit all contractually-required amounts due per Vyrian's firm set rate without offset. This includes paying any overtime wages and benefits required by law.

e.    Vyrian's established rate shall constitute the gross remittance and shall be subject only to offsets for statutory deductions in accordance with local, state, or federal regulations in the country of employment.

f.    Administrative Employer of Record shall inform workers of all statutory deductions and make pay receipts and other substantiation available to workers and Vyrian each pay period.

g.    Administrative Employer of Record's wages, hours of work and other working conditions shall be not inferior to the best conditions existing locally, for work of the same character performed in the same working position and environment.

v.    **Ethical Behavior & Anti-Corruption**
a.    Employee and Administrative Employer of Record shall adhere to the highest standards of moral and ethical conduct, shall respect local laws, and shall not engage in any form of corrupt practices, including but not limited to extortion, fraud, or bribery.

b.    Evidence of dishonesty, corruption, bribes, improper advantage, or any other form of illegal practice or unethical behavior by the supplier or associated operations will result in Employee termination.

**5.4.    Conduct & Quality.**

**5.4.1.    Acknowledgement.** Employee and Administrative Employer of Record's conduct have a direct impact on Vyrian's ability to provide quality services to its customers. Employee is expected to adhere to the above policies and to apply them in all dealings with, and on behalf of Vyrian, its India Business Unit, and its



Administrative Employer of Record. Your acceptance of work from Vyrian is your acknowledgement of your importance to our quality management system and your agreement to abide by the policies set forth herein.

**5.4.2.** **Flow Down Requirements.** Employee shall ensure that any other employee, subcontractor, agent, or other third party assigned to provide services to Principal or to Administrative Employer of Record under this Agreement, acts consistently with these policies.

**5.4.3.** **Disqualification.** Failure to abide by Vyrian's ethics and quality policy in business dealings may result in termination of Employee.

**5.5.** **Confidentiality.**

**5.5.1.** **Administrative Employer of Record Responsibility.** Employee and Administrative Employer of Record shall ensure the confidentiality of Principal's projects under development, and related product information, as well as intellectual property shared by nature of our working relationship. Documents furnished by Vyrian are furnished solely for the purpose of doing business with or on behalf of Vyrian. Proprietary documents may be furnished in hard copy, electronic or other media. You are responsible for controlling and maintaining such documents to preclude improper use, loss, damage, alteration and/or deterioration.

**5.5.2.** **Non-Disclosure.** Unless authorized by Vyrian in writing, the Employee and Administrative Employer of Record may not transmit or furnish any Vyrian furnished documents, or copies of such documents, to anyone except as required for performance of Principal work.

**5.6.** **Ownership of Work Product.** Vyrian retains legal ownership of the product of Employee and Administrative Employer of Record's work, and such "work product" at all times remains the sole and exclusive property of Vyrian. "Work product" consists of any creative work conceived of using the Vyrian's resources or time. This includes written and electronic documents, audio and video recordings, system code, processes, systems and also any concepts, ideas, or other intellectual property developed for Vyrian, regardless of whether the intellectual property is actually used by Vyrian.

**5.7.** **No License.** No work product created under this Agreement may be claimed, construed, or presented as property of the Employee, Administrative Employer of Record, or any individual, or entity, even after the contract has terminated or the relevant project has completed. Accordingly, information classified as confidential must remain so even after the end of the Agreement.

**5.8.** **Contact Information.** The Administrative Employer of Record must promptly notify Vyrian in writing of any requested changes to its organization or facility, including but not limited to changes in company name, bank details, or location. For the purposes of this Agreement, the designated contacts and roles for the India Business Unit are as follows:

**TABLE A:**

| Personnel | Title/ Primary Role |
|---|---|
| Abdul Datarwala (primary) | **Vice President of Operations/Global Trade** Establishes, supervises, and audits all Business Unit and AEOR operations, systems, and personnel (Admin, IT, billing, HR, Sales, Sourcing); Directs all recruitment and training for all OTS personnel. |
| Husain Datarwala | **Key Manager** |

V Y R I A N
Your World Integrated

| | Performs office administration related to OTS personnel on the ground under direction of Vice President of Operations/Global Trade; Manages third-party leases, pass-through payroll, and tax obligations under VP's direct supervision. |
|---|---|
| Janessa Templeton | **Procurement Director**<br>Leads procurement training and provides daily, order-level procurement direction for Business Unit staff. |
| Audrey Sivasothy | **Quality/ Business Compliance Director**<br>Leads quality review for third-party audited business KPIs for the Business Unit. |

These individuals shall serve as the initial points of contact for all matters related to this Agreement.

**5.9.    Site Visits.**

**5.9.1    QMS Site Audit Requirement.**  AS9120 requires that any related entities, subcontractors, suppliers, and downstream suppliers provide audit access to those who utilize their services to ensure transparency, compliance with agreements, and effective quality control. Therefore, Vyrian employees or representatives shall visit and audit all Administrative Employer of Record service locations including any facilities in which services are being performed. Employee and Administrative Employer of Record staff shall facilitate this process without restriction.

**5.9.2    Notice.** Compliance site visits may be conducted periodically, as determined by Vyrian, and may be initiated at any time during the term of the Agreement.  Vyrian will generally conduct key site visits, reviews, or audits annually with 10 days' notice of any such visit. However, due to the nature of the relationship between the Parties to this MOU, site visits are expected to be ongoing and may occur without notice.

**5.9.3.    Permanent Office.**  OT Solutions shall allocate and maintain permanent, dedicated office space at all facilities for Vyrian's exclusive use in conducting compliance reviews, quality audits, and operational oversight.

**5.10.    Right to Audit.**
Vyrian reserves the right to audit, inspect, and examine the records, books, systems, and other relevant documentation of the Administrative Employer of Record or any third parties involved in the performance of the services under the Agreement. The scope of audits shall include, but is not limited to, review of the following:

    i.    Financial records and accounting practices, including billing, invoices, payments, and financial statements;
    ii.    Operational records and reports related to the performance of services;
    iii.    Compliance with applicable laws, regulations, and contractual obligations;
    iv.    Any other documentation relevant to the services provided under the agreement.

**5.11.    Access to Records and Facilities.**  Vyrian and its designated representatives shall have full access to all Administrative Employer of Record systems, documents, records and facilities that are related to the performance of this Agreement. This includes access to physical locations, electronic data, and any other materials that may be required to perform the audit. The Employee and Administrative Employer of Record shall cooperate fully with Vyrian, providing all necessary assistance, data, and records in a timely manner.



**5.12.**    **Frequency and Timing of Audits**. Audits of the Administrative Employer of Record under this MOU shall occur at any time with or without notice. Vyrian will attempt to provide reasonable notice of an audit, unless an immediate audit is necessary due to suspected non-compliance, fraud, or other urgent circumstances. Audits are expected to be ongoing processes to be conducted as part of Vyrian's own internal auditing process.

**5.13.**    **Non-Conformances.** In the event that an audit reveals discrepancies, non-compliance, or other issues, the Employee and Administrative Employer of Record staff shall promptly provide a written response and take corrective actions to address any findings. The Auditor and Administrative Employer of Record staff shall work collaboratively with Principal to resolve any issues identified during the audit, and shall provide regular updates on the progress of corrective actions to Principal.

**5.14.**    **Records Retention.** Vyrian's contractually required records retention policy is 7 years for most documents. The right to audit shall remain in effect for the duration of the Agreement and terminate upon the closure of the records retention period, unless otherwise specified in writing by Vyrian.

**5.15.**    **Audit Cooperation.** Failure to comply with the requirements of this policy or to cooperate with the audit process shall constitute a breach of the Agreement and may result in termination of the Agreement or other legal remedies as provided for in the Agreement.

**5.16.**    **Corrective Action Requests.**

**5.16.1.**    **NCRs.** Upon receipt from Vyrian of a noncompliance notice, Employee and Administrative Employer of Record shall complete a Nonconformance (NCR) form and return it to Vyrian within the allotted time noted on the request. If the form cannot be returned within the allotted time a request for extension must be submitted to Vyrian within the original allotted time.

**5.16.2.**    Upon notification of a quality concern / request for corrective action, service provider is expected to:

    a.    Institute immediate containment action(s) for services failure.
    b.    Submit an initial containment plan to the Vyrian requestor within 24 hours of notification.
    c.    Correct any service abnormalities as requested.
    d.    Submit an initial root cause analysis and corrective action update within 5 working days of notification.
    e.    Provide verification and recurrence prevention actions / evidence within 10 working days.
    f.    Provide a final corrective action report with supporting data within 30 days of notification.
    g.    Continue containment activities until corrective action closure confirmation has been received from Vyrian.
    h.    Provide additional support as may be required.

**5.16.3.**    Any exceptions to the requirements stated above are at Vyrian's discretion and must be approved by the Vyrian requestor prior to the due date.

**5.17.**    **Willful Breach.**

**5.17.1.**    Any purposeful or willful failure by Employee or Administrative Employer of Record to provide services as required under this Agreement shall constitute a material breach. "Purposeful or willful failure" means any misconduct or deliberate refusal, intentional neglect, or bad faith withholding of services by Employee or Administrative Employer of Record as determined by Vyrian in its reasonable discretion.



5.17.2.  Upon occurrence of a willful breach Vyrian shall be entitled to the following cumulative remedies, in addition to any other remedies available under this Agreement or applicable law:

    a.  Immediate termination of this Agreement without opportunity to cure;

    b.  Liquidated damages in an amount equal to one invoiced "contract day" for each day of Employee or Administrative Employer of Record breach rounded to the nearest day. One "contract day" shall be the daily invoiced rate for all Administrative Employer of Record staff, facilities, and operations, etc., which the Parties agree is a reasonable pre-estimate of the damages Vyrian would suffer from such willful breach;

    c.  Reimbursement of all costs incurred by Vyrian to secure replacement services on an expedited basis; and

    d.  Indemnification for any third-party claims arising from Employee or Administrative Employer of Record's willful breach.

**5.18.  Supplier Laboratories and Test Facilities**
This section has been intentionally deleted.

**5.19.  Shipment of Suspected Non-Conforming Product**
This section has been intentionally deleted.

—

## 6.0.  EQUIPMENT & FACILITIES

—

**6.1.  Provision and Use of Equipment**

**6.1.1.  Principal Responsibility.**  Vyrian shall provide the India Business Unit with all equipment, furnishings, tools, devices, software, hardware, materials, and other tangible or intangible assets ("Equipment") and facilities reasonably necessary for the Administrative Employer of Record to perform the services required under this Agreement. Principal recognizes that the India Business Unit may require specific connectivity tools, VPN access, communication systems, email, or other technology to effectively perform services across international boundaries. Principal shall ensure that the Unit has access to all necessary connectivity tools, either by direct provision or by authorizing and funding Administrative Employer of Record's local purchase of such tools.

**6.1.2.  Principal's Discretion.**  Vyrian shall determine, in its sole discretion, which Equipment or facilities are required for performance and shall provide such Equipment and facilities in good working condition and order.

**6.1.3.  Administrative Access.**  Administrative Employer of Record shall grant full administrative access to Principal for all connectivity tools, systems, software, email, and programs for its effective management and control.

**6.1.4.  Delivery & Maintenance.**  Principal shall deliver all required Equipment to Administrative Employer of Record at the commencement of this Agreement, or as otherwise needed throughout the Term. Principal shall be responsible for the maintenance, repair, and replacement of Equipment due to normal wear and tear. Administrative Employer of Record shall promptly notify Principal of any Equipment malfunction, damage, or need for replacement.

VYRIAN

**6.1.5.** **Equipment Ownership**. All Equipment provided by Principal to personnel under this Agreement shall remain the exclusive property of Principal at all times. Employee and Administrative Employer of Record acknowledge and agree that no title or ownership interest in the Equipment transfers to either party by virtue of this Agreement or either party's use or possession of the Equipment.

**6.1.6.** **Local Equipment Purchase Authorization**. In consideration of Administrative Employer of Record's geographic location, the Principal may, at its sole discretion, authorize or remit payment for the AEOR to procure Equipment directly through local vendors. In such cases:

    i.   OT shall obtain Vyrian's written approval of specific items and costs before any purchase;

    ii.   OT shall provide detailed receipts and documentation for all purchases;

    iii.  All Equipment purchased through such arrangements shall remain Vyrian's property as specified in the Equipment Ownership clause of this Agreement.

**6.1.7.** **Limited License to Use**. Principal grants Employee and Administrative Employer of Record a limited, non-transferable, non-exclusive license to use the Equipment solely for the purpose of providing services to Principal as specified in this Agreement. Parties acknowledge that such Equipment remains at all times the sole and exclusive property of Principal, and that neither party acquires an ownership interest in said property regardless of the duration of possession. This license shall automatically terminate upon the expiration or termination of this Agreement.

**6.1.8.** **Prohibited Activities**. Employee and Administrative Employer of Record shall not: (a) use the Equipment for any purpose other than providing services to Principal; (b) loan, sublicense, sell, lease, mortgage, or otherwise transfer or encumber the Equipment; (c) modify, disassemble, or reverse engineer the Equipment; (d) remove, alter, or obscure any identification labels or proprietary notices affixed to the Equipment, (e ) or limit Principal's management's administrative access to any equipment and systems.

**6.2.** **Return of Equipment**. Upon the expiration or termination of this Agreement for any reason, Employee and Administrative Employer of Record shall immediately return all Equipment to Principal, in the same condition as received, reasonable wear and tear excepted. Employee and Administrative Employer of Record shall bear all costs associated with the return shipment, including but not limited to packaging, storage, insurance, and transportation expenses.

**6.7.** **Holdover/Failure to Return.** If Employee and Administrative Employer of Record fail to return any Equipment within thirty (30) business days following the expiration or termination of this Agreement, Vyrian may, in addition to pursuing all available legal remedies: (a) charge Employee and Administrative Employer of Record the reasonable replacement cost of such Equipment; (b) enter Administrative Employer of Record premises to recover the Equipment; and/or (c) seek injunctive relief to compel the return of such Equipment.

**6.8.** **Remedies**. Parties acknowledge that actual damages for unauthorized retention of Equipment are difficult to ascertain and agree that liquidated damages represent a reasonable estimation of Principal's damages. If Equipment is not returned within 30 days of Principal's request or termination of this Agreement, Employee and Administrative Employer of Record shall pay liquidated damages equal to fifty percent (50%) of the original replacement value of the Equipment, regardless of the age or condition of the unreturned Equipment. Payment of replacement value shall not transfer ownership of the Equipment to Employee or Administrative Employer of Record, and Principal maintains all property rights to the Equipment.



## 7.0. PAYMENTS, INVOICING AND REIMBURSEMENTS

**7.1.**    **Direct Purchase Authorization**.    To facilitate certain pre-approved business-related expenditures, Employee and Administrative Employer of Record may be granted access to Principal's corporate cards. Parties are authorized to use such Principal funds solely for pre-approved transactions that are directly related to the provision of goods or services to the Principal as specified in this Agreement.

**7.2.**    **Limits & Prohibited Expenditures**.  Employee and Administrative Employer of Record shall not exceed transaction limits specified by Principal without prior written approval from designated company personnel. Parties shall not use corporate cards or funds for personal expenditures, including but not limited to meals, entertainment, gifts or travel unrelated to business purposes.

**7.3.**    **Billing Substantiation.**  Employee and Administrative Employer of Record must provide valid receipts for all transactions made using the company card. Failure to provide receipts may result in reimbursement being delayed or denied. Principal reserves the right to monitor the use of company cards and request detailed reports of expenditures to ensure compliance with these restrictions.

**7.4.**    **Card Security.**  Employee and Administrative Employer of Record are responsible for safeguarding Principal funding sources and ensuring they are used only by authorized personnel for authorized purposes. Any suspected misuse or loss of company cards must be reported immediately to Principal for containment.

**7.5.**    **Non-transferrable.**  Authorization to use corporate cards is non-transferable. Cards shall not be used by any party other than authorized parties. Violation of these restrictions shall result in immediate revocation of the company card, a demand for reimbursement of unauthorized charges, termination of employment, and/or legal action.

**7.6.**    **Reimbursement Invoice Requirements, Preparation, and Review.**

**7.6.1.**    **Invoice Preparation.**  Invoices shall be prepared by Employee and Administrative Employer of Record, with consultation from the Principal's Vice President of Operations/Global Trading. The Vice President shall review each invoice and its supporting documentation prior to issuing approval. No invoice will be approved without appropriate documentation on file. Each invoice shall include a detailed, itemized breakdown of all charges, including but not limited to:

      i.    Equipment,
     ii.    Lease charges,
    iii.    Individual employee salaries and compensation,
    iv.    Government taxes and fees, and
     v.    All other eligible items for reimbursement.

**7.6.2.**    **Pass-Through Billing Requirement.**  Employee and Administrative Employer of Record shall only bill Principal for the direct pass-through costs incurred and paid to another person or entity. All items listed on submitted invoices shall reflect the exact amounts paid by Employee or Administrative Employer of Record to third parties, with no markups, margins, modification, or additional charges to be assessed to Principal.

**7.6.3.**    **Invoice Transparency.** Employee and Administrative Employer of Record shall maintain complete and accurate records of all pass-through costs, including payroll and non-payroll costs. All pass-through expenses must be documented with original receipts. Any changes or increases in any previously fixed costs must be substantiated.



**7.6.4    Payroll Requirements.**  The compensation rates established for all personnel employed under this MOU shall be set solely by the Principal and shall be reflected in the monthly invoices submitted by Employee and Administrative Employer of Record. Compensation shall be documented and remitted monthly to workers by Administrative Employer of Record without offset (notwithstanding documented statutory deductions required by law), and via traceable payment methods.

**7.6.5.    Payroll Records.**  Employee and Administrative Employer of Record shall keep a record of all such payroll records and provide those records to Principal's Vice President for review with each payment invoice and request. Records shall clearly distinguish between: (i) employees and vendors; (ii) payment methods (including but not limited to direct deposit and cash); (iii) base salary amounts; and (iv) any tax deductions applied to payments. For cash payments, signed and dated receipts from personnel or entities acknowledging receipt of such payment, with the amount clearly indicated, will satisfy documentation requirements.

**7.6.6.    Tax Expense Documentation.**  Employee and Administrative Employer of Record shall submit records of all invoiced tax payments to Principal's Vice President for review on a quarterly basis, and upon Principal's reasonable request. Such records shall include official tax payment receipts, confirmation numbers, or other documentation sufficient to verify that all required taxes have been properly calculated and remitted to the appropriate taxing authorities

**7.6.7.    Expense Reporting & Approval.**  Employee and Administrative Employer of Record shall provide documentation, sufficient to verify that all payroll and non-payroll invoiced costs represent exact amounts paid to third parties, to the Principal's Vice President of Operations/Global Trading for monthly review, documentation, and final approval.

**7.6.8.    Invoice Approval.**  Upon the satisfactory review and filing of the submitted documentation, the Vice President shall "green light" and give final written approval to Vyrian's finance team to release payment based on the document review and verification.

**7.6.9.    Final Payment Processing.**  The Principal shall remit all payments due to Administrative Employer of Record when: (1) It provides satisfactory documentation of the invoiced amounts to the Vice President, and (2) the Vice President approves such documentation and payments for processing. Payments will be made within thirty (30) days of the date that the Vice President has submitted a valid payment approval to the Finance team.

**7.7.    Overpayments.** Employee and Administrative Employer of Record shall immediately refund Principal for all overpayments, including but not limited to any markup or additional charges applied to pass-through costs in cases where Employee or Administrative Employer of Record later receive refunds, negotiate lower prices, or receive payment discounts, credits, or offsets from other sources.

**7.8.    Noncompliance.**  Failure to properly invoice or reimburse Principal in accordance with this agreement, including any violation of this pass-through cost provision, or failure to substantiate billing, shall constitute a material breach of this Agreement. Employee and Administrative Employer of Record shall immediately refund all such misappropriated amounts to Principal plus 10% interest, or the maximum rate permitted by law. Additionally, Principal shall be entitled to all other remedies available under this Agreement and applicable law.

**7.9.    Audit Rights and Compliance.**  Employee and AEOR's records, including invoices and supporting documentation, shall be subject to auditing by the Principal or a designated third-party auditor at any time to ensure compliance with the terms of this Agreement.



**7.10.    No Waiver.** Principal's payment of any invoice, fee, or other sum under this Agreement shall not be construed as acceptance of any deliverable, waiver of any breach or default by Employee or Administrative Employer of Record, or a limitation on Principal's right to pursue any remedy available under this Agreement or applicable law.

—

## 8.0.   CONFIDENTIAL INFORMATION

—

**8.1.    Definition.** During the Term, Employee and Administrative Employer of Record may receive or have access to confidential and proprietary information of the Principal and/or its customers and third-party suppliers. "Confidential Information" shall mean any and all documents, data, materials, and other information that the Principal provides or discloses to the parties, or to which the party is provided access, in connection with this Agreement, whether written, oral, or computer based, including without limitation all business, financial, technical and product information, methods, processes, formulas, patterns, techniques, and plans and modifications and derivative works of all of the foregoing.

**8.2.    Non-disclosure.** At all times during and after the Term, except as otherwise expressly agreed in writing by the Principal in advance, Employee and Administrative Employer of Record (i) will retain all Confidential Information in strict confidence, (ii) will use Confidential Information only in connection with performing their duties and obligations hereunder, (iii) will not copy, reproduce, modify, prepare derivative works of, reverse engineer, disassemble, reverse compile, or decompile any Confidential Information without the Principal's prior written consent; and (iv) will cause all their Representatives who receive or are provided access to Confidential Information to comply with all the foregoing in (i)-(iii).

**8.3.    Necessary Disclosure.** Administrative Employer of Record may disclose or provide access to Confidential Information to its staff who (i) needs to know such Confidential Information in connection with performance of duties and obligations hereunder; (ii) has been advised in detail of duties and obligations hereunder with respect to such Confidential Information; and (iii) has executed a written agreement that imposes on such staff duties and obligations with respect to Confidential Information that are at least as stringent as those imposed hereunder.

**8.4.    No License.** Except as expressly provided herein, nothing in this Agreement is intended to or shall provide to any party any right, license, authority, or permission with respect to the Confidential Information or use thereof.

**8.5.    Confidential Information Provided As-Is.** ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS" AND WITHOUT ANY WARRANTY, EXPRESS, IMPLIED, OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY WARRANTIES REGARDING ITS ACCURACY, COMPLETENESS, PERFORMANCE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS, OR ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**8.6.    Return of Confidential Information.** All right, title, and interest in and to Confidential Information, including without limitation all Intellectual Property rights therein, shall be and remain the sole and exclusive property of the Principal.  Employee and Administrative Employer of Record shall promptly return the originals and all copies of Confidential Information to the Principal in good order without request upon termination of this Agreement or at any other time upon The Principal's written request.

**8.7.    Remedies for Breach.** The Parties acknowledge and agree that any disclosure or use of all or any part of the Confidential Information provided to Employee and Administrative Employer of Record hereunder other

V Y R I A N

than as permitted hereunder will result in irreparable harm to the Principal, for which there is no adequate remedy at law. In the event of any such disclosure or use of the Confidential Information, the Principal shall be entitled to equitable relief, including an injunction to restrain any such disclosure or use and to prevent further breach of this Agreement. The foregoing remedy of injunctive relief is cumulative and shall not limit or exclude any other remedy available to the Principal at law or in equity.

8.8.    **No Claim to Confidentiality.**  All information and materials exchanged or developed in the course of Employee or Administrative Employer of Record's performance under this Agreement shall be deemed Principal's exclusive property. Employee and Administrative Employer of Record acknowledge and agree that Administrative Employer of Record operates only as an extension of Principal in providing the services under this Agreement and waives any right to Confidentiality. Neither Employee nor Administrative Employer of Record shall claim or designate any information, materials, processes, methodologies, or work product created, developed, or used in connection with this Agreement as confidential or proprietary information. This provision shall survive the termination or expiration of this Agreement. This provision does not affect each party's obligation to maintain the confidentiality of Principal's information as set forth elsewhere in this Agreement.

—

## 9.0. TERMINATION

—

9.1.    **Termination for Convenience.**  Principal may terminate this Agreement, in whole or in part, at any time without cause upon thirty (30) days' prior written notice to Employee or Administrative Employer of Record. In the event of such termination for convenience, Principal shall pay Employee and/or Administrative Employer of Record for: (i) services satisfactorily performed up to the date of termination; and (ii) reasonable, documented, and non-cancelable expenses directly related to the services that were incurred prior to receipt of the termination notice. Under no circumstances shall Principal be liable for any amount in excess of the fees described in this Agreement, nor shall Principal be liable for any consequential, incidental, or special damages as a result of termination.

Upon Principal's request, Employee and Administrative Employer of Record shall provide reasonable transition assistance to Principal or its designee for a period not to exceed sixty (60) days following termination or expiration of this Agreement.

9.2.    **Termination for Cause**.  Principal may terminate this Agreement for cause if Employee or Administrative Employer of Record materially breaches this Agreement and fails to cure such breach within fifteen (15) days after receiving written notice specifying the breach. Notwithstanding the foregoing, Principal may terminate this Agreement immediately and without notice or opportunity to cure if Employee or Administrative Employer of Record: (i) breaches its confidentiality or intellectual property obligations; (ii) becomes insolvent, makes an assignment for the benefit of creditors, or becomes subject to bankruptcy, receivership, liquidation, or similar proceedings; (iii) fails to provide proper substantiation or accounting for invoiced billings; (iv) engages in acts of dishonesty, impropriety, or other misconduct; or (v) violates any applicable law, rule, or regulation in connection with the performance of this Agreement.

9.3.    **Effect of Termination**.  Upon termination or expiration of this Agreement:

(a) Employee and Administrative Employer of Record shall immediately cease all work unless otherwise directed by Principal;



(b) Employee and Administrative Employer of Record shall promptly deliver to Principal all deliverables (whether completed or in-process) and all materials, documentation, and information belonging to Principal;

(c) The limited authority granted to Employee as a proxy or agent for Principal under this Agreement shall automatically terminate and become null and void, without further action by the Principal. Employee shall immediately cease all activity and shall have no further authority to act on behalf of the Principal in connection with the matters contemplated by the Agreement;

(d) All exclusivity obligations set forth in this Agreement shall survive termination, unless specifically released by Principal in writing;

(e) All Administrative Employer of Record personnel shall be released from any restrictive covenants arising from the contractual relationship between the Parties and neither Principal nor Employee or Administrative Employer of Record shall raise any objection whatsoever to future employment arrangements secured by personnel who have provided services under this exclusive relationship; and

(f) Any provisions of this Agreement that by their nature extend beyond termination or expiration shall survive, including but not limited to confidentiality, intellectual property, exclusivity, warranties, indemnification, limitation of liability, and governing law provisions.

**9.3.1.    Return of Equipment.**  Employee and Administrative Employer of Record shall immediately return to Principal all Equipment, materials, and assets purchased and/or used under this Agreement as outlined in prior sections of this MOU. License to use such items remains valid only during the Term of this Agreement. Failure to return Equipment shall constitute conversion of property and entitle Principal to pursue all available legal remedies, including but not limited to injunctive relief, monetary damages, and reimbursement of all costs and attorney's fees incurred in recovering such property.

**9.3.2.    Exclusivity Obligation.**  Employee acknowledges and agrees that the Administrative Employer of Record serves as a captive unit within the India Business Unit. The Administrative Employer of Record operates exclusively for Principal as an extension of the Principal's own business operations. As such, it is prohibited from pursuing any independent commercial interests, profit-generating activities, or contracts with third parties without Principal's prior express written permission. Employee, including his successors, heirs, or assigns are expressly prohibited from conducting business under the "OT Solutions" trade name for any other client without express written permission from Vyrian Incorporated either during or after the Term of this Agreement.

The Parties acknowledge that this exclusivity provision was a material inducement for Principal to enter into this Agreement with Employee, and that the failure to abide by these terms would cause irreparable harm to Principal.

**9.3.3.    Remedies.**  In the event of Employee or Administrative Employer of Record's material breach of this Agreement, Principal shall be entitled to all remedies available at law or in equity, including but not limited to:

    i.   The right to withhold payment for Support Services not performed in accordance with the requirements of this Agreement;

    ii.  The right to terminate this Agreement;

    iii. The right to procure replacement services from an alternate source and charge Employee or Administrative Employer of Record for any excess costs incurred, including reasonable administrative expenses;

VYRIAN

     iv.  The right to specific performance, injunctive relief, or other equitable remedies where monetary damages would be inadequate or difficult to determine; and

     v.  The right to recover direct damages resulting from such breach.

Principal's exercise of any remedy shall not preclude the exercise of other remedies. The remedies specified herein are cumulative and in addition to any other remedies available to Principal under this Agreement or applicable law. Employee and Administrative Employer of Record acknowledge that certain breaches may result in irreparable harm to Principal for which monetary damages would be an inadequate remedy, and therefore agrees that Principal shall be entitled to injunctive relief for such breaches without the necessity of posting bond or proving actual damages. Any failure or delay by Principal in exercising any right or remedy under this Agreement shall not operate as a waiver of such right or remedy.

—

## GENERAL TERMS

—

**10.0.**    **LIMITATION OF LIABILITY.**  IN NO EVENT SHALL VYRIAN BE LIABLE TO ANY OTHER PARTY FOR ANY CONSEQUENTIAL, SPECIAL, INCIDENTAL, INDIRECT, OR PUNITIVE DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER SUCH DAMAGES ARE BASED ON CLAIMS ARISING UNDER THEORIES OF CONTRACT, TORT, NEGLIGENCE, OR STRICT LIABILITY.

**11.0.**    **INDEMNIFICATION.**  To the fullest extent permitted by law, Employee and Administrative Employer of Record jointly and severally agree to indemnify, defend, and hold harmless Vyrian, its subsidiaries, affiliates, successors, assigns, officers, directors, employees, and agents ("Indemnified Parties") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and costs of investigation and defense, that are incurred by or asserted against any Indemnified Party arising out of or in any way connected with: (a) any breach or non-fulfillment of any representation, warranty, covenant, or obligation under this Agreement by any Party; (b) any negligent, reckless, or intentional misconduct or misrepresentation of Employee, Administrative Employer of Record, or their respective personnel in connection with the performance of their obligations under this Agreement; (c) any bodily injury, death, or damage to property caused by acts or omissions of Employee, Administrative Employer of Record, or their respective personnel; (d) any failure by Employee or Administrative Employer of Record to comply with any applicable laws, regulations, or legal requirements; or (e) any claims by their respective employees, agents, or contractors. This indemnification shall survive the termination or expiration of this Agreement.

**12.0.**    **NO WAIVER.**  No failure or delay by Principal in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof. No single or partial exercise of any such right, power or remedy shall preclude any other further exercise of any other right, power or remedy. A waiver of any right, power, or remedy on any occasion shall not be construed as a bar to or waiver of any such right, power, or remedy on any future occasion.

Additionally, no variation, modification, or deviation from any process, procedure or requirement set forth in this Agreement, whether intentional or unintentional, shall constitute a waiver or establish a precedent for any future or subsequent variation, modification, or deviation. Any purported waiver must be in a writing and signed by the Principal.

**13.0**    **HEADINGS.** The headings and titles of the sections and subsections of this Agreement are for convenience only and are not to be considered in construing this Agreement. Such headings do not form part of this Agreement and shall not affect its interpretation.



**14.0.**   **SEVERABILITY.**  If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such provision shall be severed from this Agreement, and the remaining provisions will remain in full force and effect. If any provision is determined to be invalid, illegal, or unenforceable, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible.

**15.0.**   **GOVERNING LAW.**  This Agreement and all matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the laws of the State of Texas and the United States of America, without giving effect to any choice or conflict of law provision or rule.

**16.0.**   **JURISDICTION.**  Each Party irrevocably consents to the exclusive jurisdiction and venue of the United States federal courts located in the State of Texas and the state courts located in either Harris County or Fort Bend County, Texas in connection with any action or proceeding arising out of or relating to this Agreement. Employee and Administrative Employer of Record hereby expressly and irrevocably submit to and consent to personal jurisdiction in the United States for all purposes related to this Agreement. Each party waives any objection based on forum non conveniens, lack of personal jurisdiction, or inconvenient venue and waives any objection to venue of any action instituted hereunder. The Parties acknowledge that this mandatory consent to jurisdiction was a material inducement for Principal's decision to enter into this Agreement, and that the failure to abide by these terms would cause irreparable harm to Principal.

**17.0.**   **ENTIRE AGREEMENT**.  This Memorandum of Understanding constitutes the entire agreement between the Parties hereto with respect to the subject matter. All prior discussions, negotiations, understandings, and agreements between the Parties, whether written or oral, regarding the subject matter of this Agreement have been incorporated and are hereby replaced by this Agreement.

The Parties acknowledge that no representations or warranties have been made by either party other than those expressly set forth in this Agreement. Any amendments, modifications, or additions to this Agreement shall be made in writing and executed by both parties.

This Memorandum governs all ongoing and future dealings, and shall remain in effect until terminated in accordance with the provisions set forth herein. The Parties agree that this document accurately reflects their mutual understanding and voluntary agreement, and that no oral or written statement or understanding, other than those contained in this Agreement, shall be valid or enforceable.

**IN WITNESS WHEREOF**, the Parties' duly authorized representatives have signed this MOU, intending to be bound, as of October 3rd, 2022.

**Vyrian Incorporated**                          **OT Solutions Tech:**

By: _____            By: _____

Printed Name: SATH SIVASOTHY            Printed Name: HUSAIN DATARWALA
Title: CEO, Vyrian Incorporated            Title: KEY MANAGER, OT Solutions PVT LTD