# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **Vyrian Inc.,** | |
| *Plaintiff*, | |
| v. | **CASE NO. 4:25-cv-03886** |
| **Abdul Tayyeb Datarwala, Husain Datarwala, Amatullah Alibhai, and OT Solutions Tech Pvt, Ltd.,** | **Jury Trial Demanded** |
| *Defendants*. | |

## <u>FIRST AMENDED COMPLAINT</u>

# Table of Contents

**FIRST AMENDED COMPLAINT** ................................................................... 1

**NATURE AND SUMMARY OF THE FIRST AMENDED COMPLAINT** ..................... 1

**PARTIES** .................................................................................................. 2

**JURISDICTION AND VENUE** ...................................................................... 3

**FACTUAL ALLEGATIONS** .......................................................................... 4
    A. The India Business Unit ....................................................................... 4
    B. The Criminal Enterprise and Pattern of Racketeering Activity ................ 6
    C. The Conspiracy and its Objects ............................................................ 7
    D. The Manner and Means of the Conspiracy ............................................ 9
    E. Involvement of Husain and Amatullah Datarwala ................................ 12
    F. Computer Fraud and Abuse .............................................................. 14

**Cause of Action No. 1: Violations Of The Racketeer Influenced And Corrupt Organizations Act (Civil Rico) (18 U.S.C. §§ 1962(C) And (D))** ............... 15
**I. The RICO Enterprise** ............................................................................ 15

**II. Civil RICO Claims Against Individual Defendants** .................................. 18
    A. Abdul Tayebb Datarwala—Principal Architect ................................... 18
    B. Husain Datarwala—Operational Manager in India ............................. 19
    C. Amatullah Alibhai—The Gatekeeper ................................................ 20

**III. Pattern of Racketeering Activity** ....................................................... 23
    A. RICO Predicates (§ 1961(1))—Wire Fraud (18 U.S.C § 1343) .............. 24
    B. Concealment and Data Manipulation to Support Wire Fraud ................ 26
    C. Use of Alter Ego Shell Entities to Obscure Money Movement .............. 27

**IV. Continuity and Relatedness** ............................................................... 28

**V. RICO Conspiracy – 18 U.S.C. § 1962(d)** ................................................ 29

**VI. Domestic Injury to Business and Property** ........................................... 30

**Cause of Action No. 2: Conspiracy To Violate The Computer Fraud And Abuse Act (18 U.S.C. § 1030(B) Et Seq.)** ................................................ 31

**Cause of Action No. 3: Violation Of The Computer Fraud And Abuse Act (18 U.S.C. §§ 1030(A)(2)(C) And (A)(4))** ................................................... 34

**Cause of Action No. 4: Fraud Conspiracy** ................................................. 37

**Cause of Action No. 5: Fraud** ...................................................................................**44**

**Cause of Action No. 6: Breach Of Fiduciary Duty** .............................................**47**
A.   Breach of Fiduciary Duties ................................................................. 48
B.   Proximate Cause and Injury ................................................................ 49

**Cause of Action No. 7: Breach Of Contract** ........................................................**50**
A.   Vyrian's Performance and Husain's Material Breaches .............................. 51
B.   Damages and Contractual Remedies .................................................... 52

**Cause of Action No. 8: Tortious Interference With Contract (MOU)** ................**52**
A.   Existence of a Valid Contract and Abdul's Knowledge................................ 52
B.   Willful and Intentional Interference ...................................................... 53
C.   Proximate Cause............................................................................. 59
D.   Damages...................................................................................... 60
E.   Malice/Exemplary Damages .............................................................. 60

**Cause of Action No. 9: Constructive Trust And Equitable Relief** .......................**61**

**JURY DEMAND** .....................................................................................**63**

**PRAYER FOR RELIEF** ...........................................................................**63**

**ATTORNEYS FOR PLAINTIFF VYRIAN INC** ...........................................**64**

### Tables and Figures

Table 1- Representative Wage Theft Chart ............................................... 10
Table 2- January and February Remittances to OT Solutions (USD) ................ 12
Table 3- OT Solutions' Employee Headcount Chart (2020-2025)..................... 22
Table 4- OT Solutions' Invoicing Growth Chart (2020-2025)......................... 23
Table 5- January 2025 Wire Transfers to OT Solutions and Affiliated Shell Vendors ............... 38
Table 6- February 2025 Wire Transfers to OT Solutions and Affiliated Shell Vendors ............. 38

Figure 1- Enterprise Shell Entity Network ........................................................ 28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **Vyrian Inc.,** | |
| *Plaintiff,* | |
| **v.** | **CASE NO.  4:25-cv-03886** |
| **Abdul Tayyeb Datarwala, Husain Datarwala, Amatullah Alibhai, and OT Solutions Tech Pvt. Ltd.** | **Jury Trial Demanded** |
| *Defendants.* | |

## FIRST AMENDED COMPLAINT

Plaintiff  Vyrian Inc. ("Plaintiff" or "Vyrian") files this First Amended Complaint against Defendants Abdul Tayyeb Datarwala, Husain Datarwala, Amatullah Alibhai, and OT Solutions Tech Pvt. Ltd. (collectively "Defendants") and in support states as follows:

## NATURE AND SUMMARY OF THE COMPLAINT

1.     This civil action arises from a multi-year scheme through which former Vyrian employees—Abdul Tayyeb Datarwala ("Abdul"), his brother Husain Datarwala ("Husain"), and Abdul's wife, Amatullah Alibhai ("Amatullah")—orchestrated and executed the diversion of company funds under the guise of operating Vyrian's India Business Unit. The scheme relied on systematically inflated invoices, falsified payroll and statutory charges, coded and opaque record-keeping, and unauthorized intrusions and deletions into Vyrian's email systems to surveil executives, obstruct oversight, and destroy evidence. Vyrian's losses exceed $6.2 million.

2.     Vyrian asserts claims for violations of the Racketeer Influenced and Corrupt Organizations Act (Civil RICO) (18 U.S.C. §§ 1962(c) and (d)) against Abdul, Husain, and Amatullah,

1

conspiracy to violate the Computer Fraud and Abuse Act (18 U.S.C. § 1030(b)) against Abdul, Husain, and Amatullah, direct CFAA violations (18 U.S.C. § 1030(a)) against Abdul, and Texas-law claims for fraud, breach of fiduciary duty, breach of contract, civil conspiracy, and tortious interference with a contract, together with equitable claims constructive trust/equitable relief. Vyrian seeks compensatory and exemplary damages, statutory remedies (including attorneys' fees under 18 U.S.C. § 1030(g)), injunctive relief to preserve and trace assets, and imposition of a constructive trust over all traceable proceeds.

## PARTIES

3.    Plaintiff Vyrian Inc. is a Nevada corporation with its headquarters and principal place of business at 3931 Ann Arbor Dr., Houston, TX 77036. Vyrian distributes electronic components and provides data services globally.

4.    Defendant Abdul Datarwala was Vyrian's Vice President of Global Trading and oversaw the India Business Unit.  Abdul Datarwala enjoyed a close personal relationship with Vyrian CEO, Sath Sivasothy. This relationship was grounded in Abdul Datarwala's ties to the Dawoodi Bohra community, which had helped Sivasothy and his family when they first came to the United States. Abdul Datarwala may be served at his last known address, 16415 Canyon Chase Drive, Houston, Texas, 77095.

5.    Defendant Husain Datarwala is Abdul Datarwala's brother and was employed by Vyrian as "Key Manager" of Vyrian's India Business Unit via OT Solutions Tech Pvt. Ltd.  Husain Datarwala is believed to reside in India at his last known address, D64 Hasanji Nagar, 453331 Indore (MP), India. Service upon Husain Datarwala may be effected under Federal Rule of Civil Procedure 4(f)(1) via the Hague Convention, or by alternative means upon motion and court approval.

2

6.      Amatullah Alibhai is Abdul Datarwala's wife and was employed with Vyrian as a project manager. During her employment she interfaced with Vyrian's outside staffing agencies and India-based teams and benefitted from the scheme described below. Amatullah Alibhai may be served at her last known address, 16415 Canyon Chase Drive, Houston, Texas, 77095.

7.      Defendant OT Solutions Tech Pvt. Ltd. ("OT Solutions") is an Indian corporation with its headquarters and principal place of business at 180, Slice 4, Scheme 97, Vip Paraspar Nagar, Indore, Madhya Pradesh, 452012, India. Service upon OT Solutions may be effected under Federal Rule of Civil Procedure 4(f)(1) via the Hague Convention, or by alternative means upon motion and court approval.

## JURISDICTION AND VENUE

8.      This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under Civil RICO, 18 U.S.C. §§ 1962(c) and (d) and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

9.      The Court has supplemental jurisdiction over the related state-law claims under 28 U.S.C. § 1367(a) because they arise from the same nucleus of operative facts.

10.     The Court has personal jurisdiction over Abdul Tayyeb Datarwala and Amatullah Alibhai because they resided in Fort Bend County, Texas during the relevant period and purposefully directed tortious conduct at a Texas company headquartered in this District.

11.     The Court has specific personal jurisdiction over Husain Datarwala because he purposefully directed the acts at issue toward Texas, including coordinating and transmitting fraudulent invoices and payment instructions to Houston, Texas, administering funds for a Texas company, and traveling to Texas in February 2025 to further the scheme.

12.     The Court has specific personal jurisdiction over OT Solutions because it entered into a contractual relationship with Plaintiff, a Texas company headquartered in Houston, and

purposefully directed its activities toward Texas, including coordinating and transmitting fraudulent invoices and payment instructions to Houston and sending Husain Datarwala to Texas in February 2025 in connection with the matters at issue.  Additionally, OT Solutions expressly submitted to the jurisdiction of this Court in the parties' Memorandum of Understanding, which provides that each party "irrevocably consents to the exclusive jurisdiction and venue of the United States federal courts located in the State of Texas"  and "expressly and irrevocably submit[s] to and consent[s] to personal jurisdiction in the United States for all purposes related to this Agreement."[1]

13.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Houston, Texas, including receipt and processing of the challenged invoices, the transmission of funds, operation and monitoring of Plaintiff's computer systems, and the resulting injury to Plaintiff.

## FACTUAL ALLEGATIONS

### A.  The India Business Unit

14.    Vyrian formed its India Business Unit in 2020 to reduce costs and streamline operations.

15.    In 2022, in response to a negative audit finding by one of Vyrian's third party auditors, Vyrian documented its existing practices and relationship to the India Business Unit in a Memorandum of Understanding.[2]

16.    To formalize and document the structure and oversight of its India Business Unit in response to aerospace quality compliance requirements, Vyrian executed a Memorandum of Understanding ("MOU") dated October 3, 2022, which documented then existing policies and procedures. Exhibit A ("MOU").

---

[1] Exhibit A ("MOU") § 16.0, at 21.
[2] *See* MOU.

4

17.     The MOU was executed by Sath Sivasothy, CEO of Vyrian, and Husain Datarwala, in his capacity as Key Manager of The India Business Unit. The document was specifically designed to address and close a quality compliance nonconformance finding during Vyrian's AS9120B and AS6081 audit, and was intended to serve as objective evidence of Vyrian's exclusive control and ownership over its Indian operations.

18.     The MOU is clear and unambiguous in establishing that OT Solutions was a fully captive, non-commercial business unit, created and wholly funded by Vyrian for the limited purpose of providing ministerial employer-of-record and administrative support services in India. Key provisions include:

a) **Vyrian's Exclusive Ownership and Control**. The MOU states that "the entirety of the India Business Unit, Administrative Employer of Record, and all related operations are wholly owned and controlled by Principal [Vyrian] and continue to be solely financed by Principal to ensure exclusivity and compliance with international law" (Recital 6, MOU at 2).

b) **No Independent Commercial Authority or Profit Motive.** Section 2.1.2 expressly prohibits Husain or OT Solutions from "leveraging the India Business Unit or any Principal resources for independent commercial interests, activities, or personal gain."

c) **Express Fiduciary Obligations.** Section 3.3 states that "all management and supervisory personnel shall operate in good faith and with due diligence" and must "at all times act in the best interest of the Principal."

d) **Abdul Datarwala's role as Vice President of Operations.** Abdul Datarwala was formally designated as Vice President of Operations/Global Trade with full

authority to "establish, supervise, and audit all India Business Unit and Administrative Employer of Record operations, finances, systems, and personnel" (§ 3.1.1.1(b), MOU at 4).

e) **Husain Datarwala's role as Key Manager.** Husain Datarwala was appointed Key Manager "responsible for the Administrative Employer of Record's day-to-day office administration," payroll execution, lease management, and tax obligations—but only "in accordance with directives from the Principal's Vice President" (§ 3.1.2.1(b), MOU at 5–6).

f) **Pass-Through Billing and Expense Controls.** Section 7 of the MOU imposes detailed accounting protocols. Invoices were required to reflect "only direct pass-through costs" and were prohibited from including "markups, margins, modification, or additional charges" (§ 7.6.2, MOU at 15).

g) **Ownership of Work Product and Equipment.** All work product, systems, and records created by OT Solutions or its personnel remained the "sole and exclusive property of Vyrian" (§ 5.6, MOU at 10). All company equipment, tools, and devices were likewise to be returned immediately upon termination (§§ 6.2–6.8, MOU at 14).

### B. The Criminal Enterprise and Pattern of Racketeering Activity

19.    From 2020 through early 2025, Defendants Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai operated as an association-in-fact enterprise (the "Datarwala Family Enterprise") that defrauded Vyrian through a pattern of racketeering activity. The Enterprise operated through OT Solutions, converting what was designed to be Vyrian's legitimate captive staffing entity into the primary vehicle for executing a multi-year fraudulent scheme. This

corruption of OT Solutions' original purpose allowed Defendants to maintain the appearance of normal business operations while systematically extracting millions of dollars from Vyrian.

20.    The Enterprise maintained a defined hierarchical structure. Abdul Datarwala served as architect and leader, exercising control over invoice approvals and strategic coordination from his position as Vyrian's Vice President of Global Trading. Husain Datarwala functioned as operational manager in India, executing payroll schemes, coordinating bank transfers, and managing approximately 13 shell entities to obscure fund movements. Amatullah Alibhai acted as gatekeeper, undermining competitive staffing vendors in Mexico and the Philippines to consolidate all foreign hiring through the Enterprise-controlled OT Solutions to maximize fraudulent billing opportunities.

21.    Between 2020 and 2025, the Enterprise engaged in hundreds of predicate acts of wire fraud in violation of 18 U.S.C. § 1343. These acts involved the interstate and international transmission of fraudulent invoices, false financial data, and wire transfer instructions containing material misrepresentations about employee salaries, commissions, statutory tax obligations, and operational expenses. Representative examples of these wire fraud predicates are documented in Exhibit E, which details the systematic pattern of fraudulent communications and corresponding wire transfers that sustained the Enterprise's operations throughout the conspiracy period.

22.    The Enterprise's criminal activities resulted in Vyrian remitting over $9.5 million to OT Solutions and related alter-ego entities, with approximately $6.2 million of that amount representing fraudulent charges. The Defendants accomplished this through three principal coordinated schemes described below.

### C.  The Conspiracy and its Objects

23.    The corruption of OT Solutions' original legitimate purpose allowed the Defendants to

maintain the appearance of normal business operations while  they executed a multi-year conspiracy to defraud Vyrian. Defendants used OT Solutions against Vyrian through three coordinated schemes:

24.    First, the conspiracy involved submitting fraudulent, inflated monthly spreadsheets and invoices for Vyrian's India Business Unit via OT Solutions for payment.  These monthly spreadsheets and invoices overstated salaries, commissions, lease costs, and statutory tax/Provident Fund charges, all for the personal enrichment of Abdul, Husain, and Amatullah. Attached as exhibits to this First Amended Complaint, and incorporated by reference, are monthly payment emails (Exhibit B), fraudulent spreadsheets from 2020 – 2025 (Exhibit C), and a sample of employee paystubs and offer letters confirming what the employees were actually paid (Exhibit D).

25.    Second, from February 2022 through May 2022, Amatullah and Abdul blocked Vyrian from expanding and diversifying its hiring options in Mexico and the Philippines. They restricted agency hires to just three employees, established contrived approval controls, and eventually terminated those contracts entirely. Under the guise of legitimate business oversight, they imposed arbitrary performance metrics, education requirements, and placement restrictions that were specifically designed to sabotage the vendors' effectiveness. Once they had created sufficient justification through these manufactured obstacles, they cancelled the contracts to ensure all staffing would flow exclusively through India. This deliberate strategy allowed the defendants to consistently grow headcount under OT Solutions while maximizing OT's invoicing revenue potential and staffing opportunities.

26.    Third, in furtherance of both schemes, the co-conspirators covertly reconfigured Vyrian's Microsoft Exchange systems to surveil executives and anticipate oversight efforts. The co-

conspirators covertly reconfigured Vyrian's Microsoft Exchange "outgoing spam filtering" to copy all outbound corporate emails—including those of the CEO, CFO, and HR Director—into a mailbox they controlled, directly infiltrated executive mailboxes, and, in the weeks before termination, deleted approximately 445 emails and related documents tied to the scheme. These acts were executed without authorization and with the purpose of anticipating oversight, concealing the fraud, and destroying proof.

### D.   The Manner and Means of the Conspiracy

27.   Each month, Abdul and Husain prepared itemized expense spreadsheets for the India Business Unit, which included line items for salaries, taxes, office leases, bonuses, commissions, and miscellaneous costs. These spreadsheets were submitted directly to Vyrian's CFO for payment.[3] Abdul and Husain met with Vyrian's CEO over Zoom during the first week of each month to review the month's submitted invoices.[4] Abdul leveraged and exploited his status as a trusted senior officer to ensure that the fraudulent invoices were processed without question.

28.   The fraud involved multiple layers of misrepresentation causing Vyrian to regularly make improper payments, for example:

a) **Overstatement of employee compensation**. India Business Unit employees were often paid just 25% to 35% of the amounts billed to Vyrian. For example, during a November 2023 video call, Abdul Datarwala claimed he had directly spoken to a new hire ("DM-03") and negotiated the employee's part-time salary to $2,200 and full-time salary to just over $4,000. The following month, the new employee appeared on invoices at $4,850 monthly, a rate that continued

---

[3] Exhibit B (Monthly emails from 2020-25 from Abdul and Husain requesting payment).
[4] Exhibit C (Excel files from 2020-25 showing employee wages and expenses that Datarwala Brothers fraudulently invoiced to Vyrian).

through 2025. The employee's bank statements later revealed that the employee had never received more than $1,700 per month regardless of part-time or full-time status, despite what Abdul approved for Vyrian to be charged monthly. In another example, a sales employee ("SE-09") was reported as receiving $1,900 per month, but his paystub revealed actual monthly payments of less than $660. The Datarwalas knowingly misrepresented compensation rates to Vyrian while systematically pocketing the substantial difference. The same pattern held across dozens of employees for years.[5]

**Wage Theft Based on 11 Representative Business Unit Employees**

|  | Employee ID | Invoiced Salary (USD) | Datarwala Brothers Paid | Wage Theft USD | Delta |
|---|---|---|---|---|---|
| Ujjwal Mourya | SE-12 | 2,650.00 | 1,148.24 | 1,501.76 | 43% |
| Dhananjay Godse | SE-09 | 1,900.00 | 654.50 | 1,245.50 | 34% |
| Shubham Prajapathi | SE-64 | 1,850.00 | 516.71 | 1,333.29 | 28% |
| Shashank Tripathi | SE-08 | 2,050.00 | 688.94 | 1,361.06 | 34% |
| Vikas Mani | CS-02 | 2,400.00 | 1,090.83 | 1,309.17 | 45% |
| Aditya Vardhan | CS-07 | 1,900.00 | 631.53 | 1,268.47 | 33% |
| Abhijeet Singh | PE-01 | 2,350.00 | 723.39 | 1,626.61 | 31% |
| Akshay Majalikar | PE-03 | 2,250.00 | 930.07 | 1,319.93 | 41% |
| Heena Rani | AF-02 | 2,750.00 | 735.35 | 2,014.65 | 27% |
| Rohan Goyal | AF-03 | 2,700.00 | 1,010.45 | 1,689.55 | 37% |
| Naveen Sharma | DM-03 | 4,850.00 | 1,664.94 | 3,185.06 | 34% |

*Table 1- Representative Wage Theft Chart*

b) **Ghost Payroll**: Employee end-of-employment notice periods were also manipulated to extract additional funds from Vyrian. For example, in a meeting with Vyrian's CEO on February 19, 2025, the Datarwalas insisted that Vyrian pay a three-month notice payment of $12,000 for employee (SE-113) based on

---

[5] See Exhibit D (Sample of 11 employee paystubs and offer letters for what they were actually paid).

the $4,000 per month salary Vyrian paid him. However, the employee's paystubs only showed a monthly payable salary of $2,350 per month and he was subject to only a two-month notice period. This manipulation was a scheme to induce Vyrian to disburse additional fraudulent payments.

c) **Fake or Inflated Tax Charges**: The invoices included line items for statutory taxes and Provident Fund payments (India's mandatory employee retirement savings contributions) that were never remitted to Indian authorities.

d) **Commissions That Were Never Paid**: Between 2021 and 2025, over $277,000 in commissions were billed to Vyrian by the Datarwala brothers for payment to India Business Unit employees. Employees' bank statements confirm that they never received any such bonuses.

e) **Lease Inflation**: Office leases were priced at above-market rates. The Datarwalas pocketed the difference.

29.    The representative January and February 2025 chart below provides examples of who sent the fraudulent invoices, what they contained, when they were transmitted, and how the amounts were broken up between the various shell entities. This scheme has been in place since at least October 2020 and continued through February 2025.



| Invoice Month | Year | Requester | Date | OT Company codes | Amount | Wired On | Receiving Bank |
|---|---|---|---|---|---|---|---|
| **JAN and FEB 2025 Remittances to OT Solutions (Vyrian India Business Unit) in USD** | | | | | | | |
| January | 2025 | Abdul | 1/2/25 | OT Solutions | $52,908.00 | 1/2/25 | IDFC First Bank (India) |
| January | 2025 | Abdul | 1/6/25 | Webwise | $15,600.00 | 1/6/25 | IDFC First Bank |
| January | 2025 | Abdul | 1/8/25 | Nextech | $13,420.00 | 1/8/25 | AU Small Finance Bank LTD |
| January | 2025 | Abdul | 1/8/25 | Infotech | $17,070.00 | 1/8/25 | CITBANK NA |
| January | 2025 | Abdul | 1/6/25 | Modern | $20,610.00 | 1/6/25 | IDFC First Bank |
| | | | | **Jan Wire Total** | **$119,608.00** | | |
| **Invoice Month** | **Year** | **Requester** | **Date** | **OT Company codes** | **Amount** | **Wired On** | **Receiving Bank** |
| February | 2025 | Husain | 2/3/25 | OT Solutions | $48,960.00 | 2/3/25 | IDFC First Bank (India) |
| February | 2025 | Husain | 2/4/25 | Webwise | $16,321.00 | 2/4/25 | IDFC First Bank |
| February | 2025 | Husain | 2/6/25 | Nextech | $20,455.00 | 2/6/25 | CITBANK NA |
| February | 2025 | Husain | 2/6/25 | Infotech | $14,688.00 | 2/6/25 | CITBANK NA |
| February | 2025 | Husain | 2/4/25 | Modern | $21,115.00 | 2/4/25 | IDFC First Bank |
| | | | | **Feb Wire Total** | **$121,539.00** | | |

*Table 2- January and February Remittances to OT Solutions (USD)*

30.    On February 19, 2025, the scheme unraveled when an employee named Kawaljeet Singh came forward during a Zoom call and disclosed his real paystub, which was grossly inconsistent with his invoiced salary on file. This employee disclosure triggered an internal audit of the India Business Unit's finances and discovery of additional employees that had significant differences between their actual pay and their invoiced salary submitted by Abdul and Husain.

### E.  Involvement of Husain and Amatullah Datarwala

31.    Husain Datarwala was not merely a passive administrator in the multi-year scheme. He was an active co-conspirator who oversaw daily payroll operations, bank transfers, and all Business Unit administrative tasks that required a physical presence on the ground in India. Husain appeared on monthly Zoom video calls between 2022-2025 where he supported Abdul Datarwala's fraudulent statements regarding invoice charges and lobbied for additional funding for the India Business Unit. Husain Datarwala sent or was copied on the email submission of every fraudulent

invoice to Vyrian between 2020 and 2025.

32.     Amatullah Alibhai was not simply an unwitting employee caught in her family's scheme. She was a knowing accomplice and indispensable architect of the Defendants' strategy. An MBA student, Alibhai was hired in February 2022 as a project manager to manage Vyrian's outsourced staffing strategy and vendor relationships with two business process outsourcing companies: Konecta Mexico and Sirius Philippines.

33.     Once in place, Amatullah used her position to undermine Vyrian by removing competitive options to OT Solutions through deliberate obstruction. She throttled hiring placements to 2-3 candidates for the Mexican and Philippine staffing companies, while OT Solutions, under her husband and brother-in-law's control, expanded rapidly during this same time period. Her financial analysis of competitor performance provided strategic intelligence that informed the Defendants' decisions. Three minutes after sending a detailed analysis showing Konecta's profitability and growth trajectory, she endorsed Abdul's abrupt decision to cancel the contract, eliminating one of Vyrian's two profitable staffing sources and further consolidating all hiring through OT Solutions. Amatullah prioritized the family enterprise over Vyrian's interests.

34.     The success of her four-month campaign to undermine Vyrian's hiring diversification efforts and to consolidate hiring in India became immediately apparent by June 2022. Hiring through OT Solutions doubled from 49 to 96 employees, and fraudulent invoicing skyrocketed from $169,250 to $318,263.

35.     On learning of the impending litigation, Amatullah actively participated in Abdul's efforts to dispose of assets acquired through fraud by jointly listing their residential properties for sale in June and July 2025. The properties included 3434 Harper Meadow Missouri City, TX, (MLS #50171089) and a neighboring property at 3534 Lake Landing, Missouri City TX (MLS #

92213365), both listed through the Houston Association of Realtors. The synchronized listing of multiple homestead properties when litigation is imminent appears to be a coordinated effort by Amatullah and Abdul to liquidate and place fraudulently obtained assets beyond the reach of potential recovery.

### F. Computer Fraud and Abuse

36.    In January 2025, just prior to his termination, Microsoft data logs revealed that Abdul engaged in a large-scale deletion of emails and records, including messages implicating him, Husain and Amatullah in fraudulent activity.

37.    Company data logs also reveal that, potentially for years, Abdul unlawfully intercepted and rerouted all outbound emails—including private executive correspondence—into his own email folders. While Abdul held full administrator privileges for the India Business Unit's OT Solutions' email systems, these privileges did not apply to Vyrian's separate email infrastructure. Abdul knowingly reconfigured Vyrian's Microsoft Exchange spam monitoring settings to intercept Vyrian's email traffic and effectively cause copies of all outgoing Vyrian emails to be routed to his personal email folders. This unauthorized configuration allowed him to systematically monitor all Vyrian correspondence, including executive communications, without directly logging into inboxes and triggering detection.

38.    Data logs reveal that on several other occasions, Abdul directly infiltrated the mailboxes of Vyrian's CEO, CFO, and HR managers without permission, activity that was well outside the scope of his employment and exceeded his legitimate authority as Vice President of Global Trading.

39.    Abdul's unauthorized access to Plaintiff's computer systems, including his surreptitious monitoring of executive email accounts, rerouting of outbound communications to himself, and deletion of digital records, was undertaken in furtherance of and to conceal the broader fraudulent

scheme carried out by all three Defendants. Abdul's CFAA violations were an integral mechanism for controlling access to information, impeding oversight, and preventing detection of the scheme in which Husain and Amatullah were active participants.

## CAUSE OF ACTION NO. 1: VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (CIVIL RICO)

### (18 U.S.C. §§ 1962(c) and (d))

#### (Against Defendants Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai)

40.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein.

41.    **Statutory Basis.** 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate subsection (c).

## I.    The RICO Enterprise

42.    Defendants Abdul Tayebb Datarwala, Husain Datarwala, and Amatullah Alibhai are each a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is "capable of holding a legal or beneficial interest in property."

43.    The "Datarwala Family Enterprise" is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). Its members and components include:

    a)  Corporate Vehicle: OT Solutions

    b)  Core Members: Defendants Abdul Tayebb Datarwala, Husain Datarwala, and Amatullah Alibhai

c)   Financial Infrastructure:  A network of at least 13 alter-ego vendors (including Webwise Solutions, Nextech Solutions, Infotech Innovations, and Modern Technology) that together supplied the financial infrastructure used to extract Vyrian funds.

44.   The Enterprise operated through an ascertainable hierarchical structure with distinct roles and responsibilities.

a)   **OT Solutions** was originally established as Vyrian's wholly-owned and captive entity under the MOU (Recital 6, MOU at 2), and was designed to operate exclusively for Vyrian's benefit with transparent pass-through billing and full audit cooperation. Section 2.1.2 of the MOU expressly prohibits Husain or OT Solutions from "leveraging the India Business Unit or any Principal resources for independent commercial interests, activities, or personal gain." Instead, the Defendants ultimately turned OT Solutions against Vyrian, using it to implement their fraudulent scheme of submitting overinflated and false invoices to Vyrian for payment through international wire transfers.

b)   **Defendant Abdul Datarwala** participated in directing the Enterprise by serving as the architect and leader, exercising control over Indian staffing invoice approvals, and strategic coordination of fraudulent activities through OT Solutions.

c)   **Defendant Husain Datarwala** participated in directing the Enterprise's affairs by executing payroll decisions, coordinating bank transfers among shell entities, co-preparing monthly cost schedules used to generate fraudulent invoices, and coordinating transfers among shell entities through OT Solutions.

16

    d) **Defendant Amatullah Alibhai** participated in directing the Enterprise's affairs by imposing and enforcing vendor-approval constraints and cancellations that funneled headcount and billings exclusively to the Enterprise vehicle OT Solutions to consolidate all foreign staffing through OT Solutions and maximize fraudulent invoicing requests.

    e) **Shell entities** served as conduits for the movement of fraudulent proceeds to OT Solutions by layering and obscuring the true destination of misappropriated funds.

45. From 2020 through 2025, the Enterprise maintained continuity of structure and purpose through OT Solutions. Members coordinated their activities through regular communications, shared banking relationships and addresses, and operated with the unified objective of extracting money from Vyrian while concealing the scheme's operation and proceeds.

46. The Enterprise had an ascertainable structure separate from the pattern of racketeering activity. This structure included OT Solutions' formal corporate setup, the October 3, 2022 MOU that established how operations would work, shared business addresses and bank accounts among the shell companies, coordinated decisions to undermine Vyrian's global hiring efforts in Mexico and Philippines, and regular communication channels used to plan and carry out the fraud through monthly fraudulent invoices submitted for wire payment.

47. Each Defendant is a distinct "person" under § 1961(3) who operated or managed, directly or indirectly, the affairs of the Enterprise through the pattern of racketeering activity described herein.

48.     The Datarwala Family Enterprise functioned from 2020-2025 as an ongoing racketeering organization with an ascertainable structure, defined roles, continuity of personnel, and a common purpose of systematically defrauding Vyrian.

49.     The Enterprise operated in Texas and across India. It engaged in interstate and foreign commerce by transmitting wire transfers between the United States and India, coordinating operations through cloud-based systems and Microsoft Exchange servers located in Texas, and transmitting invoices, spreadsheets, and instructions across international borders.

50.     Beginning in 2020 and continuing through 2025, each Defendant participated in the operation or management of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c). From 2020-2025, Abdul  acted as architect and approver of monthly invoices and payment instructions and set routing and splitting across shell entities. From 2020-2025, Husain acted as on-the-ground support for payroll manipulation, bank transfers, and shell-entity invoicing. From February 2022 - May 2022, Amatullah  exercised control over staffing-vendor approvals and the contrived "engineers-only" constraint that funneled headcount—and billing—exclusively to the Enterprise-controlled vehicle, OT Solutions. The Enterprise used the co-opted OT Solutions and multiple alter ego shell entities to perpetuate this coordinated scheme of fraudulent billing, vendor sabotage, electronic surveillance, and evidence destruction.

## II.  Civil RICO Claims Against Individual Defendants

### A.  Abdul Tayebb Datarwala—Principal Architect

51.     **Role in the Enterprise.**  By the conduct described, Abdul Datarwala participated in the operation or management of the enterprise's affairs. He served as the principal architect and leader of the Datarwala Family Enterprise. As Vyrian's Vice President of Global Trading, he exercised

control over all India Business Unit operations, including invoice preparation, payment approvals, and financial and technology oversight. Abdul leveraged his senior position and the trust placed in him by Vyrian's CEO to systematically defraud the company while concealing the Enterprise's activities through electronic surveillance and evidence destruction. Abdul's role was essential to the Enterprise's success. His authority within Vyrian provided legitimacy to fraudulent invoices, his technical access enabled surveillance of potential threats, and his coordination of family members ensured systematic and loyal execution of the scheme. Without Abdul's leadership and abuse of his fiduciary position, the Enterprise could not have operated undetected for five years or extracted over $6.2 million from Vyrian.

52.    **Specific Racketeering Acts.** Abdul's racketeering activities included: (a) preparing and submitting hundreds of fraudulent invoices containing inflated salaries, fictitious commissions, and fabricated tax charges; (b) coordinating with Husain to direct fraudulent payments to Enterprise-controlled shell entities; (c) coordinating with Amatullah to undermine competitive vendors in Mexico and the Philippines and funnel staffing through India to inflate headcount for fraudulent invoicing; (d) unlawfully accessing Vyrian's computer systems to monitor executive communications and anticipate oversight efforts; (e) systematically deleting corporate emails and records to destroy evidence of the fraudulent scheme; and (f) using his fiduciary position to authorize millions in fraudulent disbursements while concealing his personal financial interest in the Enterprise.

### B.  Husain Datarwala—Operational Manager in India

53.    **Role in the Enterprise.**  By the conduct described, Husain Datarwala participated in the operation or management of the enterprise's affairs. He served as the operational manager and on-the-ground executor of the Datarwala Family Enterprise in India. Appointed as Key Manager of

OT Solutions under the October 3, 2022 MOU, Husain was responsible for day-to-day administration, payroll execution, and coordination of fraudulent activities within India while reporting to Abdul. Husain's role was critical to the Enterprise's operational success. His physical presence in India enabled execution of fraudulent payroll schemes, his banking relationships facilitated money movement through shell entities, and his coordination with Abdul ensured systematic submission of fraudulent invoices. Without Husain's physical presence in India, operational management, and willingness to misrepresent actual employee compensation and business expenses, the Enterprise could not have sustained its five-year fraud or diverted millions in corporate funds to family-controlled accounts.

54.     **Specific Racketeering Acts.** Husain's racketeering activities included: (a) co-preparing monthly fraudulent expense spreadsheets with Abdul that inflated salaries, fabricated commissions, and misrepresented tax obligations; (b) administering payroll operations while knowing employees received only 25-35% of invoiced amounts; (c) directing fraudulent wire transfers to Enterprise-controlled shell entities and bank accounts; (d) coordinating with Abdul to structure severance schemes based on false employment terms; (e) participating in monthly Zoom calls with Vyrian executives to defend and justify fraudulent pricing when questioned; and (f) managing approximately 13 alter-ego entities and bank accounts used to process and disguise Enterprise proceeds during the fraud.

### C. Amatullah Alibhai—The Gatekeeper

55.     **Role in the Enterprise.**  By the conduct described, Amatullah Alibhai participated in the operation or management of the Enterprise's affairs. She served as the Enterprise's gatekeeper by undermining competitive vendors in Mexico and Philippines to consolidate the Enterprise's control over Vyrian's staffing operations and maximize its billing potential. An MBA student with

a sophisticated understanding of business operations and vendor management, Amatullah was appointed by Vyrian in February 2022 to manage business process outsourcing (BPO) staffing vendors. Rather than applying her business education to benefit Vyrian, she used her advanced knowledge and position of trust to  remove competitive staffing options and consolidate the Enterprise's control to increase staffing at OT Solutions and increase fraudulent billing practices through Abdul and Husain's emails and invoices.

56.     **Specific Racketeering Acts.**  Amatullah's racketeering activities included: (a) conducting a coordinated campaign to thwart other profitable foreign staffing opportunities through strategic non-responsiveness and restricting vendor operations through hiring caps and approval controls; (b) monitoring and analyzing competitor performance while simultaneously undermining their success; (c) coordinating with Abdul to limit and cancel staffing vendor relationships despite documented profitability; (d) enforcing the fabricated "electrical-engineers-only" hiring rule against competitive vendors to limit their hires while exempting OT Solutions from the same requirement; (e) and benefiting from Enterprise proceeds through real estate acquisitions and luxury expenditures.

57.     **India Staffing Consolidation Strategy.**  Acting in concert with Abdul, Amatullah enforced their contrived "electrical-engineers-only" rule and limited BPO hiring to just a handful of placements with Vyrian.[6] Vendors were forced to pass on Mexican and Filipino talent and re-screen their candidate pipelines to meet the Defendants' fabricated standard, while OT Solutions continued to place candidates in India at a rapid pace without restriction.

58.     The Enterprise deliberately undermined Vyrian's geographic diversification efforts to ensure that it maintained full control over Vyrian's staffing operations and staffing remained centralized

---

[6] Exhibit F at 4-8 (Amatullah Alibhai arbitrarily limits hiring to only 3 engineers).

in India. Amatullah's enforcement of this asymmetry ensured Enterprise-controlled entities captured Vyrian's staffing growth. The two vendors under Amatullah's control never made more than **six** total staff placements during her oversight of their contract periods. Meanwhile, with Amatullah in place, OT Solutions experienced its greatest growth, doubling its headcount from 49 to 96 employees and increasing its fraudulent billing from $169,250 to $318,263 by the end of May 2022 when Abdul cancelled the last staffing contract.



*Table 3- OT Solutions' Employee Headcount Chart (2020-2025)*



*Table 4- OT Solutions' Invoicing Growth Chart (2020-2025)*

59.   **Essential Role in Enterprise Operations.**   Amatullah's role was indispensable to the Enterprise's growth strategy. Her MBA-level understanding of competitive dynamics made her sabotage particularly effective. Her position within Vyrian's management structure provided institutional cover for actions protecting the Enterprise. Her sophisticated financial analysis of competitors provided the Enterprise with critical intelligence on competitive threats, market opportunities, and optimal timing for vendor cancellations. Without Amatullah's vendor management role and decision-level control over approvals, the Enterprise could not have dismantled Vyrian's other viable staffing options or achieved the explosive growth that followed.

### III.      Pattern of Racketeering Activity

60.   To accomplish their fraudulent scheme, Defendants engaged in four coordinated categories of criminal conduct: (1) submitting and approving fraudulent invoices to extract unauthorized payments from Vyrian; (2) routing the stolen proceeds through a network of alter-ego shell companies to disguise the money trail; (3) undermining competitive vendors to consolidate control over Vyrian's staffing operations and maximize headcount for fraudulent billing opportunities;

and (4) engaging in unauthorized computer access and evidence destruction to conceal their activities from detection.

61. Defendants engaged in a pattern of "racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1) and (5) by committing numerous acts of wire fraud (18 U.S.C. § 1343) and by engaging in related acts of unauthorized computer access, obstruction, aiding and abetting, and fraudulent concealment in furtherance of their wire fraud scheme. Each Defendant acted with actual knowledge of the illegal activities and intended to engage in the conduct.

62. Defendants engaged in a pattern of racketeering activity including the following predicate crimes:

### A. RICO Predicates (§ 1961(1))—Wire Fraud (18 U.S.C § 1343)

63. The RICO predicates are wire fraud (18 U.S.C. § 1343). Other acts described (including unauthorized computer access, evidence destruction, and vendor interference) were means and methods used to perpetrate and conceal the § 1343 wire fraud.

64. From 2020 through early 2025, Defendants transmitted or caused the transmission of over 300 international wire transfers and hundreds of interstate electronic communications containing materially false information in furtherance of their scheme to defraud Vyrian Inc. These fraudulent transmissions included:

 a) Inflated salary invoices: Monthly spreadsheets and invoices sent from India to Vyrian's Houston headquarters between 2020 and 2025 that falsely inflated employee salaries, often by more than 65%;[7]

 b) Fictitious severance claims: False termination payment requests, including a February 2025 demand for $12,000 three-month severance for an employee

---

[7] See Table 1 (Representative Wage Theft Chart).

who was still working and contractually owed $4,500 for a two month severance;

c) Phantom sales commissions and bonuses: Claims exceeding $277,000 that were never actually disbursed to employees between 2020 and 2025;

d) False tax invoice charges: Recurring tax charges amounting to over $459,103 between 2022 and 2025 that were not remitted to Indian authorities and lacked any supporting documentation;

e) Payment fragmentation and concealment: Funds were routed each month through controlled shell entities as "vendor charges" between 2021 and 2025;

f) Global staffing consolidation scheme: Electronic communications and strategic silence designed to undermine competitive vendors in Mexico and the Philippines to consolidate Vyrian's staffing operations through India and maximize headcount for fraudulent billing opportunities, including Amatullah's February and March emails limiting hiring and endorsing vendor cancellation just three minutes after she documented their profitable performance.[8]

65.  Each of these transmissions was made via email and through online banking platforms, across international borders, and on a recurring monthly basis. Defendants engaged in the above-mentioned predicate acts for five years.

66.  The attached 18 U.S.C § 1343 Wire Fraud Predicate Acts Chart (Exhibit E) presents a representative and detailed sample of the numerous predicate acts committed by Defendants throughout their five-year fraudulent scheme. Each representative act identified in Exhibit E involved the transmission of emails and international wire transfers in foreign commerce between

---

[8] Specific details of these communications are addressed in paragraphs 110-118.

India and Houston, Texas, through Microsoft 365 email servers and SWIFT/Fedwire-connected financial institutions.

**B.   Concealment and Data Manipulation to Support Wire Fraud**

67.    During Vyrian's attempt to consolidate its global teams in late 2024 under the CEO's centralized command, Abdul and Husain conspired to protect the Datarwala Family Enterprise from detection and to enable its continued operation. Abdul's concealment efforts included both unauthorized computer access to monitor potential threats and systematic destruction of evidence documenting the wire fraud scheme.

68.    **Unauthorized Surveillance to Protect the Scheme.** To conceal evidence of the Enterprise's wire fraud from Vyrian management, Abdul Datarwala unlawfully reconfigured Vyrian's Microsoft Exchange server settings to redirect outbound executive emails into his personal folder using spam filter manipulations. He gave himself unauthorized administrative permissions to monitor and intercept communications across the organization that might expose or threaten the fraudulent billing scheme.

69.    For example, in September 2024, Abdul Datarwala directly infiltrated the email account of Vyrian's CEO on six different occasions: 9/4, 9/23, 9/25, 9/26, 9/27, and 9/29, and conducted his unauthorized surveillance outside of normal business hours. Then again, on November 16, 2024, between the hours of 1:08 AM and 1:23 AM, Abdul Datarwala infiltrated the email accounts of Vyrian's CEO, CFO, and HR Director and monitored their email communications without authorization.

70.    **Active Concealment of Wire Fraud Evidence.** While monitoring his colleagues' communications, Abdul intentionally minimized his own electronic trail, conducting Enterprise business through verbal channels and personal WhatsApp accounts to avoid detection. When

pressed for substantiation of fraudulent charges that formed the basis of the wire fraud, Abdul systematically deflected scrutiny by claiming no documentation existed because, "India is not like America, everything in India runs on cash." On December 2, 2024, when he was questioned directly about inflated salary charges in a recorded Zoom call, Abdul defended the fraudulent pricing by claiming the American market "has ruined the Indian salary numbers."

71. **Escalating Evidence Destruction.** As detection became imminent, Abdul exhibited escalating efforts to conceal Enterprise activities through both active evidence destruction and deliberate avoidance of scrutiny. Abdul systematically destroyed evidence of the wire fraud scheme by deleting corporate emails necessary to reconstruct his activities. In December 2024 and January 2025, just weeks before his termination, Abdul deleted significant volumes of data. Datarwala's average daily email deletion rate was 2 emails per day, but he deleted 239 emails on December 30, 2024 and another 209 emails on January 21, 2025—a deletion rate over 100 times his normal pattern.

72. Abdul also began feigning illnesses to avoid confrontation and attempted to avoid participating in recorded company meetings. For example, on December 31, 2024, Datarwala attempted to stop a regularly scheduled Zoom meeting with Vyrian's CEO just one minute into the call by claiming that it should not be recorded because "we talk about sensitive numbers here."

### C. Use of Alter Ego Shell Entities to Obscure Money Movement

73. Between 2020 and 2025, Husain and Abdul routed fraudulent proceeds through approximately 13 Enterprise-connected shell entities, including Webwise Solutions, Nextech Solutions, Infotech Innovations, and Modern Technology. These entities served no legitimate business purpose and were created solely to obscure the source and destination of funds diverted from Vyrian.

```
┌─────────────────────────────────────────┐
│         OT Solutions Alter-Ego           │
│             Shell Entities               │
│                                          │
│    1.  OT Solutions                      │
│    2.  Infotech Solutions                │
│    3.  Web work Solutions                │
│    4.  Modern Technology                 │
│    5.  NexTech Solutions                 │
│    6.  Webwise Solutions                 │
│    7.  SM Technology                     │
│    8.  Web Works Solutions               │
│    9.  Web Soft Technology               │
│    10. Web Cross Systems                 │
│    11. WEBSYS                            │
│    12. WINTECH Solutions                 │
│    13. Wenmatics                         │
│                                          │
└─────────────────────────────────────────┘
```

*Figure 1- Enterprise Shell Entity Network*

74.    The Defendants used these shell entities to split large monthly OT Solutions invoices and fragment payment trails, create multiple transaction layers, and commingle legitimate and fraudulent proceeds.  Each month, Abdul Datarwala prepared and submitted 5-6 shell company invoices to Vyrian for payment that matched the large overhead invoice submitted by his brother Husain for that month.

## IV.  **Continuity and Relatedness**

75.    Over five years (2020-2025), Defendants conducted a systematic course of racketeering activity designed to extract millions of dollars from Vyrian for the Enterprise's benefit. The pattern demonstrates closed-ended continuity under RICO.

76.    **Closed-Ended Continuity.** The racketeering acts satisfy closed-ended continuity through their extended duration and systematic nature, including:

      i.   Monthly fraudulent invoicing and wire transfers spanning five years;

      ii.  Hundreds of wire transmissions across international borders;

28

    iii.  Recurring use of multiple shell entities in coordinated money movement schemes; and

    iv.  Strategic staffing consolidation in India to maximize headcount and fraudulent billing.

### V. <u>RICO Conspiracy – 18 U.S.C. § 1962(d)</u>

77.    Defendants conspired to violate § 1962(c) by agreeing to conduct the Enterprise's affairs through a pattern of racketeering activity. The conspiracy involved coordinated agreements to commit:

  **a)  Financial Fraud:**

    i.  Submitting and approving fraudulent invoices;

    ii.  Using corporate infrastructure to route and disguise misappropriated funds; and

    iii.  Sharing in the proceeds and maintaining silence about the fraudulent scheme.

  **b)  Global Staffing Consolidation Scheme:**

    i.  Undermining competitive vendors in Mexico and Philippines through coordinated interference to consolidate all staffing through India;

    ii.  Imposing discriminatorily stringent hiring criteria on outside vendors while exempting OT Solutions to increase India's headcount for fraudulent billing; and

    iii.  Analyzing competitor performance and exploiting that intelligence to justify contract cancellations to funnel business to the Enterprise.

c) **Concealment and Obstruction:**

  i. Concealing or destroying evidence necessary to detect the scheme

  ii. Obstructing investigations and preventing Vyrian from discovering or recovering funds

  iii. Personally benefiting from misappropriated funds through property acquisitions and luxury expenditures

## VI. <u>Domestic Injury to Business and Property</u>

78.     Plaintiff suffered a domestic injury to its business and property in Houston, Texas: the fraudulent payments were disbursed from Houston-based accounts, and the losses were booked on Plaintiff's U.S. books at its Houston headquarters. As a direct and proximate result of Defendants' racketeering activity, Vyrian Inc. has sustained injury to its business and property, including:

a) Misappropriation of more than $6.2 million in corporate funds;

b) Loss of competitive pricing and cost efficiency resulting from elimination of legitimate staffing vendors;

c) Internal investigation, forensic audit, and legal costs;

d) Loss of employee trust and organizational integrity; and

e) Disruption to payroll systems, employee relationships, and operational continuity.

79.     Plaintiff seeks treble damages under 18 U.S.C. § 1964(c), costs of suit, reasonable attorneys' fees, and prejudgment interest. Current documented losses exceed $6.2 million based on reconciled wire transfer records. Plaintiff will refine damages calculations through forensic accounting analysis and comprehensive bank record review.

## CAUSE OF ACTION NO. 2: CONSPIRACY TO VIOLATE THE COMPUTER FRAUD AND ABUSE ACT

## (18 U.S.C. § 1030(b) et seq.)

### (Against Defendants Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai)

80.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

81.     **Statutory basis & private right of action.** This is a civil claim under 18 U.S.C. § 1030(b) and 18 U.S.C. § 1030(g) for conspiracy to violate the Computer Fraud and Abuse Act ("CFAA"). Plaintiff alleges that the conduct involved at least one factor in § 1030(c)(4)(A)(i)(I)—including an aggregate "loss" exceeding $5,000 in a one-year period—as further described below.

82.     **Protected computers.** At all relevant times, Plaintiff owned and operated Microsoft 365/Exchange email tenants hosted in the United States and used in interstate and foreign commerce for executive communications, finance, HR, and cross-border operations. These systems are "protected computers" within the meaning of § 1030(e)(2)(B).

83.     **The conspirators and agreement.** Beginning no later than 2024 and continuing into 2025, Abdul, Husain, and Amatullah knowingly combined, confederated and agreed to commit a CFAA offense by facilitating and concealing a multimillion-dollar fraud scheme through unauthorized and/or exceeding-authorization access to Plaintiff's protected computers and data. Their common objective was to obtain and retain things of value—including confidential business information and money routed through inflated invoices and shell entities—and to obstruct oversight and detection.

84.     **Predicate CFAA offense.** The conspiracy's object included a violation of § 1030(a)(4) (accessing a protected computer knowingly and with intent to defraud, without authorization or by

exceeding authorized access, and by means of such conduct furthering the intended fraud and obtaining anything of value), and, in the alternative or in addition, § 1030(a)(2)(C) (obtaining information from a protected computer without authorization or exceeding authorized access).

85. **Overt acts in furtherance of the conspiracy.** In furtherance of the agreement, and to facilitate and conceal the fraud Abdul:

    a) Covertly reconfigured Microsoft Exchange spam filter rules to automatically forward all outgoing emails company-wide — including those from the CEO, CFO, and HR Director — into folders controlled by him. This gave him continuous and surreptitious access to confidential executive communications, including audit and business planning, fraud concerns, and financial oversight.

    b) In September 2024, directly infiltrated the email account of Vyrian's CEO on six different occasions: 9/4, 9/23, 9/25, 9/26, 9/27, and 9/29.

    c) On November 16, 2024 between the hours of 1:08 AM and 1:23 AM, infiltrated the email accounts of Vyrian's CEO, CFO, and HR Director and monitored their email communications without authorization.

    d) In December 2024 and January 2025 — just weeks before his termination — deleted hundreds of emails and corporate documents, including invoice spreadsheets, approval trails, and correspondence that implicated him and his co-conspirators in the India Business Unit fraud.

86. **Unauthorized / exceeds-authorized-access.** Abdul's interception rule and mailbox intrusions were undertaken without authorization or exceeded authorized access because his role on the Vyrian Tenant was limited to basic account provisioning and password resets at the CEO's direction—not monitoring or accessing executive mailboxes or re-routing company-wide mail. He

manipulated Threat Management and EAC settings to place himself in the mail-flow path and repeatedly toggled mailbox permissions to mask access.

87. **Furthering the intended fraud; "anything of value."** By means of the unauthorized access, the conspirators furthered the intended fraud by surveilling executive oversight efforts, preempting audit scrutiny, timing and defending inflated invoices, and destroying evidence; they thereby obtained "things of value," including confidential business information and the ability to extract and retain money through continued fraudulent billing.

88. **Loss and § 1030(g) factor.** Plaintiff suffered "loss" as defined in § 1030(e)(11) exceeding $5,000 in a one-year period, including third-party forensic review, Microsoft Exchange log analysis, incident response, system reconfiguration, permission remediation, and related investigative labor reasonably necessary to assess, contain, and remediate the intrusion. These losses occurred within a continuous 1-year window.

89. **Causation.** The losses alleged were proximately caused by the conspiracy and its overt acts because such expenditures were reasonably necessary to investigate and remediate the unauthorized access, restore systems, and respond to the concealment and evidence-destruction efforts that enabled continued fraudulent extractions.

90. **Joint and several liability.** Each Defendant is jointly and severally liable for all civil damages recoverable under § 1030(g) resulting from the conspiracy and from any predicate CFAA violation committed in furtherance of the conspiracy, irrespective of which conspirator performed the direct access.

## CAUSE OF ACTION NO. 3: VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT

## (18 U.S.C. §§ 1030(a)(2)(C) and (a)(4))

## (Against Defendant Abdul Datarwala)

91.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

92.     This cause of action is brought under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, which prohibits intentional, unauthorized access to protected computers, and the knowing destruction, transmission, or misuse of data causing damage or loss. Plaintiff seeks civil relief pursuant to 18 U.S.C. § 1030(g) for violations of, inter alia, 18 U.S.C. § 1030(a)(2)(C) and § 1030(a)(4).

93.     At all relevant times, Vyrian Inc. maintained a secure, cloud-based Microsoft Exchange email platform and administrative system, hosted in the United States and used in interstate and foreign commerce. This included: 1) Internal and executive email communications (CEO, CFO, HR Director); 2) Financial audit files and accounting records; 3) Invoicing, remittance, and operations correspondence across U.S.–India channels; 4) Personnel data, vendor records, and bank instruction spreadsheets. These systems qualify as "protected computers" as defined in 18 U.S.C. § 1030(e)(2)(B).

94.     Defendant Abdul Datarwala, while serving as Vyrian's Vice President of Global Trading, was granted full administrative access to coordinate India-based operations. However, he was not authorized to access, intercept, monitor or delete the internal email accounts of Vyrian's U.S. executives, nor to modify the company's mail routing settings for corporate-wide surveillance or deletion purposes, and nor to access or alter corporate records for any purpose other than legitimate

business needs.

95.    In at least June 2024 through early 2025, Abdul exceeded his authorized access and intentionally manipulated the company's Microsoft Exchange system, by:

a) **Rerouting Outbound Emails**: Abdul covertly reconfigured Microsoft Exchange spam filter rules to automatically forward all outgoing emails company-wide — including those from the CEO, CFO, and HR Director — into folders controlled by him. This gave him continuous and surreptitious access to confidential executive communications, including audit and business planning, fraud concerns, and financial oversight for the purpose of obtaining information from a protected computer without authorization in furtherance of a scheme to defraud and to obtain things of value, including advance knowledge of oversight actions.

b) **Mailbox Infiltration**: Using unauthorized administrator tools or access credentials, Abdul directly accessed the mailboxes of Vyrian's CEO, CFO, and HR Director. These actions violated Vyrian's internal access controls and bypassed ordinary safeguards. The unauthorized access included monitoring flagged terms, attachments, and sender-recipient patterns tied to audit discussions. Specifically, in September 2024, Abdul Datarwala directly infiltrated the email account of Vyrian's CEO on six different occasions: 9/4, 9/23, 9/25, 9/26, 9/27, and 9/29, and conducted his unauthorized surveillance outside of normal business hours. Again, on November 16, 2024 between the hours of 1:08 AM and 1:23 AM, Abdul Datarwala infiltrated the email accounts of Vyrian's CEO, CFO, and HR Director and monitored their email

communications without authorization.

   c) **Mass Deletion of Records**: In December 2024 and January 2025 — just weeks before his termination — Abdul deleted hundreds of emails and corporate documents, including invoice spreadsheets, approval trails, and correspondence that implicated him in the India Business Unit fraud. Internal audit logs show unusual spikes in deletion activity tied to Abdul's credentials. Datarwala deleted approximately 445 email communications between December 30, 2024 and January 21, 2025.

96.   These actions were committed knowingly and without authorization, and were not within the scope of Abdul's job responsibilities. In addition, following his termination in February 2025, Abdul wrongfully retained the laptops provided to him by Vyrian and has refused to return them despite multiple demands.

97.   Abdul's intent in accessing and manipulating the protected systems was to: conceal the ongoing fraudulent scheme being conducted through OT Solutions and affiliated vendor shell entities; obstruct internal investigations into payroll fraud, inflated commissions, and missing tax payments; anticipate and neutralize oversight actions by monitoring executive planning emails and HR correspondence; destroy evidence before discovery or termination; and prevent Vyrian from uncovering over $6.2 million in embezzlement and false invoicing. Such conduct was undertaken with intent to defraud and in furtherance of obtaining things of value not otherwise available to him.

98.   These acts were committed with fraudulent and malicious intent and were instrumental to the success and concealment of Defendant's fraudulent conduct.

99.   As a direct result of Abdul's unauthorized access, Vyrian suffered losses well in excess of

$5,000 during a one-year period, including: 1) forensic investigation costs, including Microsoft audit log recovery, spam filter rule tracking, and email server diagnostics; and 2) HR and IT response expenses associated with investigating mailbox infiltration and email deletion.

## **CAUSE OF ACTION NO. 4: FRAUD CONSPIRACY**

### **(Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai)**

100.   Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

101.   Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai combined, confederated and agreed to defraud Plaintiff Vyrian Inc., through the coordinated submission and processing of fraudulent invoices, misappropriation of payroll and operating funds, and concealment of their misconduct.

102.   Defendants Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai knowingly agreed and conspired to commit the fraudulent acts alleged herein, including but not limited to submitting fraudulent Excel spreadsheets and invoices to Plaintiff's management team in Houston, Texas as described in the factual allegations above and in Exhibits B and C.

103.   Defendants committed numerous overt and unlawful acts in furtherance of their joint scheme to defraud Vyrian through submission and approval of fraudulent invoices by overstating payroll, bonuses, taxes, and leases (Exhibit B); and electronic surveillance and deletion of internal emails by Abdul to monitor Vyrian executives and preempt discovery.

104.   For example, in January 2025, Abdul Datarwala emailed Vyrian's CFO, Tony Sivasothy, and CEO, Sath Sivasothy, directing that five separate fraudulent invoices be paid to the following entities:

| Date | Payee | Amount (USD) | Receiving Bank |
|------|-------|--------------|----------------|
| January 2, 2025 | OT Solutions | $52,908.00 | IDFC First Bank – India |
| January 6, 2025 | Webwise | $15,600.00 | IDFC First Bank – India |
| January 6, 2025 | Modern | $20,610.00 | IDFC First Bank – India |
| January 8, 2025 | Infotech | $17,070.00 | Citibank N.A. |
| January 8, 2025 | Nextech | $13,420.00 | AU Small Finance Bank Ltd. |

*Table 5- January 2025 Wire Transfers to OT Solutions and Affiliated Shell Vendors*

105.    On each of these payment requests, Abdul copied Husain Datarwala. The invoices—totaling $119,608.00—were approved by Abdul and paid by Vyrian the same day they were requested.

106.    In February 2025, Husain Datarwala submitted similar fraudulent  payment requests to Tony and Sath Sivasothy, for the following entities:

| Date | Payee | Amount (USD) | Receiving Bank |
|------|-------|--------------|----------------|
| February 3, 2025 | OT Solutions | $48,960.00 | IDFC First Bank – India |
| February 4, 2025 | Webwise | $16,321.00 | IDFC First Bank – India |
| February 4, 2025 | Modern | $21,115.00 | IDFC First Bank – India |
| February 6, 2025 | Nextech | $20,455.00 | Citibank N.A. |
| February 6, 2025 | Infotech | $14,688.00 | Citibank N.A. |

*Table 6- February 2025 Wire Transfers to OT Solutions and Affiliated Shell Vendors*

107.    On each of these payment requests, Husain copied Abdul Datarwala. The invoices—totaling $121,539.00—were likewise approved by Abdul and processed by Vyrian on the same day they were submitted.

108.    These invoices were fraudulent in that they sought payment for inflated or fictitious expenses, and the payment routing through multiple alter-ego entities concealed the true nature and destination of the funds.

109.    As an example, in January and February 2025, the Datarwala Brothers submitted invoices to Vyrian for the 11 employees listed below, representing gross monthly salaries far higher than the amounts those employees actually received. For example, Ujjwal Mourya was invoiced at

$2,650.00 per month while his February 2025 paystub shows he received only $1,148.24—an undisclosed difference of $1,501.76 (43%). This same misrepresentation occurred for each employee in the sample:

| | Employee ID | Invoiced Salary (USD) | Datarwala Brothers Paid | Wage Theft USD | Delta |
|---|---|---|---|---|---|
| **Wage Theft Based on 11 Representative Business Unit Employees** | | | | | |
| Ujjwal Mourya | SE-12 | 2,650.00 | 1,148.24 | 1,501.76 | 43% |
| Dhananjay Godse | SE-09 | 1,900.00 | 654.50 | 1,245.50 | 34% |
| Shubham Prajapathi | SE-64 | 1,850.00 | 516.71 | 1,333.29 | 28% |
| Shashank Tripathi | SE-08 | 2,050.00 | 688.94 | 1,361.06 | 34% |
| Vikas Mani | CS-02 | 2,400.00 | 1,090.83 | 1,309.17 | 45% |
| Aditya Vardhan | CS-07 | 1,900.00 | 631.53 | 1,268.47 | 33% |
| Abhijeet Singh | PE-01 | 2,350.00 | 723.39 | 1,626.61 | 31% |
| Akshay Majalikar | PE-03 | 2,250.00 | 930.07 | 1,319.93 | 41% |
| Heena Rani | AF-02 | 2,750.00 | 735.35 | 2,014.65 | 27% |
| Rohan Goyal | AF-03 | 2,700.00 | 1,010.45 | 1,689.55 | 37% |
| Naveen Sharma | DM-03 | 4,850.00 | 1,664.94 | 3,185.06 | 34% |

*Representative Wage Theft Chart (Table 1)- (Repeated for reference)*

110.    The invoiced amounts for January and February 2025 reflect the same inflated rates the Datarwalas had been billing since the start of these employees' tenure, despite knowing the actual salaries paid were significantly lower. This scheme—knowingly misrepresenting compensation rates to inflate invoices and pocket the difference—was applied not only to these 11 employees but across dozens of India Business Unit employees over multiple years.[9]

111.    Amatullah Alibhai, while employed by Vyrian and maintaining privileged access to internal project management systems, knowingly participated in the family enterprise and benefitted from fraud-derived assets. From October 2021 to May 2022, Vyrian engaged two outside staffing vendors to reduce labor concentration risk and keep labor pricing competitive. During this same

---

[9] See Exhibit D (sample of 11 employee paystubs and offer letters reflecting actual pay).

period, Vyrian continued to use OT Solutions as an employer-of-record to manage India staffing. At the same time, OT Solutions aggressively ramped its own hiring operations and created a direct conflict of interest with outside vendors. Amatullah's actions—coordinating with her husband, restricting vendor hiring, and consolidating OT Solutions' control—ensured that the family enterpise captured the full benefit of Vyrian's international staffing operations.

112.    In February 2022, Vyrian appointed Amatullah Alibhai, an MBA student, to oversee business process outsourcing ("BPO") management.[10]  In this capacity, she managed two vendors, Konecta Mexico ("Konecta") and Sirius via ArenaCX ("Arena") a management company. Amatullah coordinated vendor communications with her husband, Abdul Datarwala. However, rather than acting in Vyrian's best interests, Amatullah's true objective was to protect the family's criminal enterprise by  undermining Mexican and Philippine staffing options and consolidating control over Vyrian's staffing operations in India to maximize headcount for the Defendants' fraudulent billing scheme.

113.    Amatullah deliberately sabotaged the outside vendors through a coordinated campaign of obstruction. Emails went unanswered, meetings were not scheduled, and candidate submissions were ignored.[11] Amatullah's interference extended beyond mere non-responsiveness to actively throttling of competitive hiring. She deliberately limited BPO placements to only 2-3 candidates at a time,  artificially constraining their growth potential while simultaneously ensuring the Enterprise could aggressively ramp up its hiring.

114.    This coordinated approach ensured that competitive Mexican and Philippine staffing agencies could never achieve sufficient scale to threaten the Enterprise's dominance. These actions were not inadvertent oversights but calculated measures to remove competitive pressure. OT

---

[10] Exhibit F at 1 (Amatullah Alibhai's appointment as BPO project manager).
[11] Exhibit F at 9 (WhatsApp Message from Saul Berumen Salazar at Konecta Mexico).

Solutions employees, under Abdul's direction, interviewed and trained the Konecta and Sirius personnel, while Amatullah deliberately ensured those vendors received no cooperation, support or feedback. Rather than advocating for Vyrian's diversified sourcing strategy, she actively undermined it to benefit the family enterprise.

115.    Konecta requested meetings with Amatullah on February 11, 2022[12]   and February 14, 2022[13] after she assumed the manager role, but she made herself systematically unavailable.[14] After weeks with no response, Konecta privately escalated concerns directly to Vyrian's CEO on February 28, 2022, noting the "lack of communication with Amatullah and Abdul" and that qualified candidates were being rejected or ignored.[15] Konecta also expressed concern that Abdul and Amatullah were keeping the CEO out of communications.[16] When the CEO intervened and shared the feedback with Abdul, his response was dismissive: "Yeah I think they are not right fit anymore. I think we need to close off with them."[17] Despite being copied on all communications with vendors she was hired to manage, Amatullah remained deliberately silent throughout these email exchanges. This knowing silence enabled Abdul to cancel both BPO agreements she managed unopposed, and facilitated the criminal enterprise's capture of Vyrian's entire international staffing operation.

116.    When Sirius Philippines attempted to copy Vyrian's CEO on escalations, Abdul removed the CEO from communications.[18] This gave Amatullah continued cover and power to obstruct while maintaining plausible deniability. By systematically blocking vendor access and withholding support, Amatullah ensured OT Solutions captured all of Vyrian's overseas headcount. Her

---

[12] *Id.* at 2.
[13] *Id.* at 3.
[14] *Id.* at 9.
[15] *Id.*
[16] *Id.*
[17] *Id.* at 10-19.
[18] *Id.* at 20-23.

cooperation was essential to the Enterprise's success.

117.    Amatullah's direct involvement in the enterprise is further demonstrated by her active monitoring of vendor performance while she simultaneously undermined them. In a March 28, 2022 internal email analyzing February 2022 performance, Amatullah documented that Konecta's three engineers generated $21,739 in profit and $63,690 in sales, with one engineer (Emilio) alone accounting for $13,000 in profit.[19] Her analysis acknowledged that while the numbers might appear low, this was only because Konecta "had started not too long back" and showed "a gradual increase." This email demonstrates that Amatullah personally knew the BPO vendors were performing well and generating legitimate results for Vyrian based on her own analysis.

118.    Then, just three minutes after sending her detailed financial analysis about Konecta's profitable performance, legitimate contributions, and growth trajectory, Abdul notified the CEO that he was cancelling the Konecta contract.[20] Amatullah replied seconds later with: "Sounds good!" This enthusiastic approval of the cancellation without question or pause, sent just moments after documenting the vendor's success, demonstrated her complete indifference and disregard for her duty to ensure that Vyrian maintained a geographically diverse workforce.

119.    Unbeknownst to Vyrian, Abdul had already begun dismantling the Konecta relationship by March 15, 2022,[21] while Amatullah maintained her facade of vendor management.

120.    The impact of Amatullah's enterprise activity became immediately apparent after May 2022, when all outside staffing vendors under her watch were eliminated.[22] With no competitive alternatives remaining, hiring through OT Solutions exploded from 49 to 96 employees and fraudulent invoicing potential skyrocketed from $169,250 at the start of her management to

---

[19] *Id.* at 24-27 (Amatullah Alibhai on Konecta's Performance).
[20] *Id.*
[21] *Id.* at 28-31 (Abdul Datarwala cancels Konecta Mexico).
[22] *Id.* at 32 (Abdul Datarwaka cancels Sirius Philippines).

$318,263 by the end of her tenure.[23]

121.    This dramatic expansion demonstrated the true scope of demand that had been artificially channeled away from legitimate competitors. Her own detailed financial analysis proved the vendors were profitable and improving, yet she chose to cancel them to corner the market for the family enterprise. Without her deliberate obstruction from within Vyrian's management structure, Abdul and Husain could not have captured this massive increase in fraudulent billing.

122.    Finally, on December 2, 2022, during the height of the invoicing and payroll overbilling scheme she helped launch by undermining other staffing options, Amatullah acquired real property located at 3534 Lake Landing Lane, Missouri City, Texas 77459. She has since listed that property for sale on or about June 25, 2025, further evidencing her intent to convert and profit from the scheme's unlawful gains.

123.    These acts by Defendants are not isolated. They reflect a sustained, coordinated course of conduct undertaken by individuals who shared common knowledge, intent, and benefit.

124.    As a direct and proximate result of the conspiracy, Plaintiff has suffered:

a)  over $6.2 million in quantifiable losses arising from fraudulent invoices, ghost payroll, and fictitious commissions;

b)  operational harm from disrupted vendor relationships, failed compliance audits, and reputational injury;

c)  additional damages in the form of forensic audit costs, outside counsel fees, and remediation of Indian operations; and

d)  delay in discovery and restitution caused by the Defendants' unified efforts to conceal the truth.

---

[23] See Tables 3 and 4.

125.    Each Defendant is jointly and severally liable for all damages resulting from the conspiracy and the torts committed in furtherance of it, including fraud, conversion, embezzlement, and breach of fiduciary duty.

126.    The conspiracy was executed with knowledge of its unlawfulness and intent to harm. Each Defendant acted willfully, maliciously, and in conscious disregard of Vyrian's rights and internal controls.

127.    Accordingly, Vyrian seeks exemplary damages to deter such coordinated corporate misconduct and punish the deliberate abuse of trust and position.

## CAUSE OF ACTION NO. 5: FRAUD

### (Abdul Datarwala and Husain Datarwala)

128.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

129.    From October 2020 through February 2025, Abdul Datarwala and Husain Datarwala repeatedly made and caused to be made material misrepresentations to Vyrian's management in Houston to induce Vyrian to remit monthly wire transfers described in detail in Count 4.

130.    Specifically, Abdul submitted—via email to Vyrian's executives and in monthly Zoom invoice review calls—fraudulent Excel spreadsheets and PDF invoices reflecting inflated costs for Vyrian's Indian operations.[24, 25]

131.    These spreadsheets contained numerous false statements, including inflated salaries for at least the following eleven employees: Ujjawal Mourjja, Dhananjay Godse, Shubham Prajapathi, Shashank Tripathi, Vikas Mani, Aditya Vardhan, Abhijeet Singh, Akshay Majalikar, Rohan Goyal,

---

[24] *See* Exhibit B (Emails with dates from 2020-25 from Abdul and Husain requesting payment)
[25] Exhibit C (Excel files from 2020-25 showing employee wages and expenses that Datarwala Brothers fraudulently invoiced to Vyrian).

Naveen Sharma, and Heena Rani, as well as fabricated commissions, inflated lease charges, and fictitious tax liabilities.

132.    By way of example, from December 2023 to January 2025, Abdul approved spreadsheets listing employee "DM-03" at a salary of $4,850 per month. Bank records show the employee received no more than $1,700 per month despite Abdul claiming during a Zoom call with Vyrian's CEO to have personally negotiated with "DM-03" to set his initial part-time salary at $2,200 and full-time at "just over $4,000."

133.    Other specific misrepresentations by Abdul included:

a)  Falsely representing that salary amounts on invoices reflected actual amounts paid to staff in India, when employees were receiving as little as 25–35% of the invoiced amount.[26]

b)  Misstating the duration and financial obligation of severance/notice periods— e.g., in February 2025 demanding $12,000 for "SE-113" based on a three-month notice period at $4,000/month, when the employee's contract called for only two months at $2,350/month.

c)  Including fabricated line items for commissions and bonuses—totaling over $277,000 between 2021–2025—that employees never received.

d)  Adding "Provident Fund" and other statutory tax charges without ever remitting them to Indian authorities.

e)  Representing that OT Solutions and affiliates (Webwise, Nextech, Infotech Innovations, Modern Technology) were necessary intermediaries to pay staff, when in reality they were alter ego shell entities used to route funds for personal

---

[26] Exhibit D (Sample of 11 employee paystubs and offer letters for what they were actually paid).

gain.

134.    Each misrepresentation was material and false, made knowingly or with reckless disregard for the truth, and intended to induce Vyrian to approve and remit monthly payments totaling over $9.5 million.

135.    As a direct and proximate result, Vyrian was fraudulently induced to remit millions of dollars to shell entities under Abdul's control and suffered damages estimated at $6.2 million.

136.    Husain Datarwala directly participated in the preparation and execution of the fraud. He managed payroll and operational execution in India, co-prepared the monthly expense spreadsheets, and coordinated with Abdul in crafting and submitting false invoices.[27, 28]

137.    Vyrian reasonably relied on the Abdul's and Husain's express and implied representations in authorizing millions of dollars in wire transfers and maintaining the business structure of its India Business Unit. That reliance was induced by false assurances of accuracy, completeness, and compliance, and by the Datarwala brothers deliberate efforts to obscure the fraud through document manipulation, access restriction, and electronic email surveillance of executives.

138.    As a direct result of the Defendants' fraudulent conduct, Vyrian has suffered: over $6.2 million in documented financial losses; substantial investigative, forensic, and legal expenses; loss of operational stability due to layoffs and inability to support infrastructure expansion; and ongoing damages stemming from lost employee trust, internal disruption, and reputational harm.

139.    The conduct of Abdul and Husain, individually and together, was intentional, malicious, and undertaken with willful disregard for Plaintiff's rights. Plaintiff therefore seeks punitive and exemplary damages to punish and deter such egregious misconduct.

---

[27] See Exhibit B (Emails with dates from 2020-25 from Abdul and Husain requesting payment)
[28] Exhibit C (Excel files from 2020-25 showing employee wages and expenses that Datarwala Brothers fraudulently invoiced to Vyrian).

## CAUSE OF ACTION NO. 6: BREACH OF FIDUCIARY DUTY

### (Against Defendants Abdul Datarwala and Husain Datarwala)

140. Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this First Amended Complaint as though fully set forth herein. This is an action for breach of fiduciary duty under Texas common law.

141. Abdul and Husain owed Plaintiff Vyrian Inc. fiduciary duties arising either by law, contract, or the nature of their employment and agency roles.

142. **Abdul Datarwala** served as Vyrian's Vice President of Global Trading from 2021 through 2025. In this executive capacity, he had direct authority over Vyrian's India Business Unit and exclusive administrative rights over OT Solutions, the administrative Employer of Record ("EOR"), which is a non-commercial entity established to support Vyrian's operations in India. His control included banking, payroll, vendor relationships, invoice submission, and financial reconciliation.

143. Abdul's fiduciary status, which exists under law, is further recognized pursuant to the October 3, 2022 MOU that he assisted to prepare and was executed between Vyrian and OT Solutions. Abdul was named as Vyrian's Vice President of Operations/Global Trade and charged with: establishing, supervising, and auditing all India Business Unit and Administrative Employer of Record operations, finances, systems, and personnel; assuming and maintaining exclusive global administrative rights and control over Vyrian's operational infrastructure; reviewing all invoices for accuracy and substantiating and conducting appropriate scrutiny prior to submitting them for final payment to Vyrian's finance team; and ensuring compliance with contract, regulatory, and quality assurance obligations.

47

144.  **Husain Datarwala** was appointed as the Key Manager of OT Solutions in the same MOU, and served as an on-the-ground proxy and administrative agent. His responsibilities included payroll, office management, lease coordination, vendor relations, and invoice generation, all "subject to the review and approval of the Principal's Vice President." The MOU further stated that all managers act in the best interest of the Principal and must avoid any personal gain or independent commercial use of Vyrian resources.[29]

145.  As managerial representatives of Vyrian, Abdul and Husain owed ongoing fiduciary duties of loyalty, care, candor, and full disclosure. These duties included the following obligations 1) to disclose material facts regarding the true nature, purpose, and recipients of payments made from Plaintiff's accounts; 2) to not engage in self-dealing by directing, authorizing, or benefiting from transactions in which they had a personal financial interest, without disclosing such interest to Plaintiff or obtaining Plaintiff's informed consent; 3) to refrain from misappropriating corporate resources, 4) disclose conflicts of interest, and 5) to act solely in the company's best interests.

### A.  Breach of Fiduciary Duties

146.  Each Defendant breached their fiduciary duties through knowing misconduct, concealment, and personal enrichment:

147.  **Abdul Datarwala:** Approved and submitted monthly invoices containing knowingly inflated salaries, fictitious commissions, and unsubstantiated tax charges; utilized alter ego shell entities—including Webwise Solutions, Nextech, and Infotech Innovations—to divert funds while disguising vendor affiliations; illegally monitored internal executive communications by re-routing outgoing emails to his personal folders and unlawfully accessing the mailboxes of Vyrian's CEO, CFO, and HR manager; deleted hundreds of emails and records in January 2025,

---

[29] MOU § 2.1.2, at 3.

immediately before his termination, in an apparent effort to conceal fraud; refused to cooperate in internal audits, despite his express contractual obligation under the MOU to "review, substantiate, and retain copies of all invoices and documentation."

148. **Husain Datarwala:** Co-prepared and submitted falsified and inflated invoices; participated in structuring severance schemes based on misrepresented employment terms; administered payroll with knowledge that employees were receiving far less than what was invoiced—often only 25% to 35% of billed amounts; engaged in improper use of Vyrian's corporate credit card for luxury personal expenditures while traveling in the United States; and accepted and routed company funds into accounts tied to shell entities he managed, in violation of his contractual limitations and fiduciary status as an administrative proxy.

### B. Proximate Cause and Injury

149. The Defendants' breaches of duty were a direct and proximate cause of substantial injury to Plaintiff, including: 1) over $6.2 million in diverted funds through fictitious payroll, commissions, lease overcharges, and inflated invoices; 2) loss of substantial business equipment utilized by the India Business Unit, including computers and associated computer data; 3) destruction of audit and compliance integrity under AS9120 and AS6081 standards; 4) loss of business continuity, trained human capital resources, and reputational harm in the aerospace and defense supply chain sector; and 5) substantial costs associated with forensic accounting, remediation, and litigation.

150. **Exemplary Damages**: Defendants' breaches of fiduciary duty were willful, intentional, and involved self-dealing. Accordingly, Plaintiff seeks exemplary damages for this conduct.

151. **Equitable Remedies**: In addition to compensatory damages, Plaintiff seeks disgorgement of all profits and benefits wrongfully obtained by Defendants through their breaches of fiduciary

duty, as Defendants should not be permitted to retain any benefit from their wrongful conduct.

152.    Plaintiff also seeks forfeiture of all compensation, benefits, and profits that Vyrian paid to Defendants during the period of their breaches of fiduciary duty, as disloyal fiduciaries are not entitled to retain compensation earned while violating their obligations to their principal.

## CAUSE OF ACTION NO. 7: BREACH OF CONTRACT

### (Against Defendant OT Solutions)

153.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as though fully set forth herein. In 2020, Vyrian directed Husain Datarwala to incorporate OT Solutions in India as a captive staffing entity, with 'pass-through' billing (i.e., charging Vyrian only the actual amounts paid) for all costs, including employee salaries, with no markup. OT Solutions was registered using Husain and his mother, Napheesa Datarwala, as Indian-resident nominees—per Abdul and Husain's representation that two Indian nationals were required under Indian law.

154.    On March 13, 2020, one week before OT Solutions' formal incorporation in India, Abdul Datarwala provided Husain's banking details to Vyrian's CEO and CFO to commence operations. Vyrian began funding the entity immediately.

155.    In 2022, Vyrian formalized this arrangement and documented its existing operational practices through a written Memorandum of Understanding that established clear contractual obligations, which included prohibiting OT Solutions from marking up any invoices. On October 3, 2022, Vyrian Inc., OT Solutions executed a written Memorandum of Understanding ("MOU") signed by Sath Sivasothy as CEO of Vyrian and by Husain Datarwala as Key Manager of OT Solutions.[30]

---

[30] See Exhibit A.

156.    The MOU constitutes a valid and enforceable contract supported by Vyrian's continued funding of the India Business Unit, provision of equipment and resources, and ongoing business relationship with OT Solutions.

157.    Under the MOU, OT Solutions accepted specific contractual obligations, including: (1) **Pass-Through Billing** (§ 7.6.2): billing only "direct pass-through costs" with "no markups, margins, modification, or additional charges"; (2) **Audit Cooperation** (§§ 5.10-5.15): providing "full access" to records and "cooperat[ing] fully" with audits; (3) **Good Faith Performance** (§ 3.3): operating "in good faith" and "in the best interest of the Principal"; (4) **Equipment Return** (§ 9.3.1): returning all company assets upon termination; and (5) **Exclusivity** (§ 9.3.2): refraining from using "OT Solutions" for other clients.

158.    The MOU contains express Texas choice of law and jurisdiction provisions (§§ 15.0, 16.0).

### A. Vyrian's Performance and OT Solutions' Material Breaches

159.    Vyrian performed by providing over $9.5 million in funding, equipment, and infrastructure to Husain Datarwala and OT Solutions and by maintaining the business relationship as specified in the MOU.

160.    Instead of fulfilling its contractual obligations, OT Solutions was used as a tool to defraud Vyrian through systematic breaches of the MOU. OT Solutions materially breached by: (1) submitting invoices with inflated salaries, fictitious commissions, and fabricated charges, violating the pass-through billing requirements; (2) refusing to provide payroll records, tax receipts, and other documentation during Vyrian's 2024-2025 audits; (3) using OT Solutions and shell entities for personal enrichment, violating good faith and exclusivity obligations; and (4) failing to return company equipment and assets after termination.

### B. Damages and Contractual Remedies

161.    As a direct result of Husain's breaches, Vyrian suffered over $6.2 million in fraudulent overpayments, loss of equipment and records, investigation costs, and operational disruption.

162.    The MOU provides for liquidated damages for willful breach (§ 5.17.2), equipment recovery damages including attorneys' fees (§ 9.3.1), and other contractual remedies. Due to Husain's continued refusal to return property or cooperate with audits, Vyrian seeks specific performance and injunctive relief.

163.    To prosecute this breach of contract claim, Vyrian was required to retain counsel and, upon prevailing in this case, should be awarded its reasonable and necessary attorneys' fees as provided by Chapter 38 of the Texas Civil Practice and Remedies Code.

### CAUSE OF ACTION NO. 8: TORTIOUS INTERFERENCE WITH CONTRACT (MOU) (Against Defendant Abdul Tayyeb Datarwala)

164.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein, including the allegations describing the Memorandum of Understanding ("MOU") between Vyrian and OT Solutions, executed October 3, 2022, which governs the India Business Unit's pass-through billing, audit/records duties, exclusivity/no personal gain, and managerial roles.

### A. Existence of a Valid Contract and Abdul's Knowledge

165.    Abdul participated in management meetings where the planning and development of the MOU occurred. He contributed to discussions defining his oversight responsibilities, aligning the control requirements tied to that role, and identifying the technology checks and controls that would govern implementation.

166.    Abdul accessed the MOU from the company's shared drive and coordinated execution of

the agreement in India. He obtained the final signature from his brother, Husain Datarwala, and returned the fully-executed physical copy to Vyrian.

167.    Vyrian and OT Solutions (through Husain as "Key Manager") entered into the written MOU. In the agreement and through his day-to-day conduct, Abdul held himself out as Vyrian's Vice President with authority "to establish, supervise, and audit" the Unit (§ 3.1.1.1(b)), participated in the MOU's planning and execution, and had actual knowledge of its material terms, including: (a) pass-through/no-markup invoicing; (b) payroll/tax substantiation, record retention, and audit cooperation; (c) exclusive use for Vyrian and prohibition on independent or personal commercial gain; and (d) return of property and records upon termination.

### B.  Willful and Intentional Interference

168.    Acting primarily for his own benefit and not to serve Vyrian, Abdul intentionally interfered with OT Solutions' MOU obligations through an escalating pattern of deception and obstruction that made OT Solutions' performance impracticable or impossible. Abdul directed and orchestrated conduct that violated core MOU requirements, including without limitation:

a)  **Pass-through billing/no markup & verification.** Abdul assisted in the violation of MOU § 2.1.2 No Independent Commercial Interests and §5.2 (iv) (c-e) Compliance with Labor Standards, by engineering a recurring fraudulent invoicing scheme that caused OT Solutions to submit charges to Vyrian for reimbursement that the MOU did not permit. For example, Abdul submitted monthly invoices and approved monthly spreadsheets from 2020 through February 2025 that overstated employee base salaries (often by more than sixty percent) and lease costs. Abdul approved phantom "sales commissions" and "bonuses" never paid to employees along with fabricated statutory "tax" line

53

items. Abdul also directed that portions of these inflated charges be routed through nominal "third-party" vendors he controlled in an effort to obscure OT Solutions' actual costs and evade the substantiation controls that Vyrian and the MOU required.

b) **Audit, records, and cooperation.** Abdul assisted in the violation of MOU § 5.10 Right to Audit,  §5.11 Access to Records and Facilities, and §5.15 Audit Cooperation by using his position to block actual review and substantiation of OT Solutions' practices and charges. Abdul's obstruction included multiple coordinated acts:

  i. **Direct refusal to produce documentation:** Abdul refused to produce oversight records of any kind for OT Solutions and told management that such documentation "did not exist." He failed to provide access to electronic data and other materials that were required to perfom audits.

  ii. **Systematic information control:** During his tenure, Abdul redirected and siloed information from OT Solutions staff and instructed staff to route inquiries only through him.

  iii. **Active concealment.** Abdul mass-deleted emails and obscured documentation trails needed to reconcile invoices and expenses. He reconfigured Microsoft Exchange routing to secretly surveil executive emails and preempt scrutiny and also infiltrated executive mailboxes.

These deliberate acts frustrated Vyrian's audit and access rights under the MOU and OT's corollary duty to cooperate, substantiate, retain, and produce records, making compliant performance impracticable.

c) **Willful service stoppage (willful breach).** Abdul assisted, and on information and belief, orchestrated a deliberate shutdown of OT Solutions in violation of MOU §5.17 Willful Breach. On or about February 19, 2025, while Husain was on business in the United States staying with Abdul and Amatullah, OT Solutions ceased operations for approximately twenty-four hours after Vyrian refused to pay a fraudulent $12,000 "notice period" demand for employee (SE-133) and a $300,000 advance for OT Solutions' future operations. Abdul and Husain instructed all OT Solutions personnel to stop work immediately, and no one at Vyrian could reach any OT Solutions employees during the stoppage. Only after sustained pressure from Vyrian's upper management did Abdul instruct Husain and OT Solutions personnel to resume services. Acting only in his self interest, Abdul intentionally aided and induced OT Solutions' "deliberate refusal, intentional neglect, or bad faith withholding of services" within the meaning of MOU §5.17.1. This orchestrated shutdown disrupted Vyrian's operations, obstructed audit and oversight already underway, and directly resulted in damages.

169.   Abdul's interference was willful and undertaken without legal justification or excuse, and for his own private benefit.

170.   Abdul's tortious acts caused OT Solutions to breach, and/or rendered impracticable OT Solutions' performance of, multiple core obligations under the MOU.

a) **Exclusivity, ownership, and no personal gain obligations.** Abdul breached the MOU's core exclusivity requirements through deliberate financial manipulation that diverted resources from Vyrian to his private benefit. The

MOU establishes that Vyrian owns and controls the India Business Unit, which must operate solely for Vyrian's benefit as an entity "wholly owned and controlled by [Vyrian]" and "solely financed by [Vyrian] to ensure exclusivity." (MOU Recital 6; § 2.1.2). The agreement expressly prohibits "leveraging the India Business Unit or any Principal resources for independent commercial interests, activities, or personal gain." However, despite these clear restrictions, Abdul systematically routed payments through alter ego entities to obscure fund transfers and pursue his private commercial interests. This conduct directly contradicted the exclusivity requirements and rendered OT Solutions unable to fulfill its obligation to operate solely for Vyrian's benefit. Abdul's actions further violated his duties under the management structure by disregarding the vice presidential oversight requirements and key manager subordination protocols established in sections 3.1.1.1(b) and 3.1.2.1(b-c).

b) **Pass-through billing and verification duties.** Abdul systematically abused OT Solutions' billing process by approving fraudulent invoces that violated the MOU's strict pass-through cost requirements. Under § 7.6.2, OT Solutions must invoice only "direct pass-through costs" with no "markups, margins, modification, or additional charges." However, Abdul breached this obligation through multiple deceptive practices. He approved invoices that overstated base salaries and lease costs, fabricated commissions and bonuses, and inserted unsubstantiated tax charges. To further conceal these violations, Abdul routed charges through nominal "third party" shell entities to disguise true costs and to evade verification. These actions prevented OT Solutions from fulfilling its

fundamental duty to provide transparent, unmodified pass-through billing and undermined the verification controls that the MOU incorporates throughout its financial oversight provisions.

c) **Audit, access, and records cooperation requirements.** Abdul orchestrated a comprehensive obstruction scheme that prevented OT Solutions from fulfilling its audit cooperation duties and rendered Vyrian's oversight rights meaningless. The MOU establishes two interconnected obligations: Abdul must "establish, supervise, and audit all … operations, finances, systems, and personnel," including reviewing invoices for accuracy and substantiation. (§ 3.1.1.1(b))., while OT Solutions musts provide "full access" and "cooperate fully" with Vyrian's audits. (§§ 5.10–5.15). However, Abdul systematically violated both duties through deliberate concealment and obstruction. When Vyrian requested essential documentation, Abdul and Husain refused to produce payroll records, tax documentation, lease agreements, and expense substantiation. Abdul compounded this obstruction by fragmenting communication channels to avoid detection. He conducted OT Solutions' business through WhatsApp and other private platforms while using his administrator access to Vyrian and OT Solution's email systems to hide official communications from company oversight. His withholding of Microsoft tenant credentials at termination completed this pattern of obstruction. Abdul's coordinated actions prevented OT Solutions from meeting its cooperation obligations under §§ 5.10 through 5.15 and §5.6, while simultaneously blocking Vyrian's data recovery rights under §§ 6.2 through 6.8.

d) **Service-continuity obligations.** Abdul deliberately sabotaged OT Solutions' ability to maintain continuous service to Vyrian through coordinated acts of bad faith obstruction. Working with Husain, Abdul orchestrated the operational shutdown described above and willfully withheld essential services from Vyrian, constituting a deliberate breach under § 5.17. This service disruption was compounded by Abdul's continued violation of the MOU's termination requirements. Under MOU sections 6.2 through 6.8, OT Solutions must return all company equipment and data upon termination of the agreement. Despite the passage of time since termination, neither Abdul, Husain, nor OT Solutions has returned any of Vyrian's computer equipment or peripherals. This ongoing retention of company property represents a continuing breach that prevents proper transition and denies Vyrian access to its own business assets and data.

e) **Good-faith / best-interest obligations.** Abdul's conduct represents a comprehensive breach of the foundational duty that governs all aspects of the MOU relationship. Section 3.3 requires that "all management and supervisory personnel shall operate in good faith and with due diligence" and "at all times act in the best interest of the Principal." However, rather than serving Vyrian's interests, Abdul systematically prioritized his personal financial gain through the fraudulent billing schemes, obstruction tactics, and service disruptions detailed above. Each of these violations demonstrates Abdul's fundamental disregard for his fiduciary obligations to Vyrian and his deliberate choice to subordinate Vyrian's interests to his own private commercial purposes. This pervasive bad faith conduct rendered OT Solutions unable to fulfill its own

obligation to operate in Vyrian's best interest. Consequently, Abdul's actions directly contradicted the cooperative relationship the MOU was designed to establish.

### C.  Proximate Cause

171.    Abdul's intentional interference proximately caused OT Solutions' breaches of the MOU by systematically undermining the company's ability to fulfill its contractual obligations. Through his control over OT Solutions' operations, technology, and financial systems, Abdul directly caused the company's failures to:

a)  operate exclusively for Vyrian's benefit, as he diverted resources through alter ego entities for personal gain;

b)  adhere to pass-through billing requirements, as he approved fraudulent invoices containing inflated costs and phantom charges;

c)  maintain and produce required documentation, as he concealed records and fragmented communication channels;

d)  cooperate with Vyrian's audit and oversight functions, as he refused to provide substantiation and withheld access credentials;

e)  maintain continuous service, as he orchestrated an operational shutdown in bad faith; and

f)  return company property and data, as he continues to retain Vyrian's equipment and systems beyond termination.

172.    Abdul's conduct directly caused these breaches, and it rendered OT Solutions' performance of these obligations impracticable by destroying the transparency, trust, and operational integrity that the MOU required.

### D. Damages

173.    As a direct and proximate result of Abdul's intentional interference and fraudulent conduct, Vyrian suffered substantial damages, including but not limited to:

    a)  multi-year overpayments on inflated and fictitious invoices;

    b)  unreimbursed amounts for fabricated tax charges and commissions that were billed to Vyrian but never actually paid to tax authorities or employees;

    c)  investigative, forensic accounting, and operational remediation costs necessitated by Abdul's systematic concealment and obstruction;

    d)  loss of company equipment and data, operational disruption from the coordinated service shutdown, and costs associated with business continuity measures; and

    e)  consequential damages flowing from the breaches and tortious interference, and punitive damages to the extent permitted by law.

### E. Malice/Exemplary Damages

174.    Vyrian seeks exemplary damages based on Abdul's willful, malicious conduct which was perpetrated with a conscious indifference to Vyrian's contractual rights. Abdul's malice is demonstrated through his systematic and escalating pattern of deceptive conduct that was designed to defraud Vyrian while concealing his wrongdoing.

175.    Abdul deliberately created alter ego shell companies to obscure financial transfers for his personal benefit, knowing that this violated the MOU's exclusivity requirements. He intentionally submitted and approved fraudulent invoices containing inflated costs and charges, fully aware these false billings would cause Vyrian substantial financial harm.

176.    When discovery of his scheme became likely, Abdul escalated his malicious conduct by

fragmenting communications, withholding credentials, refusing to produce required documentation, and orchestrating an operational shutdown to force Vyrian to make fraudulent advance payments before his scheme unraveled. This progression from initial deception to active sabotage demonstrates Abdul's conscious indifference to Vyrian's contractual rights and his willful determination to prioritize his personal enrichment over his fiduciary obligations.

177. The calculated nature of Abdul's concealment efforts, his use of family relationships, multiple deceptive strategies, and his continued obstruction even after termination, including never returning Vyrian provided laptops as requested with the termination in February 2025 and remain in his possession, establish the willful and malicious conduct necessary to support exemplary damages.

## CAUSE OF ACTION NO. 9: CONSTRUCTIVE TRUST AND EQUITABLE RELIEF

### (Against Defendants Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai)

178. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein. This is a claim for the imposition of a constructive trust and other equitable relief arising from Defendants' knowing retention of funds and assets rightfully belonging to Plaintiff.

179. Defendants Abdul Datarwala, Husain Datarwala, and Amatullah Alibhai, by virtue of their fiduciary positions and their knowing participation in the diversion of corporate funds, wrongfully obtained or benefitted from property belonging to Vyrian. Such property includes, without limitation, cash proceeds from inflated payroll billings, fictitious commissions, lease overcharges, and other misappropriated corporate funds, which were funneled to and through entities controlled by Abdul and Husain, including OT Solutions, the various shell entities, real estate purchase and their own bank accounts.

180. Vyrian can identify specific funds and assets derived from the fraud, including: funds paid

against falsified and overinflated invoices to OT Solutions and shell vendors (Webwise Solutions, Nextech, Infotech Innovations, etc.); assets and expenditures associated with lavish wedding events and overseas travel; and bank accounts and disbursements still unreconciled due to Defendants' obstruction.

181.    Equity requires that Defendants be declared constructive trustees of all such funds, assets purchased with such funds, and any traceable proceeds thereof, and that Defendants be compelled to transfer possession and title to Vyrian. Plaintiff further seeks all other equitable relief necessary to prevent unjust enrichment, ensure full disgorgement of wrongfully obtained property, and protect Plaintiff's rights, including but not limited to the imposition of a constructive trust, accounting, and injunctive relief to preserve and recover the trust property.

182.    Due to the nature of the misconduct — including deletion of records, destruction of emails, refusal to produce financial documents, and transfer of funds across jurisdictions — monetary relief alone would be inadequate. A constructive trust will enable Plaintiff to trace and recover property rightfully belonging to it, including funds still held by the Defendants or downstream recipients. Without the imposition of a constructive trust, Defendants may further conceal, dissipate, or transfer assets outside the reach of the Court.

183.    Defendants have currently listed the subject properties for sale where one property is currently under contract further demonstrating risk of irreparable harm. These properties were purchased during the time Defendants embezzled and fraudulently misappropriated funds from Plaintiff and are subject to equitable claims of ownership. Defendants have aquired the following real properties located in Fort Bend and Harris County, Texas:

> a) **3434 Harper Meadow Ln**, Missouri City, TX 77459, and is legally described as: Lot 1 Block 2, of Parks Edge Section 11, and addition in Ft. Bend County, Texas, according to the Map or Plat thereof recorded in Plat No. 20210010, Plat Records of Ft. Bend County, Texas.

b) **3534 Lake Landing Ln**, Missouri City, TX 77459, and is legally described as: Lot 49 Block 2, of Parks Edge Section 11, an Addition in Ft. Bend County, Texas, according to the Map or Plat thereof recorded in Plat No. 20210010, Plat Records of Ft. Bend County, Texas

c) **16415 Canyon Chase Dr**, Houston TX 77095 Lot Thirty-Four (34) in Block One (1) of STONE GATE Section One (1), AMENDING PLAT, a Subdivision in Harris County, Texas, according to The Map or Plat Thereof, Recorded at File Number T994155, Film Code 528322245 Volume 426080 of the map records of Harris County, Texas.

### JURY DEMAND

184.     Having paid the required fee, Plaintiff demands a trial by jury upon all issues raised in this First Amended Complaint.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vyrian Inc. respectfully requests that the Court enter judgment in its favor and against Defendants Abdul Tayyeb Datarwala, Husain Datarwala, and Amatullah Alibhai, jointly and severally, and grant the following relief:

A.     Compensatory Damages: An award of actual damages in an amount to be determined at trial.

B.     Restitution and Disgorgement: Full restitution of all funds wrongfully retained by Defendants, and disgorgement of unjust enrichment obtained directly or indirectly as a result of the fraudulent scheme and fiduciary breaches.

C.     Treble damages under 18 U.S.C. § 1964(c).

D.     Exemplary and Punitive Damages: An award of punitive damages in an amount sufficient to punish Defendants' willful, malicious, and fraudulent conduct, and to deter similar misconduct.

E.     Constructive Trust: The imposition of a constructive trust over: 1) any funds or assets traceable to the misappropriated proceeds; 2) bank accounts or financial instruments held in Defendants' names or controlled by them; and 3) any real or personal property acquired or funded,

directly or indirectly, with misappropriated funds, including but not limited to, 3434 Harper Meadow Ln and 3534 Lake Landing Ln in Fort Bend County, Texas, and any proceeds from their sale or refinancing.

F.    Attorneys' Fees and Costs: An award of Plaintiff's reasonable attorneys' fees and the costs of prosecuting this action.

G.    Pre- and Post-Judgment Interest: Pre-judgment and post-judgment interest at the maximum rate allowed by law from the date of injury until the date of final judgment and satisfaction.

H.    Such Other and Further Relief: Such other and further legal or equitable relief as the Court deems just, proper, and appropriate under the circumstances.

Dated: October 1, 2025                     Respectfully submitted,

                                           By: */s/ Federico Reynal*

                                           Federico Reynal
                                           State Bar No. 24060482
                                           The Reynal Law Firm, P.C.
                                           917 Franklin St. Fl. 6
                                           Houston, TX 77002
                                           Phone: 713-410-6217
                                           areynal@frlaw.com

                                           Manoj S. Gandhi
                                           State Bar No. 24055518
                                           Allison Beckham
                                           State Bar No. 24050271
                                           Josh Clayton
                                           State Bar No. 24050426
                                           CLAYTON, MCKAY & BAILEY, PC
                                           1919 Decatur Street
                                           Houston, TX 77007
                                           Phone: (832) 782-4964
                                           manoj@cmblaw.com
                                           allison@cmblaw.com
                                           josh@cmblaw.com

                                           **ATTORNEYS FOR PLAINTIFF
                                           VYRIAN INC.**